

1  Daniel D. Harshman (SBN# 177139)
   Charles Wheeler
2  COZEN O'CONNOR
   425 California Street, Suite 2400
3  San Francisco, CA 94104
   Telephone: (415) 617-6100
4  Facsimile: (415) 617-6101
   E-mail: dharshman@cozen.com
5

6  Attorneys for Plaintiff          **E-filing**
   PSI CORPORATION
7

8               **IN THE UNITED STATES DISTRICT COURT**
9

10              **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

                                                              **EDL**
11
   PSI CORPORATION, f/k/a/ FRIENDLYWAY    Case No.:
12 CORPORATION, f/k/a BIOFARM, INC.       **C 07   2869**
13             Plaintiffs,               **COMPLAINT**
14        vs.
                                         **JURY TRIAL DEMANDED**
15 ALEXANDER VON WELCZEK, HENRY LO,
   MICHAEL DRAPER, and FRIENDLYWAY
16 AG,
17             Defendants.
18
   ─────────────────────────────────
19 FRIENDLYWAY, INC., KARL
   JOHANNSMEIER, PACIFIC CAPSOURCE,
20 INC., and DERMA PLUS, INC.,
21             Nominal Defendants.
22
23                       **COMPLAINT**
24
25     Plaintiff PSI Corporation, d/b/a Pantel Systems, Inc., brings this Complaint against

26 Defendants, Friendlyway AG ("FWAG"), Alexander von Welczek ("von Welczek"), Henry Lo

27 ("Lo"), and Michael Draper ("Draper" and, together with FWAG, von Welczek, and Lo,

28 "Defendants"), and Nominal Defendants, friendlyway, Inc. ("FWI"), Karl Johannsmeier

("Johannsmeier"), Pacific Capsource, Inc. ("Pacific Capsource"), and Derma Plus, Inc. ("Derma Plus" and, together with FWI, Johannsmeier, Pacific Capsource, and Derma Plus, "Nominal Defendants"). In support thereof, Plaintiff alleges as follows:

## NATURE OF ACTION

1.     This action concerns, and seeks to undo, a fraud perpetrated on Plaintiff by several persons and entities acting together.

2.     In December 2004, Plaintiff, a public company, acquired FWI, a private company, from Defendant, in a stock-for-stock merger valued at $9 million. Defendants, each of whom controlled and/or held stock in FWI, had been seeking a public "shell" company, into which to merge their privately-held operations. They sought public company status to gain access to public financing, to fund a failing and unprofitable business. Plaintiff, which at the time was such a public "shell" company, was a perfect candidate, especially in that Draper also held stock in Plaintiff and advised several of its shareholders.

3.     To convince Plaintiff to acquire their business, however, Defendants resorted to fraud. Over the course of nearly a year, Defendants repeatedly represented to Plaintiff that FWI's business was growing, that it was earning a profit, that its balance sheet was balanced, that FWI had earned record revenues by the time of the merger, that they already had arranged for additional investors to join after the merger, that they had no intentions to further distribute the stock they would receive in the merger, and that they would not dilute the investment of Plaintiff's original, existing shareholders.

4.     Each of these repeated representations was false when made. Indeed, the company Defendants delivered to Plaintiff was on its deathbed. Its balance sheet was dramatically out of balance, it had posted a record *loss* for the year of supposed record revenues, and it had incurred

2

1  significant and extraordinary liabilities and expenses. In short, in exchange for its $9 million,

2  Plaintiff received nothing. In fact, it received worse.

3
4       5.      Defendants' fraud was successful. Relying on their misrepresentations, Plaintiff

5  consummated the merger, acquired all the stock of FWI, and issued 18 million shares (or $9 million

6  worth) to Defendants. Defendants von Welczeck, lo, and FWAG took control of Plaintiff, were they

7  remained until recently.

8       6.      Plaintiff seeks to rescind the merger and return the stock of FWI to Defendants, based

9  on Defendants' wrongdoing, as is alleged in more detail below. In the alternative, Plaintiff seeks

10  damages, including the $9 million merger price.

11

12                                       **PARTIES**

13      7.      Plaintiff is a Nevada corporation with its principal place of business in Colorado

14  Springs, Colorado. During the negotiation and closing of the merger at issue in this action, Plaintiff

15  was known as Biofarm, Inc. and was located in Linfield, Pennsylvania. In 2004, after the

16  consummation of the merger, Plaintiff became known as friendlyway Corporation and moved to San

17  Francisco. In 2006, after the events as issue in this action, Plaintiff took its current name, PSI

18  Corporation, and moved its headquarters to Colorado.

19

20      8.      Von Welczeck, an individual, is a California resident, whose address is, upon

21  information and belief, 41 Locke Lane, Mill Valley, CA 94941.

22      9.      Lo, an individual, is a California resident, whose address, upon information and

23  belief, 2715 Scott Street, San Francisco, CA 94123.

24

25      10.     Upon information and belief, Draper, an individual, is a California resident.

26      11.     Friendlyway AG ("FWAG") is a German corporation, with its principal place of

27  business in Unterfoehring, Germany.

28

                                            3
                                       COMPLAINT

1    12.    FWI is a Delaware corporation, with its principal place of business in Colorado.

2    13.    Johannsmeier, an individual, is a California resident, whose address is, upon

3    information and belief, 8 Blanding Lane, Belvedere, CA 94920

4

5    14.    Pacific Capsource, Inc., is a Nevada corporation with its principal place of business in

6    San Francisco, CA.

7    15.    Derma Plus, Inc., is a Nevada corporation, with its principal place of business in San

8    Francisco, CA.

9

10                                **JURISDICTION AND VENUE**

11    16.    This Court has subject-matter jurisdiction of this action, because certain of the claims

12    in this action arise under the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C.

13    §§ 77-78 *et seq.* The Court also has subject-matter jurisdiction of this action, because the action is

14    between citizens of different States and/or a citizen of a State and a citizen of a foreign state.

15    17.    Venue is proper in this district because a substantial part of the events and omissions

16    that give rise to this claims in this action occurred in this district.

17

18                                **INTRADISTRICT ASSIGNMENT**

19    18.    Pursuant to Civil Local Rule 3-2(c), assignment to the San Francisco Division of the

20    U.S. District Court for the Northern District of California is appropriate, because a substantial part of

21    the events and damages giving rise to this action occurred in the City and County of San Francisco,

22

23    and because the parties have consented to its exclusive jurisdiction for claims that arise in this

24    action.

25    ///

26    ///

27    ///

28    ///

**FACTUAL ALLEGATIONS**

19.     FWI was incorporated in 2000 as a privately-held, Delaware corporation, located in San Francisco. FWI provided electronic self-service systems to businesses. In 1998, Defendant von Welczeck joined FWI, as a director and its Chief Executive Officer.

20.     Originally, FWI was the wholly-owned subsidiary of Defendant FWAG. In 2002, however, von Welczeck conducted a management buy-out of a majority of FWI's stock. As a result of that transaction, as of 2003, von Welczeck owned 70% of FWI's stock, and FWAG owned 30%. Upon information and belief, von Welczeck paid very little consideration to FWAG for this controlling block of stock. FWAG's Chief Executive Officer, Klaus Trox, remained as one of FWI's directors.

21.     Defendant Lo joined FWI in early 2004, as a director and its Chief Financial Officer.

22.     As of at least the beginning of 2004, FWI was revenue-positive but ultimately unprofitable. Von Welczeck, Lo, and FWAG concluded that, to resuscitate FWI and earn a return on their investment, they must secure access to public financing for their operations. Accordingly, they began to seek transactions that would allow such access for FWI. In particular, they sought a "reverse merger" with a public "shell" company, where FWI would become a subsidiary of the "shell," and its assets and operations would become those of the once-empty "shell."

23.     At that time, Plaintiff (which then was known as Biofarm, Inc.) was precisely such a public "shell" company. By 2004, Plaintiff had divested itself of any meaningful operations. In 2004, Plaintiff itself was seeking an acquisition partner, through which it could obtain profitable or potentially profitable operations.

24.     Upon information and belief, von Welczeck and Lo engaged certain persons and entities to act as "finders" for FWI in its search for a merger partner, including Draper. Acting as "finder," Draper generated interest between FWI and Plaintiff.

5

25.    Draper, however, was also one of Plaintiff's shareholders. He also was an advisor to two of Plaintiff's largest shareholders. Moreover, at the same time, Draper was acting, at least informally, as a "finder" for Plaintiff. It was Draper, purportedly acting in Plaintiff's interests, who brought FWI to Plaintiff's attention as a proposed merger partner. Thus, sitting on both sides of the proposed transaction, Draper brought Plaintiff and FWI together into merger discussions.

26.    Beginning in March 2004 continuing through August 2004, Plaintiff conducted negotiations with von Welczeck and Lo and communicated with them about the proposed transaction, including topics such as the terms of the deal, the current and projected financial condition of FWI, and von Welczeck's, Lo's, and FWAG's intentions with respect to Plaintiff and its stock, once they controlled Plaintiff.

27.    Throughout the negotiations, von Welczeck and Lo, acting together and with the knowledge and consent of FWAG and Draper, continually made misrepresentations of material fact, designed to assuage Plaintiff's concerns and convince Plaintiff to consummate a merger on terms favorable to them. Lo served as the sellers' lead spokesman, and he represented to Plaintiff that he spoke for FWI and its shareholders.

28.    In particular, on March 31, 2004, Lo represented to Plaintiff that FWAG, which was a more established company, was likely to merge with, acquire, or otherwise invest in FWI, once it was combined with Plaintiff.

29.    Also on March 31, 2004, Lo represented to Plaintiff that he and von Welczeck currently believed that FWI was performing at a rate that would generate $3.5 million in total revenue in 2004. In particular, according to Lo's representations, FWI's management believed that FWI would generate most of its revenue and profit in the second half of 2004, including $1.5 million in revenue in the fourth quarter alone. Lo stated that, by the end of 2004, FWI would be earning revenue at a rate of $6 million per year. This representation was critical, for it served as the basis for

6

the \$9,000,000 merger price demanded by FWAG, von Welczeck, and Lo, which Lo based on a 1.5 multiple of annual revenues.

30.    On May 26, 2004, Lo represented to Plaintiff that FWI had arranged for new investors to further finance Plaintiff once the merger was completed. Lo projected that, once the merger occurred, Plaintiff quickly would attain an enterprise value of \$20 to \$30 million.

31.    On July 15, 2004, as part of the due diligence process, Lo sent financial statements to Plaintiff, showing FWI's financial performance and condition for year-end 2003 and the six-month period ended June 30, 2004. He also included pro forma financial statements for the nine-month period ended September 2004 and year-end December 2004. In these financial statements, Lo represented that, as of June 30, 2004, FWI had earned a net profit. He also reiterated that FWI would earn \$3.5 million revenue by the end of the year, with an annualized revenue rate of \$5 million. Lo further represented management's current belief that, by year-end, FWI's assets would exceed its liabilities by 53%.

32.    On July 21, 2004, Lo represented to Plaintiff that FWAG, von Welczeck, and he already had arranged for additional financing for Plaintiff, once the merger was completed, through a PIPE (Private Investment in Public Equity) offering immediately after the merger.

33.    On July 21, 2004, Lo also stated that the "fundamentals" of FWI's business—i.e., the business FWAG, Draper, von Welczeck, and Lo wanted Plaintiff to purchase—were "stronger than ever" and were profitable.

34.    On August 4, 2004, Lo represented to Plaintiff that he knew that, after the closing of the merger, FWAG would merge with or significantly invest in Plaintiff. Lo repeated this representation to Plaintiff on August 12, 2004.

35.    On August 4, 2004, Lo represented that FWI was currently profitable, and he used that representation to demand a premium price to be paid to the FWI shareholders by Plaintiff.

7

36.    During these negotiations, Draper began soliciting Plaintiff's other shareholders to place pressure on Plaintiff's directors and officers to enter into and consummate the proposed merger with FWI. Upon information and belief, Draper made representations to Plaintiff's shareholders similar to those that the sellers were making to Plaintiff, concerning FWI's financial condition and prospects and FWI's intentions with respect to Plaintiff's operations and stock. Upon information and belief, Draper acted in concert with von Welczeck, Lo, and FWAG to use such representations to cause the merger to occur.

37.    On August 13, 2004, relying on the representations of Lo, von Welczeck, and FWAG, Plaintiff entered into a Share Exchange Agreement ("SEA") with FWAG, von Welczeck, and FWI, providing for the acquisition of FWI by Plaintiff. The SEA provided that Plaintiff would acquire all of FWI's stock from von Welczeck and FWAG, in exchange for 18,000,000 new shares of Plaintiff's stock. The 18,000,000 shares, which then were valued at 50 cents per share, represented the $9,000,000 price that Lo, von Welczeck, and FWAG had demanded, based on their representation that FWI was generating revenue at a rate of $6 million per year.

38.    In the SEA, FWI, von Welczeck, and FWAG made several additional representations to Plaintiff. In particular, in the SEA:

a)    FWI, through von Welczeck, represented that it had delivered financial statements for the years ended December 31, 2002 and 2003 and for the six-month period ended June 30, 2004, and that those financial statements accurately represented the financial condition and operating results of FWI. They further represented that, between June 30, 2004 and the execution of the SEA, there had not been a material adverse change in the financial condition depicted in those financial statements.

b)    FWI, through von Welczeck, represented that, between June 30, 2004 and the execution of the SEA, there had not been a material change to any material agreement to which FWI

8
COMPLAINT

1    was bound, or the incurring of indebtedness or liability individually in excess of $25,000 or

2    aggregately in excess of $100,000.

3            c)    FWAG and von Welczeck represented that they intended to acquire Plaintiff's

4    stock for their own account and did not intend to sell or distribute Plaintiff's stock.

5

6            d)    FWAG and von Welczeck covenanted that, between the execution of the SEA

7    and the closing, FWI's operations would continue in their ordinary course. In particular, they

8    covenanted that FWI would not incur any long-term or short-term debt securities or enter into any

9    extraordinary contracts. They also covenanted that FWI would continue to pay its accounts payable

10   consistent with past practice.

11

12           e)    FWAG and von Welczeck covenanted that they and FWI would pay their own

13   expenses in connection with the merger transaction.

14       39.    After the execution of the SEA, Plaintiff continued its due diligence of FWI and

15   communications with its shareholders, directors, and officers. FWAG, von Welczeck, and Lo, again

16   with Lo acting as the sellers' primary spokesperson, continued to make representations designed to

17   induce Plaintiff to consummate the merger transactions.

18

19       40.    On August 20, 2004, FWAG, through Mr. Trox and Lo, represented that it intended

20   to merge into Plaintiff, once it acquired FWI.

21       41.    On August 30, 2004, with one month remaining in FWI's third quarter, Lo

22   represented to Plaintiff that "[w]e are on pace to generate revenue in excess of $1 million for Q3,

23   which will be another record performance for friendlyway." Lo claimed that, "upon closing," "we

24   will have on file quarterly financial statements that will not only reflect strong revenue growth, but

25

26   profitability."

27       42.    On October 7, 2004, the sellers represented to Plaintiff that, for the nine-month period

28   ended September 30, 2004, FWI had earned an operating profit, a positive net income, and

9

$2,019,300 in revenue. They also represented that, during the third quarter, it had "strengthened [its] balance sheet." The sellers also represented that, for this nine-month period, FWI had incurred operating expenses of $730,425. They also projected an additional $1.1 to $1.3 million in revenue for the fourth quarter of 2004 and expressed their expectation that FWI would continue to operate profitably for the remainder of 2004.

43.    Between the execution of the SEA and the closing, Plaintiff sought additional agreement and assurance from von Welczeck, Lo, and FWAG that, in their zeal to arrange additional financing for the combined entity after the merger, they would not sell Plaintiff's stock below a certain price. Plaintiff sought these assurances to protect the original investment of its current shareholders. On November 16, 2004, the sellers, through Lo, agreed with Plaintiff that they would not issue or otherwise distribute Plaintiff's stock unless the stock had been trading for at least 30 days at a price equal to or higher than 75 cents per share and would not do so for less than 50 cents per share.

44.    During this same time period, Draper brought his double-dealing to a forceful culmination. First, unbeknownst to Plaintiff, Draper and the sellers caused FWI to issue FWI stock to Nominal Defendant Derma Plus, a company controlled by Draper, effective as of June 15, 2004 (*i.e.*, before the execution of the SEA). Then, Draper, now a FWI shareholder as well as FWI's "finder," contacted Plaintiff's existing shareholders and solicited a majority of them to authorize the proposed merger. Draper then caused those shareholders to present that controlling authorization to Plaintiff's directors and officers and to demand that Plaintiff consummate the deal. Draper himself repeatedly contacted Plaintiff, represented that he spoke for a majority of Plaintiff's shareholders, and demanded that Plaintiff acquire FWI's stock (some of which he now owned). Upon information and belief, Draper, with the contributions of von Welczeck, Lo, and FWAG, secured this shareholder

authorization by repeating the representations made to Plaintiff, including, but not limited to, their representations that FWI was currently profitable.

45.    On December 10, 2004, relying on these representations, Plaintiff and FWI entered into a Closing Agreement, consummating the merger transaction.

46.    The Closing Agreement recognized that, after the execution of the SEA, FWI had issued stock to the following additional shareholders: Lo; Derma Plus; Nominal Defendant Johannsmeier, who was a FWAG shareholder; and Nominal Defendant Pacific Capsource. The Closing Agreement provided that, accordingly, these new FWI shareholders would exchange their FWI stock for Plaintiff's stock in the merger transaction. The Closing Agreement amended the SEA to include these new shareholders as selling FWI shareholders and to impose the same obligations upon them as imposed by the SEA upon von Welczeck and FWAG.

47.    In connection with the December 10, 2004 closing, von Welczeck and Lo, as officers of FWI, certified in writing to Plaintiff that the representations, warranties, and covenants in the SEA concerning FWI remained true as of the date of the closing.

48.    In connection with the December 10, 2004 closing, FWAG, Lo, von Welczeck, and Draper (acting on behalf of Derma Plus), certified in writing to Plaintiff that their representations and warranties in the SEA as FWI shareholders, including those regarding their intent to sell Plaintiff's stock, remained true as of the date of the closing.

49.    Plaintiff relied on these representations in entering into the Closing Agreement and consummating the merger transaction.

50.    As provided in the SEA, after the closing, Plaintiff issued 18,000,000 shares of restricted common stock, valued at $9,000,000, to the shareholders of FWI, in exchange for all of the outstanding shares of FWI. Von Welczeck received 8,659,999 shares. FWAG received 6,000,001

11

shares. Lo received 900,000 shares. Derma Plus received 340,000 shares. Pacific Capsource received 1,100,000 shares. Johannsmeier received 1,000,000 shares.

51.    After the closing, FWAG, von Welczeck, and Lo took control of Plaintiff's board of directors. Von Welczeck became Plaintiff's new CEO, and Lo became Plaintiff's new CFO. Plaintiff's directors as of the time of the merger soon resigned.

52.    This massive stock issuance and change of control, however, was premised on and caused by a coordinated fraud. The several and repeated material representations described above of Lo, Von Welczeck, FWAG, and Draper, upon which Plaintiff relied in entering into the merger, were knowingly false when made.

53.    Specifically, Defendants' repeated representations that the financial statements provided to Plaintiff accurately depicted the financial condition of FWI at the time of the closing were false. Those financial statements depicted a solvent company with assets in balance with its liabilities. In reality, however, the company Defendants delivered to Plaintiff was dramatically unbalanced and unhealthy, with liabilities *nearly* double the size of its assets.

54.    The financial statements also depicted a company that was operating at a profit and earning a positive net income. In reality, by the time of the closing, FWI had incurred a record *loss* for 2004.

55.    Moreover, the financial statements delivered to Plaintiff did not accurately depict the liabilities of FWI. As of the time Plaintiff acquired FWI, Defendants had caused FWI to incur substantial liabilities that were never disclosed to Plaintiff. For example, Defendants deliberately concealed the fact that they had not paid for the services of FWI's own merger counsel, and they deceitfully delivered FWI to Plaintiff encumbered by that liability.

56.    For the same reason, Defendants' repeated representations to Plaintiff that, between June 30, 2004 and the closing, FWI would not incur and had not incurred individual liabilities in

1    excess of $25,000 or more than $100,000 in total liability, would operate FWI as usual, and would

2    continue to pay its accounts payable, were false.

3
4    57.    Defendants' repeated representations concerning FWI's revenue and profitability also

5    proved false. In truth, FWI earned approximately $2.2 million in revenue in 2004. Thus, the sellers'

6    representations that FWI was earning $3.5 million for 2004 were false. That they maintained this

7    representation until the closing in December 2004 alone shows that Defendants knew these

8    representations were false.

9    58.    In particular, the repeated representations about the financial condition and

10   performance of FWI between June 30, 2004 and the December 2004 closing were knowingly false.

11   Contrary to the representation that FWI would earn approximately $2.3 million in revenue in the

12   second half of 2004 and $1.5 million in the fourth quarter alone, FWI only earned approximately $1

13   million in revenue *during the entire second half of 2004*. Nevertheless, Defendants maintained their

14   revenue projections up until the closing at the end of the year. They did so to convince Plaintiff that

15   it was acquiring a company that earned $1.5 million in revenue per quarter, or $6 million per year. It

16   was upon this critical representation that Defendants continued to justify their $9 million purchase

17   price until closing. In reality, which Defendants knew at the time, FWI completed 2004 earning

18   approximately $500,000 in revenue per quarter.

19
20

21   59.    Indeed, in October 2004, *after the end of the third quarter*, Defendants represented

22   that FWI *already had earned* close to $2.1 million in revenue, had incurred only $730,425 in

23   operating expenses, and was profitable. In truth, which Defendants knew at the time, FWI had not

24   earned $2.1 million in revenue by the end of the third quarter, had incurred nearly $1.2 million in

25   operating expenses, and was operating at a significant loss.

26

27   60.    Similarly, Lo's August 30, 2004 representation that FWI "was on pace" to earn more

28   than $1 million in revenue for the third quarter, which he made with just one month left in the

13

COMPLAINT

quarter at issue, was knowingly false. Indeed, FWI only earned only approximately $1 million in revenue *during the entire second half of 2004.*

61.    The sellers' representations and promises concerning their intent to distribute Plaintiff's stock also were false when made. Soon after gaining control of Plaintiff, Von Welczek, Lo, and FWAG caused Plaintiff to distribute Plaintiff's stock at prices well below 50 cents a share to, among other people, themselves and their affiliates, including Lo, Mr. Johannsmeier, and FWAG. Moreover, just weeks after the closing—*i.e.*, just weeks after confirming its representation that it did not intend to distribute Plaintiff's stock—FWAG entered into an agreement to distribute Plaintiff's stock to third parties.

62.    Lo, von Welczek, and FWAG controlled Plaintiff until May 2006.

## COUNT I
### VIOLATION OF § 10(b) of the EXCHANGE ACT
### AND RULE 10b-5 PROMULGATED THEREUNDER

63.    Plaintiff repeats, reasserts and incorporates by reference the aforementioned allegations contained in this Complaint.

64.    During the period prior to execution of the SEA and during and prior to the Closing Agreement, Defendants carried out a plan, scheme, and course of conduct which was intended to, and did, deceive Plaintiff as alleged in this Complaint, caused Plaintiff to enter into the SEA and Closing Agreement, and Plaintiff to sell stock. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants made the misrepresentations and omissions and took the actions set forth herein.

65.    Defendants:  (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices, and courses of conduct which operated as a

fraud and deceit upon Plaintiff to cause Plaintiff to enter into the SEA and Closing Agreement, and to sell stock.

66.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth in this Complaint, or acted with reckless disregard of the truth in that they failed to ascertain or disclose such facts, even though facts were available to them.

67.    The materially false and misleading representations of Defendants and their failure to disclose material facts, as set forth above, caused Plaintiff to enter into SEA and Closing Agreement, and sell stock.  Plaintiff would not have entered into the SEA and/or the Closing Agreement upon the same terms, if at all, except for the materially false and misleading representations of Defendants and the failure of Defendants to disclose material facts as set forth in this Complaint.

68.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

69.    Defendants violation of Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder, resulted in significant injury to Counterclaim and Third-Party Plaintiff.

**COUNT II**
**VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT**

70.    Plaintiff repeats, reasserts and incorporates by reference the aforementioned allegations contained in this Complaint.

71.    The Defendants acted as controlling persons of FWI within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high level positions and their ownership and contractual rights, participation in, and/or awareness of FWI's operations and/or intimate knowledge of the false statements made by FWI as set forth herein, the Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of FWI including the content and dissemination of various statements which Plaintiff alleges

15

are false and misleading. The Defendants were provided with and had access to copies of FWI's reports, financial statements, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements and information were provided to Plaintiff and had the ability to prevent the issuance of the statements and information or cause the statements and information to be corrected.

72.    In addition, each of the Defendants had direct and/or supervisory involvement in the operations of FWI and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein. As set forth above, the Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered damages in connection with the issuance of its securities pursuant to the SEA and Closing Agreement and the acquisition of Defendants' shares of FWI.

## COUNT III
## RESCISSION UNDER § 29(B) OF THE EXCHANGE ACT

73.    Plaintiff repeats, reasserts and incorporates by reference the aforementioned allegations contained in this Complaint.

74.    The SEA, the Closing Agreement, and the transactions that were consummated pursuant to the SEA and Closing Agreement involved prohibited transactions within the meaning of Section 29(b) of the Exchange Act. Plaintiff is in contractual privity with Defendants under the SEA and Closing Agreement, and Plaintiff is in the class of persons that the Securities Act and the Exchange Act were designed to protect.

75.    Plaintiff is entitled to have the SEA and Closing Agreement, and the exchange of securities with Defendants pursuant thereto rescinded, since Plaintiff would not have entered into the

16
COMPLAINT

SEA and/or the Closing Agreement, or consummated the transactions pursuant thereto except for the misrepresentations and omissions of Defendants as described herein.

76.    Since consummation of the closing under the SEA and Closing Agreement, FWI has been and continues to be a wholly owned subsidiary of Plaintiff, and upon rescission, Plaintiff is able to return to each of the parties to the SEA and/or the Closing Agreement – i.e. the Defendants, Draper, and the Nominal Defendants named in this action -- the shares of FWI which were held by each party to the  SEA and/or the Closing Agreement prior to the closing.

77.    Rescission of the SEA and Closing Agreement, and of the exchange of securities provided for therein is necessary to provide Plaintiff with complete relief and to return the parties to the same position they would have been in if Plaintiff had been aware of the misrepresentations and omissions prior to the time it entered into the SEA and/or Closing Agreement.

## COUNT IV
## VIOLATION OF SECTION 25401
## OF THE CALIFORNIA CORPORATION CODE

78.    Plaintiff repeats, reasserts and incorporates by reference the aforementioned allegations contained in this Complaint.

79.    Defendants made, for the purpose of inducing the purchase or sale of securities by others, oral and written statements which included untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

80.    Plaintiff did not know the facts concerning the untruths or omissions of Defendants.

81.    Defendants failed to exercise reasonable care and/or knew of the untruths or omissions complained of.

82.    As a direct and proximate result of the complained of conduct, Plaintiff suffered

economic injuries and, pursuant to section 25501 of the California Corporations Code, are

entitled to rescission or damages, together with interest, in amount to be proven at trial.

### COUNT V
### FRAUDULENT MISREPRESENTATION

83.    Plaintiff repeats, reasserts and incorporates by reference the aforementioned

allegations contained in this Complaint.

84.    Defendants made the false representations detailed in this Complaint.

85.    Defendants made these representations in order to induce Plaintiff into entering into

the SEA and Closing Agreement.

86.    The materially false and misleading representations of Defendants and their failure to

disclose material facts, as set forth above, caused Plaintiff to enter into SEA and/or Closing

Agreement, and sell stock.

87.    Plaintiff would not have entered into the SEA and/or Closing Agreement upon the

same terms, if at all, except for Defendants' materially false and misleading representations and the

failure of Defendants to disclose material facts as set forth in this Complaint.

88.    Plaintiff justifiably relied on these representations, because had Plaintiff known the

truth which was disclosed by Defendants, Plaintiff would not have entered into or consummated the

transactions contemplated under the SEA and/or Closing Agreement, or would have done so under

substantially less favorable terms to the other parties to those agreements.

89.    As a direct and proximate result of the complained of conduct, Plaintiff suffered

economic injuries.

### COUNT VI
### BREACH OF CONTRACT

90.    Plaintiff repeats, reasserts and incorporates by reference the aforementioned

allegations contained in this Complaint.

18

91.     On August 20, 2004, Plaintiff and von Welczek, and FWAG entered into the SEA.

92.     In the SEA, FWI, von Welczeck, and FWAG represented:

a)      FWI, through von Welczeck, represented that it had delivered financial statements for the years ended December 31, 2002 and 2003 and for the six-month period ended June 30, 2004, and that those financial statements accurately represented the financial condition and operating results of FWI. They further represented that, between June 30, 2004 and the execution of the SEA, there had not been a material adverse change in the financial condition depicted in those financial statements.

b)      FWI, through von Welczeck, represented that, between June 30, 2004 and the execution of the SEA, there had not been a material change to any material agreement to which FWI was bound, or the incurring of indebtedness or liability individually in excess of $25,000 or aggregately in excess of $100,000.

c)      FWAG and von Welczeck represented that they intended to acquire Plaintiff's stock for their own account and did not intend to sell or distribute Plaintiff's stock.

d)      FWAG and von Welczeck covenanted that, between the execution of the SEA and the closing, FWI's operations would continue in their ordinary course. In particular, they covenanted that FWI would not incur any long-term or short-term debt securities or enter into any extraordinary contracts. They also covenanted that FWI would continue to pay its accounts payable consistent with past practice.

e)      FWAG and von Welczeck covenanted that they and FWI would pay their own expenses in connection with the merger transaction.

93.     FWAG and von Welczeck breached their contractual obligations as set forth in the previous paragraph of this Complaint.

19

1    94.    On December 10, 2004, Plaintiff and FWI entered into a Closing Agreement,

2    consummating the merger transaction. The Closing Agreement amended the SEA to include these

3    new shareholders as selling FWI shareholders and to impose the same obligations upon them as

4    imposed by the SEA upon von Welczeck and FWAG.

5

6    95.    In connection with the December 10, 2004 closing, von Welczeck and Lo, as officers

7    of FWI, certified in writing to Plaintiff that the representations, warranties, and covenants in the SEA

8    concerning FWI remained true as of the date of the closing.

9    96.    Von Welczeck, FWAG, and Lo breached their contractual obligations as set forth in

10    the previous two paragraphs of this Complaint.

11

12    97.    Von Welczeck, FWAG, and Lo also agreed with Plaintiff that they would not issue or

13    otherwise distribute Plaintiff's stock unless the stock had been trading for at least 30 days at a price

14    equal to or higher than 75 cents per share and would not do so for less than 50 cents per share. Von

15    Welczeck, FWAG, and Lo breached this contractual obligation.

16    98.    As a direct and proximate result of the complained of conduct, Plaintiff suffered

17
economic injuries.

18

19                                    **COUNT VII**
                                   **CIVIL CONSPIRACY**

20
      99.    Plaintiff repeats, reasserts and incorporates by reference the aforementioned

21
allegations contained in this Complaint.

22

23    100.    Defendants formed a conspiracy to commit fraud and to breach contractual

24    obligations with Plaintiff, as set forth above.

25    101.    Defendants took several and repeated steps, constituting wrongful conduct, in

26
furtherance of that conspiracy

27

28

                                         20

102.    Defendants intended and/or were aware that those steps would further that conspiracy.

103.    Defendants acted without authority or justification.

104.    The unlawful actions of Defendants have caused and will continue to cause Plaintiff injury.

**COUNT VIII**
**INJUNCTIVE RELIEF**

105.    Plaintiff repeats, reasserts and incorporates by reference the aforementioned allegations contained in this Complaint.

106.    As is stated above, Defendants have committed securities violations, committed common law fraud, and breached their contracts with Plaintiff.

107.    Defendants, now in possession in Plaintiff's stock, can continue to harm Plaintiff unless enjoined by this Court.

108.    If Defendants sell Plaintiff's stock, this will cause irreparable injury to Counterclaim and Plaintiff.

109.    Plaintiff has no adequate remedy at law.

110.    The balance of the equities favors granting injunctive relief restricting Defendants from transferring Plaintiff's stock to anyone except Plaintiff, and ordering Defendants to return the stock to Plaintiff.

WHEREFORE, Plaintiff, by and through its attorneys, respectfully requests that this Court: Enter judgment against Defendants on all counts;

(i)    Rescind the SEA and Closing Agreement and Order Defendants and Nominal Defendants to return their shares of Plaintiff's stock to Plaintiff;

1    (ii)    Award Plaintiff damages, including direct, indirect, consequential and punitive

2        damages as appropriate;

3    (iii)    Order Defendants to pay Plaintiff's attorney's fees and costs in pursuing this

4
        matter; and

5

6    (iv)    Grant such other and further relief this Court deems just and proper under the

7        circumstances.

8    Dated: June 1, 2007                COZEN O'CONNOR

9

10                        By:    _____

11                            Daniel D. Harshman
                            Attorneys for Plaintiff PSI CORPORATION

12

13                    **DEMAND FOR JURY TRIAL**

14    Plaintiff demands a trial by jury on all claims.

15    Dated: June 1, 2007                COZEN O'CONNOR

16
                        By:    _____
17
                            Daniel D. Harshman
18                            Attorneys for Plaintiff PSI CORPORATION

19

20

21

22

23

24

25

26

27

28