1  Daniel D. Harshman (SBN# 177139)
   Charles E. Wheeler (SBN# 82915)
2  Cozen O'Connor
   425 California Street, Suite 2400
3  San Francisco, CA  94104
   Telephone:  (415) 617-6100
4  Facsimile:  (415) 617-6101
   Email:  dharshman@cozen.com
5          cwheeler@cozen.com
6
7  Attorneys for Plaintiff
   PSI CORPORATION
8

9              IN THE UNITED STATES DISTRICT COURT

10          FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                      OAKLAND DIVISION

| | |
|---|---|
| 12  PSI CORPORATION (f/k/a/ FRIENDLYWAY CORPORATION, f/k/a BIOFARM, INC.), | Case No. C 07-02869 SBA |
| 13 | |
|      Plaintiff, | **PSI CORPORATION'S MEMORANDUM OF POINTS AND AUTHORITIES IN** |
| 14 | **SUPPORT OF ITS MOTION FOR A** |
|      vs. | **TEMPORARY RESTRAINING ORDER** |
| 15 | |
| 16  ALEXANDER VON WELCZECK, HENRY LO, MICHAEL DRAPER, | |
| 17  and FRIENDLYWAY AG, | |
| 18      Defendants. | |
| 19 | |
| 20  FRIENDLYWAY, INC., KARL JOHANNSMEIER, PACIFIC CAPSOURCE, | Date  :    TBD |
| 21  INC., and DERMA PLUS, INC., | Time  :    TBD |
| 22      Nominal Defendants. | Before:    TBD |

23  ///

24  ///

25

26

27

28

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................ i

TABLE OF AUTHORITIES ...................................................................................................... iii

INTRODUCTION ........................................................................................................................ 1

STATEMENT OF FACTS ........................................................................................................... 2

I.      DEFENDANTS BEGIN TO COURT PLAINTIFF. ........................................................ 2

II.     DEFENDANTS COMMIT FRAUD AND VIOLATE THE SECURITIES
        LAWS TO CONVINCE PLAINTIFF TO BUY FWI'S STOCK AND SELL
        $9 MILLION OF ITS OWN STOCK. ............................................................................ 3

        A.      The Negotiations ................................................................................................. 3

        B.      The Agreement and Defendants' Continuing Campaign ............................ 6

        C.      The Closing and the Culmination of Defendants' Scheme ......................... 8

        D.      The Shocking Truth ............................................................................................ 9

STATEMENT OF ISSUES TO BE DECIDED ........................................................................ 12

I.      Is Plaintiff Entitled to a Temporary Restraining Order and Preliminary Injunction
        Enjoining Defendants from Selling and/or Transferring or Attempting to Sell
        and/or Transfer Their Stock in Plaintiff Until Such Time as the Court Can
        Adjudicate Plaintiff's Claims for Rescission? ........................................................ 12

ARGUMENT .............................................................................................................................. 13

I.      PLAINTIFF WILL LIKELY SUCCEED ON THE MERITS AND WILL
        LIKELY SUFFER IRREPARABLE HARM WITHOUT TEMPORARY
        INJUNCTIVE RELIEF. ................................................................................................ 14

        A.      Plaintiff Is More Than Likely to Succeed on the Merits. .......................... 14

                1.      Plaintiff will likely succeed on its securities and common law fraud claims. 14

                2.      Plaintiff will likely succeed on its breach of contract claim. ......................... 17

                3.      Plaintiff will likely be awarded rescission. .................................................... 18

        B.      Irreparable Harm to Plaintiff Is More Than a Possibility. ......................... 19

i

II.    PLAINTIFF HAS RAISED SERIOUS QUESTIONS GOING TO THE MERITS,
       AND THE BALANCE OF HARDSHIPS TIPS IN PLAINTIFF'S FAVOR. ...................... 21

CONCLUSION.................................................................................................................................. 23

PSI CORPORATION'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER
Case No. C 07-02869 EDL

## TABLE OF AUTHORITIES

**Cases**

*A&M Records, Inc. v. Napster, Inc.,*
239 F.3d 1004 (9th Cir. 2001) ............................................................................. 19

*Boam v. Trident Fin. Corp.,*
6 Cal. App. 4th 738, 9 Cal. Rptr. 2d 177 (1992)............................................... 19

*De Beers Consol. Mines, Ltd. v. United States,*
325 U.S. 212 (1945)............................................................................................ 13

*Deckert v. Independence Shares Corp.,*
311 U.S. 282 (1940)....................................................................................... 20, 21

*Gilder v. PGA Tour, Inc.,*
936 F.2d 417 (9th Cir. 1991) .............................................................................. 14

*In re Estate of Ferdinand Marcos,*
25 F.3d 1467 (9th Cir. 1994) .............................................................................. 13

*In re Northpoint Comm. Group, Inc., Secs. Litig.,*
221 F. Supp. 2d 1090 (N.D. Cal. 2002) .............................................................. 16

*Kaplan v. Rose,*
49 F.3d 1363 (9th Cir. 1994) .............................................................................. 16

*Kent v. Clark,*
20 Cal. 2d 779, 128 P.2d 868 (1942) ................................................................. 19

*Kidron v. Movie Acquisition,*
40 Cal. App. 4th 1571 (1995) ............................................................................. 18

*Lockheed Missile & Space Co., Inc. v. Hughes Aircraft Co.,*
887 F. Supp. 1320 (N.D. Cal. 1995) ................................................................... 13

*Los Angeles Mem'l Coliseum Comm'n v. NFL,*
634 F.2d 1197 (9th Cir. 1980) ............................................................................ 13

*McCurdy v. Simpson,*
2007 WL 801023 (N.D. Cal. 2001) ..................................................................... 14

*MTC Electronic Technologies Co. v. Leung,*
876 F. Supp. 1143 (C.D. Cal. 1995) ................................................................... 15

iii

*Regional Properties, Inc. v. Financial and Real Estate Consulting Co.*,
    678 F.2d 552 (5th Cir. 1982) ................................................................. 18

*Reichert v. General Ins. Co.*,
    68 Cal. 2d 822, 69 Cal. Rptr. 321 (1968) ............................................... 17

*Republic of Philippines v. Marcos*,
    862 F.3d 1355 (9th Cir. 1988) ............................................................... 22

*Sammartano v. First Judicial District Court*,
    303 F.3d 959 (9th Cir. 2002) ................................................................. 13

*Simpson v. AOL Time Warner, Inc.*,
    452 F.3d 1040 (9th Cir. 2006) ............................................................... 15

*Sun Microsystems, Inc. v. Microsoft Corp.*,
    188 F.3d 1115 (9th Cir. 1999) ............................................................... 14

*Wilhelm v. Pray, Price, Williams & Russell*,
    186 Cal. App. 3d 1324, 231 Cal. Rptr. 355 (1986) ................................ 15

**Statutes**

Securities and Exchange Act of 1943 § 10(b) ..................................................... 14

Securities and Exchange Act of 1943 § 20(a) ..................................................... 14

Securities and Exchange Act of 1943 § 29(b) ..................................................... 14

California Civil Code § 1689 ............................................................................... 19

California Corporation Code § 25401 ....................................................... 14, 15, 18

PSI CORPORATION'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER
Case No. C 07-02869 EDL

## INTRODUCTION

This action concerns, and seeks to undo, a fraud perpetrated on Plaintiff, a publicly-owned company, by several persons and entities, acting in concert.  In December 2004, Plaintiff acquired Nominal Defendant friendlyway, Inc. ("FWI"), a private company, from Defendants (Alexander von Welczeck, Henry Lo, Michael Draper and Friendlyway AG) and the other Nominal Defendants (Karl Johannsmeier, Pacific Capsource, Inc., and Derma Plus, Inc.), in a stock-for-stock deal valued at $9 million.  Defendants, each of whom controlled and/or held stock in FWI, had been seeking a public "shell" company, into which to merge their privately-held operations.  They sought public company status to gain access to public financing, to fund a failing and unprofitable business. Plaintiff, which at the time was such a public "shell" company, was a perfect candidate, especially in that Defendant Draper held stock in Plaintiff as well as FWI and advised several of Plaintiff's shareholders.

To convince Plaintiff to acquire their business, however, Defendants resorted to fraud.  Over the course of nearly a year, Defendants repeatedly represented to Plaintiff that FWI's business was growing, that it was earning a profit, that its balance sheet was balanced, that FWI had earned record revenues by the time of the merger, that they already had arranged for additional investors to join after the merger, that they had no intentions to further distribute the stock they would receive in the merger, and that they would not dilute the investment of Plaintiff's original, existing shareholders. Each of these repeated representations was false when made.  Indeed, the company Defendants delivered to Plaintiff was on its deathbed.  Its balance sheet was dramatically out of balance, it had posted a record *loss* for the year of supposed record revenues, and it had incurred significant and extraordinary liabilities and expenses.  In short, in exchange for its $9 million, Plaintiff received nothing.  In fact, it received worse.

1

Defendants' fraud was successful.  Relying on their misrepresentations, Plaintiff consummated the merger, acquired all the stock of FWI, and issued 18 million shares (or $9 million worth) to Defendants.  Defendants von Welczeck, Lo, and FWAG took control of Plaintiff, which they held until recently.  Plaintiff now seeks to undo this swindle, rescind the acquisition, return the stock of FWI to Defendants, and recover its 18 million shares of its own stock.

Without temporary injunctive relief preserving the status quo until Plaintiff's claims may be heard, however, Plaintiff's right to rescind the acquisition and recover its stock may be thwarted.  Defendants could sell Plaintiff's stock to third-parties, innocent or otherwise, and frustrate or prevent the very relief Plaintiff asks the Court to grant.  Although the mere possibility of such sales justifies temporary injunctive relief, especially in light of the relatively slight imposition such relief would impose on Defendants, this threat is more than a mere possibility.  Several recent developments, which are described below, show that Defendants are preparing to sell, and even have agreed to sell, Plaintiff's stock.  Accordingly, temporary injunctive relief is not just warranted, it is an absolute necessity.

## STATEMENT OF FACTS

### I.     DEFENDANTS BEGIN TO COURT PLAINTIFF.

FWI, which is a privately-held company, used to be the wholly-owned subsidiary of Defendant FWAG.  (*See* Ex. A, PSI's Dec. 16, 2004 Form 8-K.)  In 2002, however, FWI's Chief Executive Officer, Defendant von Welczeck, bought of 70% of FWI's stock from FWAG.  (*See id.*; Ex. B, Allan Esrine Decl. ¶ 5; Ex. C, at Ex. A.)  Von Welczeck paid very little consideration to FWAG for this controlling block of stock.  (*See* Ex. B ¶ 5.)  FWAG's Chief Executive Officer, Klaus Trox, remained as one of FWI's directors.  (*See id.*)  In 2004, Defendant Lo became FWI's Chief Financial Officer and one of its directors.  (*See* Ex. A.)

PSI CORPORATION'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER
Case No. C 07-02869 EDL

FWI provided electronic self-service systems to businesses. (*See* Ex. A.) By 2004, however, FWI's business was failing. FWAG, von Welczeck, and Lo concluded that, to resuscitate the business, they must gain access to public financing. (*See* Ex. B ¶ 7.) In particular, they sought a "reverse merger" with a public "shell" company, where FWI would become a subsidiary of the "shell," and its assets and operations would become those of the once-empty "shell." (*See id.*) Defendants arranged for FWI to hire certain persons and entities to act as "finders" for FWI in its search for a merger partner, including Defendant Draper.

Plaintiff was just the sort of public "shell" company Defendants sought. During the negotiation and closing of the merger at issue in this case, Plaintiff (a Nevada corporation) was known as Biofarm, Inc., was located in Linfield, Pennsylvania, and had no meaningful operations.[1] (Ex. B ¶ 1.) Draper, one of FWI's "finders," also was one of Plaintiff's shareholders and was the advisor to two of Plaintiff's largest shareholders. (*See id.* ¶ 8.) Moreover, Draper had been acting as a "finder" for Plaintiff, too; Plaintiff sought to acquire an operating company to vitalize its corporate "shell." (*See id.*) In early 2004, Draper, purportedly acting in Plaintiff's interests, but actually sitting on both sides of the transaction, brought Plaintiff and FWI together into merger discussions. (*See id.*)

## II.    DEFENDANTS COMMIT FRAUD AND VIOLATE THE SECURITIES LAWS TO CONVINCE PLAINTIFF TO BUY FWI'S STOCK AND SELL $9 MILLION OF ITS OWN STOCK.

### A.    The Negotiations

In the negotiations, Defendants faced the formidable task of selling a failing business for enough consideration to retain a controlling interest of the surviving entity. To accomplish this

---

[1] Following the completion of the merger, Plaintiff became known as friendlyway Corporation and moved its headquarters to San Francisco. (*See* Ex. B ¶ 1.) In 2006, after the events at issue in this action, Plaintiff adopted its current name, PSI Corporation, and moved its headquarters to Colorado. (*See* Ex. D, David Foni Decl. ¶ 3.)

3

feat, Defendants resorted to fraud and other violations of the securities laws. Defendants made several repeated misrepresentations to Plaintiff (and its shareholders), concerning the financial condition of FWI, their expectations of its earnings and profitability, their arrangements for additional financing, their intent to sell the stock they would receive in the merger, and their plans to issue additional stock of Plaintiff once they took control. Lo served as the sellers' lead spokesman, and he represented to Plaintiff that he spoke for FWI and its shareholders. (*See* Ex. B ¶ 11.)

On March 31, 2004, Lo represented to Plaintiff that he and von Welczeck currently believed that FWI was performing at a rate that would generate $3.5 million in total revenue in 2004. (*See id.* ¶ 13.) In particular, according to Lo's representations, FWI's management believed that FWI would generate most of its revenue and profit in the second half of 2004, including $1.5 million in revenue in the fourth quarter alone. (*See id.*) Lo stated that, by the end of 2004, FWI would be earning revenue at a rate of $6 million per year. (*See id.*) This representation was critical, for it served as the basis for the $9,000,000 merger price demanded by FWAG, von Welczeck, and Lo, which Lo based on a 1.5 multiple of annual revenues. (*See id.*)

On July 15, 2004, as part of the due diligence process, Lo sent financial statements to Plaintiff, showing FWI's financial performance and condition for year-end 2003 and the six-month period ended June 30, 2004. (*See id.* ¶ 15.) He also included pro forma financial statements for the nine-month period ended September 2004 and year-end December 2004. (*See id.*) In these financial statements, Lo represented that, as of June 30, 2004, FWI had earned a net profit. (*See id.*) He also reiterated that FWI would earn $3.5 million revenue by the end of the year, with an annualized revenue rate of $5 million. (*See id.*) Lo further represented management's current belief that, by year-end, FWI's assets would exceed its liabilities by 53%. (*See id.*) On July 21,

4

2004, Lo also stated that the "fundamentals" of FWI's business – the very business Defendants wanted Plaintiff to purchase – were "stronger than ever" and were profitable.  (*See id.* ¶ 16.)  On August 4, 2004, Lo repeated his representations that FWI was currently profitable.  (*See id.* ¶ 18.)  Defendants used these representations to demand a premium price to be paid to the FWI shareholders by Plaintiff.  (*See id.*)

On May 26, 2004, Lo represented to Plaintiff that FWI had arranged for new investors to further finance Plaintiff once the merger was completed.  Lo projected that, once the merger occurred, Plaintiff quickly would attain an enterprise value of $20 to $30 million.  (*See id.* ¶ 14.)  On July 21, 2004, Lo represented to Plaintiff that FWAG, von Welczeck, and he already had arranged for additional financing for Plaintiff, once the merger was completed, through a PIPE (Private Investment in Public Equity) offering.  (*See id.* ¶ 16.)  On August 4, 2004, Lo represented to Plaintiff that he knew that, after the closing of the merger, FWAG would merge with or significantly invest in Plaintiff.  Lo repeated this representation to Plaintiff on August 12, 2004.  (*See id.* ¶ 17.)  On August 20, 2004, FWAG, through Mr. Trox and Lo, represented that it intended to merge into Plaintiff, once it acquired FWI.  (*See id.* ¶ 23.)

During these negotiations, Draper began soliciting Plaintiff's other shareholders to place pressure on Plaintiff's directors and officers to enter into and consummate the proposed merger with FWI.  (*See id.* ¶ 19.)  Draper, acting in concert with von Welczeck, Lo, and FWAG, made representations to Plaintiff's shareholders similar to those that the sellers were making to Plaintiff, concerning FWI's financial condition and prospects and FWI's intentions with respect to Plaintiff's operations and stock.  (*See id.*)

**B.**    **The Agreement and Defendants' Continuing Campaign**

On August 13, 2004, relying on Defendants' representations, Plaintiff entered into a Share Exchange Agreement ("SEA") with FWAG, von Welczeck, and FWI, providing for the acquisition of FWI by Plaintiff.  (*See id.* ¶ 20.)  The SEA provided that Plaintiff would acquire all of FWI's stock from von Welczeck and FWAG, in exchange for 18,000,000 new shares of Plaintiff's stock.  (*See* Ex. C ¶ 1.1.)   The 18,000,000 shares, which then were valued at 50 cents per share, represented the $9,000,000 price that Lo, von Welczeck, and FWAG had demanded, based on their representation that FWI was generating revenue at a rate of $6 million per year.  (*See id.*)  In the SEA, FWI, von Welczeck, and FWAG made several additional representations to Plaintiff.  In particular, in the SEA:

- FWI, through von Welczeck, represented that it had delivered financial statements for the years ended December 31, 2002 and 2003 and for the six-month period ended June 30, 2004, and that those financial statements accurately represented the financial condition and operating results of FWI.  They further represented that, between June 30, 2004 and the execution of the SEA, there had not been a material adverse change in the financial condition depicted in those financial statements.  (*See* Ex. C ¶ 3.5.)

- FWI, through von Welczeck, represented that, between June 30, 2004 and the execution of the SEA, there had not been a material change to any material agreement to which FWI was bound, or the incurring of indebtedness or liability individually in excess of $25,000 or aggregately in excess of $100,000.  (*See id.* ¶ 3.6(j).)

- FWAG and von Welczeck represented that they intended to acquire Plaintiff's stock for their own account and did not intend to sell or distribute Plaintiff's stock.  (*See id.* ¶ 4.5.)

- FWAG and von Welczeck covenanted that, between the execution of the SEA and the closing, FWI's operations would continue in their ordinary course.   In particular, they covenanted that FWI would not incur any long-term or short-term debt securities or enter into any extraordinary contracts.  They also covenanted that FWI would continue to pay its accounts payable consistent with past practice.  (*See id.* ¶ 3.5.)

6

- FWAG and von Welczeck covenanted that they and FWI would pay their own expenses in connection with the merger transaction. (*See id.* ¶ 4.8.)

Defendants continued their campaign after the execution of the SEA. On August 30, 2004, with one month remaining in FWI's third quarter, Lo represented to Plaintiff that "[w]e are on pace to generate revenue in excess of $1 million for Q3, which will be another record performance for friendlyway." (*See* Ex. B ¶ 24.) Lo claimed that, "upon closing," "we will have on file quarterly financial statements that will not only reflect strong revenue growth, but profitability." (*See id.*) On October 7, 2004, the sellers represented to Plaintiff that, for the nine-month period ended September 30, 2004, FWI had earned an operating profit, a positive net income, and $2,019,300 in revenue. (*See id.* ¶ 25.) They also represented that, during the third quarter, it had "strengthened [its] balance sheet." (*See id.*) The sellers also represented that, for this nine-month period, FWI had incurred operating expenses of $730,425. (*See id.*) They also projected an additional $1.1 to $1.3 million in revenue for the fourth quarter of 2004 and expressed their expectation that FWI would continue to operate profitably for the remainder of 2004. (*See id.*)

Between the execution of the SEA and the closing, Plaintiff sought additional agreements and assurances from von Welczeck, Lo, and FWAG that, in their zeal to arrange additional financing for the combined entity after the merger, they would not sell Plaintiff's stock below a certain price. (*See id.* ¶ 26.) Plaintiff sought these assurances to protect the original investment of its current shareholders. (*See id.*) On November 16, 2004, the sellers, through Lo, agreed with Plaintiff that they would not issue or otherwise distribute Plaintiff's stock unless the stock had been trading for at least 30 days at a price equal to or higher than 75 cents per share and would not do so for less than 50 cents per share. (*See id.*)

During this same time period, Draper brought his double-dealing to a forceful culmination. First, unbeknownst to Plaintiff, Draper and the sellers caused FWI to issue FWI stock to Nominal

7

PSI CORPORATION'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER
Case No. C 07-02869 EDL

Defendant Derma Plus, a company controlled by Draper, effective as of June 15, 2004 (*i.e.*, before the execution of the SEA). (*See id.* ¶ 27.) Then, Draper, now a FWI shareholder as well as FWI's "finder," contacted Plaintiff's existing shareholders and solicited a majority of them to authorize the proposed merger. (*See id.*) Draper then caused those shareholders to present that controlling authorization to Plaintiff's directors and officers and to demand that Plaintiff consummate the deal. Draper himself repeatedly contacted Plaintiff, represented that he spoke for a majority of Plaintiff's shareholders, and demanded that Plaintiff acquire FWI's stock (some of which he now owned). (*See id.*) Draper, with the contributions of von Welczeck, Lo, and FWAG, secured this shareholder authorization by repeating the representations made to Plaintiff, including, but not limited to, their representations that FWI was currently profitable. (*See id.*)

## C.     The Closing and the Culmination of Defendants' Scheme

On December 10, 2004, relying on these representations, Plaintiff and FWI entered into a Closing Agreement, consummating the merger transaction. (*See* Ex. E, Closing Agreement.) The Closing Agreement recognized that, after the execution of the SEA, FWI had issued stock to the following additional shareholders: Lo; Derma Plus; Nominal Defendant Johannsmeier, who was a FWAG shareholder; and Nominal Defendant Pacific Capsource. (*See id.* ¶ 2.1.) The Closing Agreement provided that, accordingly, these new FWI shareholders would exchange their FWI stock for Plaintiff's stock in the merger transaction. (*See id.*) The Closing Agreement amended the SEA to include these new shareholders as selling FWI shareholders and to impose the same obligations upon them as imposed by the SEA upon von Welczeck and FWAG. (*See id.*)

In connection with the December 10, 2004 closing, von Welczeck and Lo, as officers of FWI, certified in writing to Plaintiff that the representations, warranties, and covenants in the SEA concerning FWI remained true as of the date of the closing. (*See* Ex. F, closing certifications.) In

connection with the December 10, 2004 closing, FWAG, Lo, von Welczeck, and Draper (acting through Derma Plus), certified in writing to Plaintiff that their representations and warranties in the SEA as FWI shareholders, including those regarding their intent to sell Plaintiff's stock, remained true as of the date of the closing.  (*See id.*)

As provided in the SEA, after the closing, Plaintiff issued 18,000,000 shares of restricted common stock, valued at $9,000,000, to the shareholders of FWI, in exchange for all of the outstanding shares of FWI.  (*See* Ex. B ¶ 33.)  Von Welczeck received 8,659,999 shares.  FWAG received 6,000,001 shares.  Lo received 900,000 shares.  (*Id.*)  Derma Plus received 340,000 shares.  Pacific Capsource received 1,100,000 shares.  (*Id.*)  Johannsmeier received 1,000,000 shares.  (*Id.*)

### D.    **The Shocking Truth**

Unbeknownst to Plaintiff at the time, this massive share exchange and change of control, however, was premised on and caused by a coordinated fraud.  Defendants' representations of financial health and good intentions were false, and Defendants' knew they were false when Defendants uttered them.

First, Defendants' repeated representations that the financial statements provided to Plaintiff accurately depicted the financial condition of FWI at the time of the closing were false.  Those financial statements depicted a solvent company with assets in balance with its liabilities.  In reality, however, the company Defendants delivered to Plaintiff was dramatically unbalanced and unhealthy, with liabilities nearly *double* the size of its assets.  The financial statements also depicted a company that was operating at a profit and earning a positive net income.  In reality, by the time of the closing, FWI had incurred a record *loss* for 2004.  (*See* Ex. H, PSI's March 3, 2005 Form 8-K; Ex. I, PSI's March 17, 2005 Form 10-QSB.)

9

Moreover, the financial statements delivered to Plaintiff did not accurately depict the liabilities of FWI.  As of the time Plaintiff acquired FWI, Defendants had caused FWI to incur substantial liabilities that were never disclosed to Plaintiff.  For example, Defendants deliberately concealed the fact that they had not paid for the services of FWI's own merger counsel, and they deceitfully delivered FWI to Plaintiff encumbered by that liability.  For the same reason, Defendants' repeated representations to Plaintiff that, between June 30, 2004 and the closing, FWI would not incur and had not incurred individual liabilities in excess of $25,000 or more than $100,000 in total liability, would operate FWI as usual, and would continue to pay its accounts payable, were false.  (*See* Ex. B ¶ 34.)

Defendants' repeated representations concerning FWI's revenue and profitability also proved false.  In truth, FWI earned approximately $2.2 million in revenue in 2004.  (*See* Ex. H; Ex. I.)  Thus, Defendants' representations that FWI was earning $3.5 million for 2004 were false.  That they maintained this representation until the closing in December 2004 alone shows that Defendants knew these representations were false.  In particular, the repeated representations about the financial condition and performance of FWI between June 30, 2004 and the December 2004 closing were knowingly false.  Contrary to the representation that FWI would earn approximately $2.3 million in revenue in the second half of 2004 and $1.5 million in the fourth quarter alone, FWI only earned approximately $1 million in revenue *during the entire second half of 2004*.  (*See* Ex. H; Ex. I.)  Nevertheless, Defendants maintained their revenue projections up until the closing at the end of the year.  They did so to convince Plaintiff that it was acquiring a company that earned $1.5 million in revenue per quarter, or $6 million per year.  It was upon this critical representation that Defendants continued to justify their $9 million purchase price until closing.  In

10

reality, which Defendants knew at the time, FWI completed 2004 earning approximately $500,000 in revenue per quarter.  (*See* Ex. H; Ex. I.)

Indeed, in October 2004, after the end of the third quarter, Defendants represented that FWI *already had earned* close to $2.1 million in revenue, had incurred only $730,425 in operating expenses, and was profitable.  In truth, which Defendants knew at the time, FWI had not earned $2.1 million in revenue by the end of the third quarter, had incurred nearly $1.2 million in operating expenses, and was operating at a significant loss.  (*See* Ex. H.)  Similarly, Lo's August 30, 2004 representation that FWI "was on pace" to earn more than $1 million in revenue for the third quarter, which he made with just one month left in the quarter at issue, was knowingly false. Indeed, FWI only earned approximately $1 million in revenue *during the entire second half of 2004.*  (*See* Ex. H; Ex. I.)

The sellers' representations and promises concerning their intent to distribute Plaintiff's stock also were false when made.  Soon after gaining control of Plaintiff, Von Welczek, Lo, and FWAG caused Plaintiff to distribute Plaintiff's stock at prices well below 50 cents a share to, among other people, themselves and their affiliates, including Lo, Mr. Johannsmeier, and FWAG. Moreover, just weeks after the closing—*i.e.*, just weeks after confirming its representation that it did not intend to distribute Plaintiff's stock—FWAG entered into an agreement to distribute Plaintiff's stock to third parties.  (*See* Ex. G, FWAG Compl. ¶¶ 21-24.)

Lo, von Welczek, and FWAG controlled Plaintiff until May 2006.  (*See* Ex. B ¶ 36.)

1

2

## <u>STATEMENT OF ISSUES TO BE DECIDED</u>

3

I.      Is Plaintiff Entitled to a Temporary Restraining Order and Preliminary Injunction Enjoining
Defendants from Selling and/or Transferring or Attempting to Sell and/or Transfer Their
Stock in Plaintiff Until Such Time as the Court Can Adjudicate Plaintiff's Claims for
Rescission?

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PSI CORPORATION'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER
Case No. C 07-02869 EDL

### ARGUMENT

Defendants defrauded Plaintiff into buying FWI's stock and selling 18 million shares of its own stock. That very swindle left the principal wrongdoers in charge of PSI for almost two years. Now, free of Defendants' dominion, Plaintiff is entitled to undo that fraud, give FWI back to Defendants, and reclaim its 18 million shares of stock. Without temporary injunctive relief pending Plaintiff's likely victory on the merits, however, the Court likely will be unable to grant the relief that Plaintiff deserves, because the shares of stock at issue will be in the hands of third-parties. Accordingly, the Court should grant temporary injunctive relief, merely to preserve the *status quo* until the parties may be heard.

"[T]he basic function" of temporary injunctive relief is precisely that – to preserve the *status quo ante litem* pending a determination of the action on the merits." *Los Angeles Mem'l Coliseum Comm'n v. NFL*, 634 F.2d 1197, 1200 (9th Cir. 1980). A preliminary injunction is "always appropriate to grant intermediate relief of the same character as that which may be granted finally." *De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212, 220 (1945). As the Ninth Circuit has recognized, it is "unquestionable that it is within the district court's authority to issue a preliminary injunction where final equitable relief is sought." *In re Estate of Ferdinand Marcos*, 25 F.3d 1467, 1476 (9th Cir. 1994) (citing *Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552, 559 (9th Cir. 1992)).

The Court may grant such relief if Plaintiff shows either: (i) a likelihood of success of the merits and the possibility of irreparable harm, or (ii) the existence of serious questions going to the merits and the balance of hardships tips in Plaintiff's favor. *Sammartano v. First Judicial District Court*, 303 F.3d 959, 965 (9th Cir. 2002); *Lockheed Missile & Space Co., Inc. v. Hughes Aircraft Co.*, 887 F. Supp. 1320, 1323 (N.D. Cal. 1995) (noting that the "standard for issuing a temporary

restraining order is identical to the standard for issuing a preliminary injunction"). The two alternatives "represent extremes of a single continuum, rather than two separate tests." *Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1119 (9th Cir. 1999). "The critical element in determining the test to be applied is the relative hardship to the parties. If the balance of harm tips decidedly toward the plaintiff, then the plaintiff need not show as robust a likelihood of success on the merits as when the balance tips less decidedly." *Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 422 (9th Cir. 1991) (citation omitted). As is described below, Plaintiff satisfies either test.

## I. PLAINTIFF WILL LIKELY SUCCEED ON THE MERITS AND WILL LIKELY SUFFER IRREPARABLE HARM WITHOUT TEMPORARY INJUNCTIVE RELIEF.

Plaintiff meets the first of the alternative tests for temporary injunctive relief—*i.e.*, probable success on the merits and the possibility of irreparable harm.

### A. Plaintiff Is More Than Likely to Succeed on the Merits.

A "likelihood of success on the merits" does not require a strong likelihood of success, but rather a probability of success on the merits. *McCurdy v. Simpson,* 2007 WL 801023, at *1 (N.D. Cal. 2001) (citing *Diamontiney v. Borg,* 918 F.2d 793, 795 (9th Cir. 1990)).

#### 1. Plaintiff will likely succeed on its securities and common law fraud claims.

In its Complaint, Plaintiff asserts securities fraud claims under § 10(b), § 20(a), and § 29(b) of the Securities Exchange Act of 1943 and under section 25401 of the California Corporation Code and a common law fraud claim. (*See* Compl. at 14–18.) The elements of a securities fraud claim under Section 10(b) and Rule 10b-5 are: "(1) to use or employ any manipulative or deceptive device or contrivance; (2) scienter, *i.e.* wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to in fraud-on-the-market cases as

14

'transaction causation;' (5) economic loss; and (6) loss causation, *i.e.* a causal connection between the manipulative or deceptive device or contrivance and the loss." *Simpson v. AOL Time Warner, Inc.*, 452 F.3d 1040, 1047 (9th Cir. 2006). Similarly, "[i]n order to have a valid cause of action under California Corporations Code § 25401 [a plaintiff] must allege that there was a sale or purchase of stock in California by fraudulent untrue statements or by omitting material facts that would by omission make the statements misleading." *MTC Electronic Technologies Co. v. Leung*, 876 F. Supp. 1143, 1147 (C.D. Cal. 1995). Common law fraud requires a similar showing: a "false representation as to a material fact, knowledge of its falsity, intent to defraud, justifiable reliance and resulting damage." *Wilhelm v. Pray, Price, Williams & Russell,* 186 Cal. App. 3d 1324, 1331, 231 Cal. Rptr. 355 (1986).

Here, the record demonstrates that Defendants made several, material misrepresentations to Plaintiff in connection with Plaintiff's sale of its stock to, and purchase of its stock from, Defendants, and that they did so knowingly. These knowing misrepresentations, including representations made by the very CFO of the company whose financial condition was at issue, included:

- Representing, as late as December 10, 2004, that FWI's liabilities were roughly equal to its assets, when in truth, as the ten-month period ended six weeks *earlier*, FWI's liabilities were nearly *double* its assets.

- Representing that, as of the December 20, 2004 closing, FWI was operating at a profit and earning a positive net income, when in truth, by the time of the closing, FWI had incurred a record *loss* for 2004.

- Representing that, as of the time Plaintiff acquired FWI, Defendants had not caused FWI to incur liabilities in excess of certain thresholds, when in reality, they had, including the services of their own merger counsel, which they deceitfully passed on to Plaintiff.

- With one month left in the third quarter of 2004, representing that FWI "was on pace" to earn more than $1 million in revenue for the quarter, when in reality FWI

only earned only approximately $1 million in revenue *during the entire second half of 2004.*

- In October 2004, representing that FWI *already had earned* close to $2.1 million in revenue, had incurred only $730,425 in operating expenses, and was profitable, when in truth, FWI had not earned $2.1 million in revenue by the end of the third quarter, had incurred nearly $1.2 million in operating expenses, and was operating at a significant loss.

Plaintiff relied on these misrepresentations, as Defendants hoped they would. As a result, Plaintiff purchased stock worth far less than Defendants had warranted it to be. Accordingly, Plaintiff is likely to succeed on its section 10(b) claim, its section 25401 claim, and its common law fraud claim.

FWI itself made many of the critical representations, speaking through its officers (Lo and von Welczeck) and in its representations and warranties in the SEA and Closing Agreement, and thus would be liable along with Lo and von Welczeck. Accordingly, Defendants FWAG, Lo, and von Welczeck each are separately liable for these representations under Section 20(a), because they controlled FWI. "To state a *prima facie* case under Section 20(a), a plaintiff must allege (1) a primary violation of the federal securities laws; and (2) that the defendant exercised actual power or control over the primary violator." *In re Northpoint Comm. Group, Inc., Secs. Litig.*, 221 F. Supp. 2d 1090, 1105-06 (N.D. Cal. 2002). "Whether [the defendant] is a controlling person is an 'intensely factual question,' involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *Kaplan v. Rose*, 49 F.3d 1363, 1382 (9th Cir. 1994). Von Welczeck was FWI's CEO, the most powerful single position in a company. Lo was FWI's CFO, and FWI spoke and acted principally through him in the negotiations with Plaintiff. FWAG, FWI's former corporate parent, owned 30% of FWI's stock, filled a seat on FWI's board with its own CEO, and maintained old and close ties with von Welczeck. These Defendants clearly wielded control over FWI's actions and statements in the

16

merger transaction.  Thus, Plaintiff is likely to succeed on its section 20(a) claim against FWAG, Lo, and von Welczeck, based on FWI's fraud.

### 2.    Plaintiff will likely succeed on its breach of contract claim.

To succeed on its breach of contract claim, Plaintiff must show "(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff."  *Reichert v. General Ins. Co.*, 68 Cal. 2d 822, 830, 69 Cal. Rptr. 321 (1968). As is demonstrated by the documents themselves, most of Defendants' misrepresentations also formed contractual representations and warranties in the SEA and the Closing Agreement, made for Plaintiffs' benefit.  In particular, in the SEA:

- FWI, through von Welczeck, represented that it had delivered financial statements for the years ended December 31, 2002 and 2003 and for the six-month period ended June 30, 2004, and that those financial statements accurately represented the financial condition and operating results of FWI.  They further represented that, between June 30, 2004 and the execution of the SEA, there had not been a material adverse change in the financial condition depicted in those financial statements. (*See* Ex. C at ¶ 3.5.)

- FWI, through von Welczeck, represented that, between June 30, 2004 and the execution of the SEA, there had not been a material change to any material agreement to which FWI was bound, or the incurring of indebtedness or liability individually in excess of $25,000 or aggregately in excess of $100,000.  (*See id.* at ¶ 3.6(j).)

- FWAG and von Welczeck represented that they intended to acquire Plaintiff's stock for their own account and did not intend to sell or distribute Plaintiff's stock.  (*See id.* at ¶ 3.8.)

- FWAG and von Welczeck covenanted that, between the execution of the SEA and the closing, FWI's operations would continue in their ordinary course.  In particular, they covenanted that FWI would not incur any long-term or short-term debt securities or enter into any extraordinary contracts.  They also covenanted that FWI would continue to pay its accounts payable consistent with past practice.  (*See id.* at ¶3.8.)

- FWAG and von Welczeck covenanted that they and FWI would pay their own expenses in connection with the merger transaction.  (*See id.* at ¶ 4.8.)

17

In connection with the closing, Defendants Lo and Draper made the same representations and warranties that FWAG and von Welczeck had made in the SEA, and each Defendants warranted that their representations and warranties remained true.  Defendants breached each and every one of these warranties, however, and, as a result, Plaintiff traded its stock for stock in a worse-than-worthless company.[2]

### 3.   Plaintiff will likely be awarded rescission.

As a remedy for Defendants' fraud and breach of contract, Plaintiff is entitled to rescission of the merger and the return of its consideration.  Section 29(b) of the Exchange Act, which is the basis of Count III of Plaintiff's Complaint, provides that "a person can avoid a contract [] if he can show that (1) the contract involved a 'prohibited transaction,' (2) he is in contractual privity with the defendant, and (3) he is 'in the class of persons the Act was designed to protect.'"  *Regional Properties, Inc. v. Financial and Real Estate Consulting Co.*, 678 F.2d 552, 559 (5th Cir. 1982).  As is stated above, the merger clearly violated sections 10(b) and 20(a) of the Exchange Act, and contractual privity between Plaintiff and Defendants is unquestionable.  The Exchange Act was designed to protect defrauded purchasers and sellers of securities, like Plaintiff.

Section 25501 of the California Corporations Code provides rescission as a remedy for violations of section 25401.  *Boam v. Trident Fin. Corp.,* 6 Cal. App. 4th 738, 743-44, 9 Cal. Rptr.

---

[2]   Each Defendant is also liable for the fraud of the others, because they conspired with each other to swindle Plaintiff through such fraud.  "To prove a claim for civil conspiracy, [plaintiff is] required to provide substantial evidence of three elements: (1) the formation and operation of the conspiracy, (2) wrongful conduct in furtherance of the conspiracy, and (3) damages arising from the wrongful conduct."  *Kidron v. Movie Acquisition,* 40 Cal. App. 4th 1571, 1581 (1995) (citing *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.,* 7 Cal. 4th 503, 510-11 (1994)).  Based on the defendants' interlocking directorships, officer positions and advisory relationships both before and after the SEA closed and the allegation that Defendants acted in concert to mislead Plaintiff and its shareholders, Plaintiff states a claim for civil conspiracy arising from the fraud and breach of contract claims.  As a result, Plaintiff demonstrates a reasonable likelihood of success on its claim for civil conspiracy.

18

PSI CORPORATION'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER
Case No. C 07-02869 EDL

2d 177, 180-81 (1992).  Rescission is also a remedy for common law fraud.  *Kent v. Clark*, 20 Cal. 2d 779, 783-84, 128 P.2d 868 (1942).  Finally, under California Civil Code § 1689, a "party to a contract may rescind the contract," if that party's consent was obtained through fraud, "exercised by or with the connivance of the party as to whom he rescinds, or of any other party to the contract jointly interested with such party."  Cal. Civ. Code § 1689.  A party may rescind a contract if "the consideration for the obligation of the rescinding party fails, in whole or in part, through the fault of the party as to whom he rescinds."  *Id.*

Moreover, Plaintiff can readily accomplish the rescission it seeks – *i.e.,* it can return Defendants to the positions they held prior to the merger.  FWI remains a wholly-owned subsidiary of Plaintiff.  Plaintiff is ready, willing, and able to return all the shares of FWI's stock to Defendants.  FWI had very little assets when Plaintiff acquired it from Defendants, and those few assets were dramatically outweighed by the liabilities that Defendants passed on to Plaintiff.  Owning FWI has caused Plaintiff nothing but losses.

### B.  <u>Irreparable Harm to Plaintiff Is More Than a Possibility.</u>

Because Plaintiff has shown probable success on the merits, it need show only a possibility of irreparable harm.  *See A&M Records, Inc. v. Napster, Inc.,* 239 F.3d 1004, 1013 (9th Cir. 2001).  Plaintiff more than meets that standard here, for there is a risk that Defendants will sell the very peculiar asset that Plaintiff has a right to recover.  The stock Defendants received in connection with the merger with Plaintiff was "restricted" stock.  The limits on transferring the stock imposed by SEC Rule 144, however, recently expired.  It is now plainly "possible" that Defendants will sell their ill-gotten stock to third-parties, be they innocent or not.  There is no question that, if such a sale occurs, the Court's ability to grant the permanent equitable relief Plaintiff seeks will be hampered, if not eliminated.

Moreover, this irreparable harm is more than just a mere possibility. Rather, Defendants are in the course of "dumping" Plaintiff's stock to third-parties. On or about May 29, 2007, Plaintiff learned that Draper, on behalf of Derma Plus, recently contacted Plaintiff's transfer agent and secured the release of 720,000 shares of Plaintiff's stock. (*See* Ex. D ¶ 5.) Two days later, the market price of Plaintiff's stock declined *by half*, with no company news to explain the drop. (*See id.* ¶ 6.) Similarly, Defendant Lo recently sold shares of Plaintiff's stock. (*See id.* ¶ 7.) And, FWAG recently commenced suit against Plaintiff to secure the release of the certificates of the stock that it received in the merger at issue in this case, as well as the certificate for 1,529,824 of the shares that von Welczeck received. (*See* Ex. G ¶¶ 11-17, 24.) As FWAG candidly admits in that action, it seeks these certificates because it *already* has agreed to transfer approximately 7.8 million shares of Plaintiff's stock to "certain non-U.S. citizens" and requires the certificates consummate its sale. (*See id.*) The FWAG transaction would represent over 43% of the total stock issued to under the SEA. As these transactions demonstrate, neither Plaintiff nor the Court will receive any warning about a further sale of Plaintiff's stock by Defendants. Rather, the sales will simply happen, and Plaintiff's equitable claims will be eviscerated before they are heard.[3]

To prevent this harm, Plaintiff seeks only a temporary order preserving the *status quo*. Given Plaintiff's equitable claim to the return of the particular stock at issue, such an order is especially appropriate. In *Deckert v. Independence Shares Corp.*, 311 U.S. 282 (1940), the Supreme Court held that a complaint seeking final relief in the form of rescission was sufficient to

---

[3]    These sales represent further violations of Defendants' representations and warranties under the Agreement. Under the SEA and the Closing Agreement, Defendants represented that they "were acquiring [Biofarm's Common Stock] for investment of [their] own account . . . and not with the view to, or for resale in connection with, any distribution thereof, and . . . ha[d] no present intention of selling, granting any participation in, or otherwise distribution the same." (*See* Ex. C ¶¶ 4, 5; Ex. E ¶ 2.1.) Thus, Plaintiff's requested injunction is not only a reasonable measure to maintain the *status quo*, but it also would merely hold Defendants to their express and material promises.

20

PSI CORPORATION'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER
Case No. C 07-02869 EDL

permit the district court to enter an injunction freezing the relevant assets of the defendants "in aid of the recovery sought in the bill."[4]  *Id.* at 289.  At the pleading stage, it is "enough [] to determine that the bill contains allegations which, if proved, entitle petitioner to some equitable relief."  *Id.*

Plaintiff's right to seek damages against Defendants is not an adequate alternative.  The tainted merger at issue in this case caused Plaintiff to issue 18 million *new* shares of its stock, quadrupling the existing number of outstanding shares.  (See Ex. D ¶ 8.)  The existence of those shares severely limits Plaintiff's current efforts to obtain additional financing.  The existence of those shares also leaves substantial voting power in the hands of those who defrauded Plaintiff in the first place.  Defendants should not now be permitted to "buy-in" to the business Plaintiff has created despite their fraud, simply by paying a damages award.  Rather, because the SEA was procured by fraud, Plaintiff should be entitled to void the agreement, rescind the transaction, and cancel the relevant shares.

## II.   PLAINTIFF HAS RAISED SERIOUS QUESTIONS GOING TO THE MERITS, AND THE BALANCE OF HARDSHIPS TIPS IN PLAINTIFF'S FAVOR.

Plaintiff also readily meets the alternative test for temporary injunctive relief – *i.e.*, showing that existence of serious questions going to the merits and that the balance of hardships tips in Plaintiff's favor.  "Serious questions need not promise a certainty of success, nor even present a probability of success, but must involve a 'fair chance of success on the merits.'"  *Republic of Philippines v. Marcos*, 862 F.3d 1355, 1362 (9th Cir. 1988) (*en banc*).  As is stated

---

[4]  Conversely, the Supreme Court's decision in *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308 (1999) is not relevant to this present motion.  As a general proposition, *Grupo Mexicano* proscribed the imposition of injunctive relief in suits seeking purely legal remedies.  However, it exempted from this general rule "preliminary injunctions freezing assets [in] cases involving bankruptcy and fraudulent conveyances, and cases in which equitable relief is sought."  *In re Focus Media Inc.*, 387 F.3d 1077, 1085 (9th Cir. 2004); *see also Grupo Mexicano*, 527 U.S. at 324-25.  These are precisely the remedies Plaintiff seeks here, rendering *Grupo Mexicano* inapposite.

21

1 above, Plaintiff not only stands a "fair chance" of success, but its success is likely.  *See supra*

2 Argument Part II.A.

3 Moreover, given the irreparable harm described above, *see supra* Argument Part II.B., the balance

4 of hardships certainly tips in Plaintiff's favor.  In stark contrast to the irreparable harm which

5 Plaintiff will suffer absent an injunction, an order temporarily enjoining Defendants transferring or

6 encumbering their shares of Plaintiff's stock will not cause Defendants any harm at all, let alone

7 any lasting harm.  The ownership status of the shares would not change, and Defendants ultimate

8 rights would not be affected by the injunction.

9

10

11                                                    *          *          *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PSI CORPORATION'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER
Case No. C 07-02869 EDL

1
2

## **CONCLUSION**

For the reasons set forth above, Plaintiff respectfully requests that this Court enter an order enjoining Defendants Alexander von Welczeck, Henry Lo, Michael Draper, Friendlyway AG, Karl Johannsmeier, Pacific Capsource, Inc. and Derma Plus, Inc. from selling, assigning or transferring, in any manner, their shares of Plaintiff's stock.

Dated: June 4, 2007                                         COZEN O'CONNOR

                                                By:  /s/Daniel D. Harshman
                                                     Charles E. Wheeler
                                                     Daniel D. Harshman
                                                     Attorneys for Plaintiff
                                                     PSI CORPORATION

SAN_FRANCISCO\41165\1  198844.000

23