LAURENCE A WEISS (Bar No. 164638)
RYAN D. MARSH (Bar No. 237259)
HOLLY B. BAUDLER (Bar No. 238843)
HELLER EHRMAN LLP
275 Middlefield Road
Menlo Park, California  94025-3506
Telephone: (650) 324-7000
Facsimile: (650) 324-0638
Laurence.Weiss@hellerehrman.com
Ryan.Marsh@hellerehrman.com
Holly.Baudler@hellerehrman.com

Attorneys for Defendant
friendlyway AG

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

|  |  |
|---|---|
| PSI CORPORATION (f/k/a FRIENDLYWAY CORPORATION f/k/a BIOFARM, INC.) <br><br> Plaintiff, <br><br> v. <br><br> ALEXANDER VON WELCZECK, HENRY LO, MICHAEL DRAPER, and FRIENDLYWAY AG, <br><br> Defendants. | Case No. 07-02869 SBA <br><br> **DEFENDANT FRIENDLYWAY AG'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER** <br><br> Judge:  Hon. Saundra B. Armstrong <br> Complaint filed: June 1, 2007 |

## I.    INTRODUCTION

PSI Corporation's ("PSI's") motion for a temporary restraining order against friendlyway AG ("FWAG") is much more about the failures and misconduct of PSI's current management than it is about anything that occurred in 2004.  PSI's misconduct includes its arbitrary and improper "cancellation" of more than 7.5 million shares of PSI's common stock owned by FWAG, which has already required FWAG to file a now-pending lawsuit against PSI in San Francisco Superior Court.  At the time PSI purported to cancel the shares, in August 2006, its public explanation was "failure of consideration" – an excuse that was plainly insupportable.  Now the excuse for PSI's misconduct is "fraud." This excuse similarly does not survive close scrutiny.  Simply put, there is no basis to deny FWAG the shares of PSI common stock it owns.

Lurking behind PSI's motion is an effort by PSI to alleviate – unjustly at FWAG's expense – some of the harm caused to PSI and its shareholders by PSI's own new management.  In May 2006, Biofarm (then known as friendlyway Corp.) was the subject of a takeover transaction by a company called Pantel Systems.  Pantel installed new management (replacing Alexander von Welczeck and others, and replaced again by Pantel in January 2007) who embarked almost immediately on a frenzied acquisition spree.  Now known as PSI, the company acquired at least three other companies, issuing millions of new shares of PSI stock in the process.  PSI also was forced to obtain additional financing, further diluting its common stock.  This misguided strategy has devastated PSI's stock price, which has fallen from 49 cents/share at the time of the Pantel takeover to under 10 cents in recent weeks.  PSI's attempts to "cancel" or "rescind" the shares owned by FWAG and others is a transparent effort to reduce this damage it has caused to the value of its stock.

PSI's description of the 2004 transaction is also inaccurate.  Although the deal was structured so that Biofarm would become the parent corporation, the economic reality of the transaction is that FWI acquired Biofarm's public shell for FWI's operating business.  In exchange for contributing the shell corporation, Biofarm's shareholders received a generous

1

25% stake in FWI's operations. That FWI, and not Biofarm, was the actual buyer in this transaction is evident from the Stock Exchange Agreement itself, which provides both a special contractual rescission right to FWI in the event Biofarm's representations were not true and a special anti-dilution provision protecting FWI's shareholders' 75% stake against dilution by Biofarm's actions in the company, but providing no comparable provisions to Biofarm or its original shareholders. And, of course, after the transaction closed FWI selected Biofarm's new management and changed its name to friendlyway Corp.

PSI's motion for a TRO against FWAG should be denied because its scattershot and unsupported contentions do not establish any likelihood of success on the merits against FWAG. On close scrutiny, it is evident that PSI does not seriously pretend that anything FWAG itself said or did in connection with the 2004 transaction was fraudulent (or otherwise tortious) or in breach of FWAG's contractual obligations. As to the supposed statements of others (which constitute the vast majority of PSI's allegations), PSI's evidence amounts to little more than inactionable "fraud by hindsight" and in any event does not adequately show how FWAG controlled or conspired with those others – which FWAG did not. Finally, the requested TRO would indeed pose significant harm to FWAG and a real balancing of hardships counsels against granting the TRO.

At bottom, there is no justification to leave PSI free to engage in even more dilutive and damaging "financing" transactions while continuing to frustrate FWAG's property rights in its long-held PSI common stock.

## II.    BACKGROUND FACTS

In 2000, FWAG established a United States subsidiary, incorporated in Delaware, called friendlyway, Inc. ("FWI"). In 2002, FWAG divested a majority of the ownership of FWI. (*See* Declaration of Klaus Trox in Support of Defendant friendlyway AG's Opposition to Plaintiff's Motion for Temporary Restraining Order ("Trox Decl.") ¶ 4). Alexander von Welczeck, who was president of FWI and a former employee of FWAG, purchased 70% of FWI's outstanding common stock, and FWAG retained a minority 30% stake in the outstanding shares of FWI. (*Id.*)

2

In 2004, FWI sought to merge with a publicly-traded shell company in order to have access to funding through the public markets. (*Id.* at ¶ 8.) FWI identified Biofarm, Inc. as a possible merger candidate. (*Id.* at ¶ 9.) According its report on Form 10-QSB filed with the Securities and Exchange Commission ("SEC") on September 14, 2004, Biofarm was a "non-operating shell corporation" that, as of July 31, 2004, had "total assets of $229 and no liabilities." (*See* Declaration of Holly Baudler in Support of Defendant friendlyway AG's Opposition to Plaintiff's Motion for Temporary Restraining Order ("Baudler Decl."), Ex. 1.) Biofarm stated in a subsequent report on Form 10-KSB filed with the SEC on February 14, 2005, that it had been a "public shell company with no revenue from operations" for the past three years, and the audited financial statements included in the report indicate Biofarm had total assets of $243 and liabilities of $101,818 as of October 31, 2004. (*See* Baudler Decl., Ex. 2.)

No employee of FWAG was present during the negotiations between Biofarm and FWI. (*See* Trox Decl. at ¶ 10.) Significantly, neither Mr. von Welczeck nor Mr. Lo nor Mr. Draper was an employee of or agent for FWAG at the time. (*See* Trox Decl. at ¶¶ 5-7.)

Ultimately, the stockholders of FWI, including FWAG, agreed to exchange all of their shares of FWI common stock for 75% of the shares of Biofarm common stock pursuant to a Share Exchange Agreement dated August 13, 2004 (the "2004 Share Exchange Agreement") and a Closing Agreement, effective December 10, 2004, among Biofarm, FWI, and each of FWI's stockholders. (*See* Pl.'s Ex. C, E.)[1] The share exchange ratio was set so that the pre-merger Biofarm (now PSI)[2] stockholders would retain 25% of the surviving entity as compensation for contributing Biofarm's public shell to FWI. (*See id.*) The 18,000,000 shares received by the FWI stockholders in the merger transaction

---

[1] All citations "Pl.'s Ex." refer to the exhibits filed in support of Plaintiff PSI Corporation's Memorandum of Points and Authorities in Support of its Motion for a Temporary Restraining Order.

[2] In April 2005, Biofarm changed its name to friendlyway Corporation ("FW Corp.") (*see* Baudler Decl., Ex. 3), and in October 2006, FW Corp. changed its name to PSI Corporation ("PSI") (*see* Baudler Decl., Ex. 4).

3

represented 75% of the shares of common stock anticipated to be outstanding at the close of the merger transaction.[3] (*See id.*)

Prior to the closing of the transaction, FWAG owned approximately 33% of FWI common stock. (*See id.*) As a result of the merger transaction, FWAG was issued 6,000,001 shares of Biofarm (now PSI) common stock, which represented approximately 25% of the surviving entity. (*See id.*) FWI became a wholly-owned subsidiary of Biofarm (now PSI). (*See id.*)

Upon the closing of the transaction, Biofarm's board of directors consisted of Allan Esrine, David Stith and Herbert S. McDonald (each of whom had been a director of Biofarm prior to the merger transaction), Klaus Trox of FWAG, and Alexander von Welczeck and Henry Lo. (*See* Pl.'s Ex. A) Effective December 10, 2004, Biofarm's board of directors appointed Alexander von Welczeck as Chief Executive Officer and Henry Lo as Chief Financial Officer of Biofarm (now PSI). (*See id.*) Messrs. Esrine, Stith, McDonald and Lo remained as directors until June 2006, but did not stand for re-election to the board at the annual meeting held on June 16, 2005. (*See* Baudler Decl., Ex. 5)

Beginning in February 2005, FWAG offered and sold in Germany to non-U.S. citizens reverse convertible bonds, which were convertible into shares of Biofarm (now PSI) common stock. (*See* Baudler Decl., Ex. 6) The purchasers of the bonds subsequently elected to convert the bonds. (*See* Trox Decl. at ¶ 11.) FWAG intended to effect the conversion by transferring to the bondholders shares of Biofarm (now PSI) common stock owned by FWAG in accordance with each bondholder's subscription certificate. (*See id.*)

FWAG used the proceeds from the bond offering to provide cash to FW Corp. (now PSI). (*See id.*) Between March 1, 2005 and September 2, 2005, FWAG lent a total of $1,150,000 to FW Corp. (now PSI) pursuant to a series of promissory notes. (*See* Baudler

---

[3] On the date of the Closing Agreement, December 10, 2004, Biofarm's stock closed at $0.45 per share. (*See* Baudler Decl., Ex. 7) Thus, the market value of the 18,000,000 shares issued to the stockholders of FWI could be calculated as $8,100,000. The supposed "$9 million" price that PSI's repeatedly references in its TRO papers appears nowhere in the Stock Exchange Agreement or in the Closing Agreement.

4

1   Decl., Ex. 8)  The principal and accrued interest on the loans were subsequently converted

2   to an aggregate of 4,818,575 shares of FW Corp. common stock. (*See* Trox Decl. ¶ 13;

3   Baudler Decl., Ex. 9)

4        In May 2006, FW Corp. acquired Pantel Systems, Inc., a Nevada corporation,

5   pursuant to a Share Exchange Agreement (the "2006 Share Exchange Agreement"), dated

6   April 27, 2006, among FW Corp. (now PSI), Pantel Systems, Inc. and Kenneth J. Upcraft,

7   its sole stockholder.  (*See* Baudler Decl., Ex. 10)

8        Pursuant to the 2006 Share Exchange Agreement, Mr. Upcraft acquired 20,000,000

9   shares of FW Corp. (now PSI) common stock in exchange for all his shares of capital stock

10  of Pantel Systems, Inc.  (*See id.*)  As a result, Mr. Upcraft became the largest single

11  shareholder of FW Corp. (now PSI).  Upon the closing of the transaction described in the

12  2006 Share Exchange Agreement, Mr. Upcraft also became President and Chief Executive

13  Officer of FW Corp. (now PSI), and had the power to exercise his control over FW Corp.

14  (now PSI).  (*See id.*)

15       Soon after Mr. Upcraft acquired control of the company through the Pantel Systems

16  transaction, FW Corp. (now PSI) announced that it had "cancelled" the issuance of

17  15,560,000 shares of its common stock, which included the 6,000,001 shares issued to

18  FWAG pursuant to the 2004 Share Exchange Agreement and 1,529,824 shares transferred

19  to FWAG by Mr. von Welczeck pursuant to a settlement agreement.  (*See* Baudler Decl.,

20  Ex. 11)

21       Under Mr. Upcraft's direction, the company engaged in a series of transactions

22  involving large stock issuances, resulting in significant dilution to FW Corp.'s (now PSI's)

23  stockholders, including FWAG.  On August 7, 2006, the company acquired the assets of

24  Big Fish Marketing Group, Inc. for 4,952,380 shares plus cash and additional stock

25  promised upon achievement of certain revenue targets.  (*See* Baudler Decl., Ex. 12)  On

26  August 22, 2006, the company acquired the assets of Ignition Media Group, LLC for

27  6,818,182 shares plus $1 million in cash.  (*See* Baudler Decl., Ex. 13)  On October 17,

28  2006, the company issued 5,000,000 shares of its common stock plus warrants to purchase

5

1  up to 5,000,000 additional shares of common stock to Lazarus Investment Partners, LLP for

2  $500,000, or $0.10 per share, a substantial discount to the stock's closing price of October

3  17, 2006 of $0.35 per share.  (*See* Baudler Decl., Ex. 14.)

4      At the same time the company engaged in this string of acquisition and financing

5  transactions, it apparently attempted to mitigate the dilutive effects of these transactions at

6  the expense of FWAG and other former FWI stockholders by purporting to "cancel" their

7  validly issued stock.  (*See* Baudler Decl., Ex. 11.)

8      While Mr. Upcraft controlled the company, the FW Corp. (now PSI) stock price fell

9  from  $0.49 on April 27, 2006 to $0.35 on December 20, 2006, when Mr. Upcraft resigned

10  as chief executive officer.  (*See* Baudler Decl., Ex. 15.)

11      The new management has caused further devastation to the value of the company.

12  David Foni was appointed to the board of directors on January 16, 2007, and the board of

13  directors appointed him chief executive officer on January 19, 2007.  (*See* Baudler Decl.,

14  Ex. 16.)  The company's stock price has fallen from $0.40 on January 16, 2007 to $0.065 on

15  June 6, 2007.  (*See* Baudler Decl., Exs. 17, 18.)

16      On April 23, 2007, in connection with PSI's wrongful cancellation of FWAG's

17  shares of common stock, FWAG filed a complaint against PSI, Superior Court of

18  California, County of Santa Clara, Case No. CGC-07-462622 for breach of contract and

19  other causes of action.  (*See* Pl.'s Ex. G.)  FWAG is harmed each day PSI refuses to issue to

20  FWAG shares FWAG rightfully owns.

21  **III.    ARGUMENT**

22          **A.    PSI's Motion for Temporary Restraining Order Against FWAG Should**
           **Be Denied Because PSI Fails to Show a Likelihood of Success on the**
23          **Merits or the Existence of Serious Questions Going to the Merits**

24      PSI is not entitled to the temporary relief it seeks against FWAG because it has failed

25  to make the required showing that it is likely to succeed on the merits or that serious

26  questions going to the merits exist.  *Wherry*, 2006 WL 2038495, at *1.  PSI's claims against

27  FWAG are barred by applicable statutes of limitations and/or by the provisions of the

28  Agreement, and the evidence offered against FWAG is insufficient in any event to support

6

its claims.  Accordingly, PSI's motion for a temporary restraining order should be denied as to FWAG.

### 1.    PSI's Federal and California State Securities Claims Are Time-Barred

PSI's claims under Section 10(b) of the federal Securities Exchange Act  and under California Corporations Code § 25401 are predicated upon supposed representations about FWI's financial health, including its revenues and profitability, and other terms of the 2004 transaction between Biofarm and FWI.  Pl.'s Br. at 15-16.  PSI asserts that the falsity of the complained-of representations was revealed by Biofarm's Forms 8-K and 10-Q filed with the SEC on March 3, 2005 and March 17, 2005 respectively.  *See* Pl.'s Br. at 9-11.  Nevertheless, PSI waited until June 1, 2007 – more than two years later – to bring its statutory fraud claims.  They are therefore time-barred.

A Section 10(b) claim must have been commenced within "the earlier of (1) 2 years after the discovery of facts constituting the violation; or (2) 5 years after such violation."  28 U.S.C. § 1658(b).  Claims brought under Section 25401 of the California Corporations Code must "be brought before the expiration of one year after the discovery by the plaintiff of the facts constituting the violation[.]"  *Deveny v. Entropin, Inc.*, 42 Cal. Rptr. 3d 807, 815 (Cal. Ct. App. 2006) (internal quotation marks omitted); Cal. Corp. Code § 25506.  Under both statutes, inquiry notice is sufficient to trigger the limitations period.  *Deveny*, 42 Cal. Rptr. 3d at 423; *Betz v. Trainer Wortham & Co.*, __ F.3d __, 2007 WL 1377613, at *4 (9th Cir. May 11, 2007) (holding "that either actual or inquiry notice can start the running of the statute of limitations on a federal securities fraud claim.").  PSI does not point to a single fact supporting its alleged securities fraud claims that was not publicly disclosed well before June 1, 2005.  It was on inquiry notice of the facts on which it relies no later than that date.

PSI's claims under Sections 20(a) and 29(b) of the federal securities laws necessarily depend on the viability of its Section 10(b) claim, and therefore fail along with that claim.  *See Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 978 (9th Cir. 1999) (holding that defendants could not be liable under § 20(a) because they were not liable under another

7

provision of the Exchange Act); *In re U.S. Grant Hotel Assocs., Ltd. Sec. Litig.*, 740 F.

Supp. 1460, 1466 (S.D. Cal. 1990) (finding that plaintiff's § 29(b) claim was "dependent

upon a prior finding by the court that [defendant] violated § 10(b) of the 1934 Act[.]").

Thus, to the extent its Section 10(b) claim is time-barred, its other federal claims must fail

as well.  Moreover, to the extent its civil conspiracy claim depends on violations of the

federal and state securities statutes arising from the representations mentioned, it is also

time-barred.  *See Film Serv. Labs., Inc. v. Harvey Bernhard Enters., Inc.*, 256 Cal. Rptr.

735, 742 (Cal. Ct. App. 1989) ("Whether or not a cause of action for conspiracy is timely

must be determined by reference to the statute of limitations applicable to the underlying

cause of action.").

    PSI previews its likely effort to avoid this inevitable conclusion by contending that

"defendants" controlled the company through May 2006.  But even if true – which at least

with respect to FWAG it is not – while such facts might support a tolling argument in other

situations, *see*, *e.g.*, *Healthtrac, Inc. v. Sinclair*, 302 F. Supp. 2d 1125, 1127 (N.D. Cal.

2004), it would not do so here.  Through June 2005 – months after the facts upon which PSI

now relies were disclosed – fully half of Biofarm's board of directors were pre-transaction

Biofarm representatives, including Mr. Esrine himself.  (*See* Pl.'s Ex. A)  These directors

likely could have caused Biofarm to bring the lawsuit that PSI now attempts to bring today.

But if for some reason it could not, then Mr. Esrine himself, as holder of hundreds of

thousands of shares of Biofarm stock, could have brought a shareholder derivative suit on

behalf of Biofarm (now PSI) raising exactly the same claims he purports to support now.

No tolling should apply in this situation.  *See Resolution Trust Corp. v. Dean*, No. CIV. 91-

2026 PHX EHC, 1993 WL 837065, at *5 (D. Ariz. Jul. 20, 1993) ("Once facts giving rise to

possible liability are known, a plaintiff 'must effectively negate the possibility that an

informed stockholder or director could have induced the corporation to sue.'" (quoting

*Mosesian v. Peat, Marwick, Mitchell & Co.*, 727 F.2d 873, 879 (9th Cir. 1984)).

**2.    PSI Cannot Show That Its Fraud Claims Are Likely To Succeed or Present Serious Questions Because It Cannot Show That The**

8

**Representations It Relied On Were Untrue When Made and/or
That FWAG Made the Representations**

PSI's statutory and common law fraud claims simply are not supported by the

evidence it has provided in support of its motion.  PSI's brief and accompanying Esrine

declaration attempt to create a blizzard of supposed "representations" made by "defendants"

FWAG and/or others, but the moving papers contain scant assertions about whether these

representations were actually false when made.  Moreover, even where PSI does assert a

specific falsity, it fails to provide adequate evidence of those assertions, at least as to

FWAG.  And in many instances, PSI fails to show that FWAG even made the statements

PSI attempts to attribute to it.  Moreover, many of PSI's allegations are merely a textbook

example of impermissible "fraud by hindsight."

> a.   **PSI Fails to Show That FWAG's Representations Were
> False When Made**

Some of the representations PSI attributes to FWAG are statements that FWAG

intended to take or refrain from taking some specified action at some future time.  For

example, PSI contends that on August 20, 2004, FWAG represented that it intended to

merge into PSI once it acquired FWI.  Pl.'s Br. at 5.  PSI also points to FWAG's

representation in the Agreement that it was acquiring PSI's stock for its own account and

had no present intention of selling or otherwise distributing it.  Pl.'s Br. at 6; Pl.'s Exh. C ¶

4.5.[4]

While it is true that a false promise of future performance can give rise to a fraud

claim, *Reynolds v. All State Life Ins. Co.*, No. CV-F-05-0874 REC/SMS, 2006 WL 662749,

at *4 (E.D. Cal. Mar. 16, 2006), FWAG's alleged statements were not promises at all, but

merely statements about its then-current intentions.  Even if they could be construed as

promises to perform in the future, PSI has not adduced sufficient evidence to show that

FWAG did *not* possess its stated intention at the time of the representations.  For example,

the only evidence that PSI points to in support of its assertion that FWAG's representation

---

[4]  These are just examples of representations in the complaint constituting statements of
present intentions.  There are others and they fail for the same reasons addressed herein.

9

concerning its intent to refrain from distributing PSI's stock was false when made is FWAG's state court complaint (Pl.'s Exh. G). Pl.'s Br. at 11. The paragraphs of the complaint it cites, however, show only that FWAG entered into debt financing arrangements in mid-2005, and, much later, in April 2006, instructed PSI to transfer some PSI stock to others. Pl.'s Exh. G ¶ 24. These facts do not call into question FWAG's representation that at the time of the Agreement it had no then-present intention of distributing PSI stock. Pl.'s Exs. C, F.

PSI's other contentions about representations actually made by FWAG similarly are simply not actionable fraud. First, PSI contends that FWAG demanded $9 million for FWI's shareholders. Even if this is what happened, it is not fraud. Moreover, the more credible evidence shows that this is *not* what happened. Rather, the transaction price negotiated by the parties was an exchange ratio of Biofarm to FWI shares, not any specific price in dollars. *See* Ex. C § 1.1. Second, PSI complains that FWAG covenanted FWI's operations prior to closing. But the Agreement expressly states instead that FWI, not FWAG, covenanted both at the time the agreement was signed and at the time of closing, regarding FWI's operations and the correctness of FWI's financials. Ex. B. ¶ 3.5 and Ex. F. The Agreement itself makes clear that FWAG did not make any representations or warranties to any indicators of FWI's profitability, revenues, or expenses or other results. Ex. C § 4.

b.    **PSI Fails to State Fraud Claims Against FWAG Based on Supposed Statements of Others**

The bulk of the representations PSI relies on are oral statements supposedly made by Henry Lo about such things as FWI's financial health, profitability, and revenue projections. *See* Pl.'s Br. at 4-5. These representations do not raise any serious question on the merits of PSI's fraud claims against FWAG (or anyone else, for that matter).

As an initial matter, PSI cannot establish that Lo's statements should be attributed to FWAG. It offers only the hearsay testimony by Esrine (in his declaration) that Lo told him that "he spoke for FWI and all of its shareholders." Pl.'s Ex. B ¶ 11. Even if Lo made this

10

exact statement, it is ambiguous.  More importantly, the fact is that Lo never was employed by FWAG nor did he ever act as FWAG's agent.  Trox Decl. ¶ 6.  And, as shown below, PSI has not shown that FWAG exercised any control over Lo.

Even if Lo's statements could be attributable to FWAG, they fail to state fraud claims.  Many of these representations consisted of projections regarding how FWI would perform over a time period that was not yet concluded.  For example, PSI contends that Lo told it on March 31, 2004 that he and von Welczeck "currently believed" that FWI was performing such that it would generate $3.5 million in revenue in 2004.  Pl.'s Br. at 4.  PSI avers that Lo also stated that "by the end of 2004, FWI would be earning revenue at a rate of $6 million per year" and that he "represented management's current belief that, by year-end, FWI's assets would exceed its liabilities by 53%."  *Id*.  PSI points to no evidence that shows that these representations made by Lo were false at the time they were made or that Lo did not actually believe them to be true when he made them.  PSI merely points to FWI's financial statements filed with the SEC in March of 2005 reporting financial results for the periods ending Oct. 31, 2004 and January 31, 2005—six and nine months after the representations were supposedly made—to prove the falsity of these claims.  Pl.'s Br. at 9-10.  However, financial results for these later periods cannot show that Lo believed his projections rendered at a much earlier time were false or baseless.

Apart from projections, PSI contends that Lo made statements about FWI's existing financial condition as of particular points in time.  For example, PSI contends that Lo stated "that as of June 30, 2004, FWI had earned a net profit" or that FWI was "currently profitable" as of August 4, 2004.  *Id*. at 4-5.  Moreover, PSI contends that on July 15, 2004, Lo provided FWI's historical financial statements for year-end 2003 and the period ending June 30, 2004 and pro forma projections for the periods ending September 2004 and December 2004.  *Id*. at 4.  Again, it is impossible to tell from PSI's papers and exhibits which, if any, of FWI's and Lo's supposed representations about FWI's financial condition were actually false because the exhibits – FWI and Biofarm financial filings for later periods, do not speak to the company's financial condition on the earlier dates when the

11

alleged falsities were made.  Accordingly, PSI's evidence does not even come close to raising a serious question whether the representations made by Lo were false when he made them.

And in yet another classic example of overreaching, PSI argues that on November 16, 2004, "the sellers" agreed not to distribute PSI's stock "unless the stock had been trading for at least 30 days at a price equal to or higher than 75 cents per share and would not do so for less than 50 cents per share."  Pl.'s Br. at 7.  PSI points to Allan Esrine's declaration in support of this contention.  However, Esrine's declaration does not say that "the sellers" agreed to this at all, only that FWI agreed to it.  Pl.'s Exh. B ¶ 26.  There is no proof as to FWAG.  Moreover, a securities fraud claim based on this statement is time barred for the same reasons as set forth above.  And it is also barred as a breach of contract claim, pursuant to the two-year statute of limitations for supposed oral agreements.  Cal. Civ. Proc. Code § 339.

PSI also contends that on October 7, 2004, "the sellers" represented to PSI "that for the nine-month period ended September 30, 2004, FWI had earned an operating profit, a positive net income, and $2,019,300 in revenue" among other things.  Pl.'s Br. at 7.  However, neither PSI nor Esrine, whose declaration PSI relies on in support of its allegation, makes any attempt to specify who among "the sellers" or "the defendants" made the representations.  *Id.*; Pl.'s Exh. B ¶ 25.  Such nebulous allegations cannot implicate FWAG.  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) ("Averments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged.").[5]

---

[5] The weakness of the evidence supporting PSI's motion is also shown by the fact that Plaintiffs accuse FWAG of making representations based on Esrine's declaration despite the fact that it is evident from Esrine's declaration that he has no personal knowledge of the facts.  For only one example, plaintiff claims, pointing to Esrine's declaration, that Michael Draper "acting in concert with von Welczeck, Lo, and FWAG" made representations to plaintiff's shareholders concerning FWI's financial condition and prospects.  Pl.'s Br. at 5.  Esrine only declares that he "believes" that Draper made the representations alleged and that he did so "in concert with the rest of the Defendants[.]" Exh. B ¶ 19.

12

**3.    PSI's Section 20(a) Claim is Unlikely to Succeed and Does Not Present Serious Questions Because PSI Fails to Adduce Evidence That FWAG Controlled FWI or the Other Defendants**

For the reasons already explained, PSI fails to show a violation of Section 10(b) of the Exchange Act, thus its Section 20(a) claim must likewise fail. *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996) ("To establish 'controlling person' liability, the PSI must show that a primary violation was committed[.]").  PSI's 20(a) claim also fails because it fails to adduce sufficient evidence that FWAG "directly or indirectly" controlled FWI or any other defendant who is alleged to have made any misrepresentation by PSI.  *Id.*  And indeed, FWAG did not.

Despite the recognition by courts that whether a defendant is a control person "is an intensely factual question," *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000), PSI's evidence is scant at best.  There is no evidence whatsoever to show that FWAG exercised any control over von Welczeck, Lo, or Draper.  Indeed, von Welczeck has not been an employee of FWAG since 2002 and Lo and Draper have never been employees or agents of FWAG.  Trox Decl. ¶¶ 5-7.  As to whether FWAG controlled FWI, PSI has little more to go on than that FWAG is a minority shareholder of FWI and that FWAG's CEO, Klaus Trox, served as one of FWI's directors.  See Pl.'s Br. at 2, 16.  Neither of these facts is sufficient alone to show the control necessary under Section 20(a).  *In re Gupta Corp. Sec. Litig.*, 900 F. Supp. 1217, 1243 (N.D. Cal. 1994) (finding that a corporate defendant's "position as a minority shareholder of [another company] with an agent on the board does not establish control person liability."); *In re Genentech Inc. Sec. Litig.*, No. C-88-4038-DLJ, 1989 WL 201577, at *7 (N.D. Cal. Dec. 11, 1989) (finding allegations that Lubrizol defendants "owned nine percent of Genentech's common stock and controlled a seat on Genentech's Board . . . not sufficient to suggest that Lubrizol exercised control over Genentech's affairs.").  Based on such evidence alone, PSI cannot show that FWAG is subject to control person liability under Section 20(a).[6]

---

[6] Similarly, PSI has not made an adequate showing that FWAG participated in any conspiracy.

13

### 4.    The Terms of the Share Exchange Agreement Defeat PSI's Breach of Contract Claim

PSI contends that FWAG breached representations made in the Agreement.  *See* Pl.'s Br. at 17.  As against FWAG, PSI's argument fundamentally misinterprets the Agreement.  In fact, FWAG made only few, limited, representations.  These are contained in Section 4 of the document, and are generally directed to facts about FWAG's ownership of, and authority to transact in, FWI shares.  *See generaly*, Ex. C §§ 4.1 to 4.9.  *Other* sections of the Agreement contain representations made by *others*, including FWI (Section 3) and Biofarm (Section 5).  But those representations are *not* made by FWAG, and FWAG cannot have breached them.[7]

Notably, PSI does not seriously contend that FWAG breached the representations that *FWAG* made in the Agreement.  It points only to Section 4.5, in which FWAG represented its present investment intentions.  This is a standard representation in a securities transaction.  In claiming that FWAG breached it, PSI points only to facts about FWAG's efforts *months* and *years* later to transfer some of its PSI stock.  This conduct by FWAG does not contradict the representation at all, which speaks only to FWAG's intentions at the time of the transaction.  It was not a breach of that representation for FWAG to have arranged to transfer shares at later dates.

Even if FWAG could be responsible for the representations made by others in the Agreement, the Agreement itself precludes PSI's current claims for alleged breaches of them.  The Agreement's survival clause expressly provides that "[t]he representations, warranties, covenants and agreements made in this Agreement shall survive any investigation made by any party hereto and the closing of the transactions contemplated hereby for two years from the date of the Closing Date." Ex. C ¶ 11.5.  PSI concedes that the closing date was December 10, 2004. Pl.'s Br. at 8-9.  Thus any breach of contract

---

[7]  For example, although plaintiff contends that FWAG covenanted that between the execution of the Share Exchange Agreement and the closing, FWI's operations would continue in their ordinary course and that FWI would not incur any long-term or short-term debt securities, the Agreement itself makes clear that FWI made these covenants, not FWAG.  Pl.'s Exh. C ¶¶ 8.1 and 8.1(a)(v).

14

claim based on representations and warranties in the Agreement would be time-barred as of December 10, 2006.  PSI did not assert its claim until June 1, 2007, thus, its contract claim based on representations in the Agreement is time-barred.  *See Lincoln Nat'l Corp. v. Takecare, Inc.*, No. C 97-02193, 1998 WL 281290, at *1, 3-6 (N.D. Cal. May 11, 1998) (survival clause in stock purchase agreement bars claims based on one party's representations and warranties brought after the contractual limitations period set forth in the agreement, unless an exception in survival clause is satisfied).

**B.    PSI Cannot Show That It Faces the Possibility of Immediate Irreparable Injury or That The Balance of Hardships Tips Sharply In Its Favor.**

PSI also fails to make the required showing that it will face the possibility of irreparable harm or that the balance of hardships tips sharply in its favor.  *Wherry v. All Cal. Funding*, No. C 06-4384 SBA, 2006 WL 2038495, at *1 (N.D. Cal. Jul. 20, 2006) (Armstrong, J.).  PSI effectively concedes, as it must, that it has been in control of the company since the Pantel transaction in May 2006.  *See* Pl.'s Br. at 11.  But PSI has inexplicably waited until now to seek injunctive relief against FWAG.  PSI's supposed excuses for this delay are not credible.

*First*, PSI tries to explain away its delay in seeking a TRO against FWAG by pointing out that FWAG "recently commenced" suit against it to secure the release of stock certificates so that it can follow through on agreements it has made to transfer its stock.  Pl.'s Br. at 20.  But FWAG's complaint was filed on April 23, 2007, *see* Pl.'s Ex. G whereas the cancellation of FWAG's shares had been the subject of discussions between PSI and FWAG since August 2006.  Moreover, PSI has known since at least April 2006 that FWAG is seeking to transfer some of its stock.  *See* Ex. G ¶ 24.  Nevertheless, PSI has delayed until now to seek injunctive relief.  This delay, even while PSI knew that FWAG was attempting to transfer its stock, eviscerates PSI's argument that it would experience immediate irreparable harm if the Court does not grant temporary injunctive relief against FWAG.  *See Givemepower Corp. v. Pace Compumetrics, Inc.*, No. 07cv157 WQH(RBB), 2007 WL 951350, at (S.D. Cal. Mar. 23, 2007) (finding that "Plaintiff's delay in seeking

15

1    injunctive relief undercuts its current argument of immediate, irreparable harm."); *Montano*

2    *v. Eagle III Diversified, Inc.*, No. EDCV010848RTSGLX, 2002 WL 1352080, at *6 (C.D.

3    Cal. Jan. 10, 2002) (refusing to issue a TRO where the plaintiff filed its complaint on

4    October 30, 2001 and served its TRO application on defendant on November 16, 2001, but

5    did not file its TRO application with the court until January 2, 2002, finding that "[t]his

6    does not demonstrate the risk of immediate harm that would ordinarily justify issuance of a

7    TRO."). In any case, a TRO is not necessary to prevent irreparable harm to PSI stemming

8    from FWAG's previous efforts to transfer its shares, because PSI has wrongfully refused to

9    carry out FWAG's instructions. *See* Ex. G ¶ 28.

10        *Second*, PSI attempts to justify its request for a TRO against FWAG by the supposed

11    results of conduct by *others*. But even were the conduct of other people relevant, PSI's

12    argument fall apart upon review of the facts. In reality, PSI's stock price did *not* "drop by

13    half" – as both PSI's brief and the declaration of its current CEO, David Foni, assert. Pl.

14    Brief at 20; Foni Decl. ¶ 6. Rather, PSI's stock price has fluctuated between 6 and 8 cents

15    per share for the entire month of May and into June. *See* Baudler Decl., Exs. 17, 18. There

16    is no basis to conclude that any stock sales by others is damaging PSI.

17        By contrast, FWAG is harmed each day that it is prevented from transferring its PSI

18    stock, and injunctive relief affirmatively preventing it from doing so could only exacerbate

19    the harm it is already experiencing. Just this year, under the control of PSI's current

20    management, PSI's stock price has fallen precipitously from $0.40 on January 16, 2007 to

21    $0.065 on June 6, 2007. *See id.* Given this already sharp decline in PSI's stock price,

22    FWAG faces the real risk that the value of its stock holdings may further decline while it is

23    forced to hold on to its stock.

24        Indeed, PSI unabashedly states that it is currently seeking new financing that

25    undoubtedly will further dilute and damage FWAG's holdings. Foni Decl. ¶ 8.

26        Thus, should the Court grant PSI's request for temporary injunctive relief against

27    FWAG — which it should not — the Court should require PSI to post an injunction bond

28    pursuant to Rule 65(c) of the Federal Rules of Civil Procedure in the amount of no less than

16

$864,388, which represents the roughly $0.07/share price of PSI's stock times the number of shares of PSI stock that FWAG rightfully owns (6,000,001 shares from the 2004 Share Exchange, plus 1,529,824 shares transferred to FWAG by Mr. von Welczeck pursuant to a settlement agreement, plus 4,818,575 shares resulting from the settlement of promissory notes extended to FWAG; *see* Ex. G).

Moreover, if a TRO is to issue, then in order to truly protect the *status quo*, any such TRO should also impose the same prohibitions on *PSI*, and also prohibit PSI from issuing new stock or debt instruments, because such actions would further impair the value of FWAG's shares during the pendency of the TRO imposed against FWAG.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny PSI's motion for a temporary restraining order.  In the event the Court grants PSI's motion, it should require PSI to post a bond of no less than $864,388 – the amount that FWAG ultimately stands to lose in the event it is unable to transfer its stock in PSI – and should extend the prohibitions of the order to PSI as well.

DATED: June 7, 2007                    Respectfully submitted,

                                       HELLER EHRMAN LLP


                                       By /s/LAURENCE A. WEISS
                                           LAURENCE A. WEISS

                                       Attorneys for Defendant
                                       friendlyway AG

<u>Table of Contents</u>

I.     INTRODUCTION ................................................................................................. 1

II.    BACKGROUND FACTS ...................................................................................... 2

III.   ARGUMENT......................................................................................................... 6

       A.    PSI's Motion for Temporary Restraining Order Against FWAG
             Should Be Denied Because PSI Fails to Show a Likelihood of
             Success on the Merits or the Existence of Serious Questions
             Going to the Merits ..................................................................................... 6

             1.    PSI's Federal and California State Securities Claims Are
                   Time-Barred ..................................................................................... 7

             2.    PSI Cannot Show That Its Fraud Claims Are Likely To
                   Succeed or Present Serious Questions Because It Cannot
                   Show That The Representations It Relied On Were
                   Untrue When Made and/or That FWAG Made the
                   Representations ................................................................................. 8

                   a.    PSI Fails to Show That FWAG's Representations
                         Were False When Made ....................................................... 9

                   b.    PSI Fails to State Fraud Claims Against FWAG
                         Based on Supposed Statements of Others ........................... 10

             3.    PSI's Section 20(a) Claim is Unlikely to Succeed and
                   Does Not Present Serious Questions Because PSI Fails to
                   Adduce Evidence That FWAG Controlled FWI or the
                   Other Defendants .......................................................................... 13

             4.    The Terms of the Share Exchange Agreement Defeat
                   PSI's Breach of Contract Claim ..................................................... 14

       B.    PSI Cannot Show That It Faces the Possibility of Immediate
             Irreparable Injury or That The Balance of Hardships Tips
             Sharply In Its Favor. ................................................................................. 15

IV.    CONCLUSION ................................................................................................... 17

1

1

<u>Table of Authorities</u>

2

**Cases**

3

*Betz v. Trainer Wortham & Co.*,

4
    __ F.3d __, 2007 WL 1377613, at *4 (9th Cir. May 11, 2007) ................................. 7

*Deveny v. Entropin, Inc.*,

5
    42 Cal. Rptr. 3d 807 (Cal. Ct. App. 2006)....................................................................... 7

6

*Film Serv. Labs., Inc. v. Harvey Bernhard Enters., Inc.*,

7
    256 Cal. Rptr. 735 (Cal. Ct. App. 1989)........................................................................ 8

*Givemepower Corp. v. Pace Compumetrics, Inc.*,

8
    No. 07cv157 WQH(RBB), 2007 WL 951350, at (S.D. Cal. Mar. 23,

9
    2007) ................................................................................................................................ 17

*Healthtrac, Inc. v. Sinclair*,

10
    302 F. Supp. 2d 1125 (N.D. Cal. 2004) ......................................................................... 9

11

*Heliotrope Gen., Inc. v. Ford Motor Co.*,

12
    189 F.3d 971 (9th Cir. 1999) ........................................................................................ 8

*Howard v. Everex Sys., Inc.*,

13
    228 F.3d 1057 (9th Cir. 2000) ..................................................................................... 14

14

*In re Genentech Inc. Sec. Litig.*,

15
    No. C-88-4038-DLJ, 1989 WL 201577, at *7 (N.D. Cal. Dec. 11,
    1989) ................................................................................................................................ 14

16

*In re Gupta Corp. Sec. Litig.*,

17
    900 F. Supp. 1217, 1243 (N.D. Cal. 1994)................................................................... 14

*In re U.S. Grant Hotel Assocs., Ltd. Sec. Litig.*,

18
    740 F. Supp. 1460 (S.D. Cal. 1990) .............................................................................. 8

19

*Lincoln Nat'l Corp. v. Takecare, Inc.*,

20
    No. C 97-02193, 1998 WL 281290, at *1, 3-6 (N.D. Cal. May 11,
    1998) ................................................................................................................................ 16

21

*Montano v. Eagle III Diversified, Inc.*,

22
    No. EDCV010848RTSGLX, 2002 WL 1352080, at *6 (C.D. Cal. Jan.
    10, 2002)........................................................................................................................... 17

23

*Mosesian v. Peat, Marwick, Mitchell & Co.*, 727 F.2d 873 (9th Cir. 1984) ...................... 9

24

*Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*,

25
    96 F.3d 1151 (9th Cir. 1996) ....................................................................................... 13

*Resolution Trust Corp. v. Dean*,

26
    No. CIV. 91-2026 PHX EHC, 1993 WL 837065, at *5 (D. Ariz. Jul.

27
    20, 1993)........................................................................................................................... 9

28

2

*Reynolds v. All State Life Ins. Co.*,
    No. CV-F-05-0874 REC/SMS, 2006 WL 662749, at *4 (E.D. Cal. Mar.
    16, 2006) ............................................................................................................ 10

*Vess v. Ciba-Geigy Corp. USA*,
    317 F.3d 1097 (9th Cir. 2003) .......................................................................... 13

*Wherry v. All Cal. Funding*,
    No. C 06-4384 SBA, 2006 WL 2038495 (N.D. Cal. Jul. 20, 2006) ..................... 6, 16

**Statutes**

28 U.S.C. § 1658(b) .................................................................................................. 7

Cal. Civ. Proc. Code § 339 ........................................................................................ 12

California Corporations Code § 25401 ........................................................................ 7

California Corporations Code § 25506 ........................................................................ 8

Securities Exchange Act Section 10(b) ....................................................................... 7

DEFENDANT FRIENDLYWAY AG'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER - CASE NO. 07-02869 SBA