# Exhibit 1 to the Declaration of Holly Baudler

<DOCUMENT>
<TYPE>10QSB
<SEQUENCE>1
<FILENAME>v06711_10qsb.txt
<TEXT>

---

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 10-QSB

(Mark One)

[X] Quarterly report under Section 13 or 15(d) of the Securities Exchange Act of 1934 for the quarterly period ended July 31, 2004

[_] Transition report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

For the transition period from ---------------- to ----------------

Commission File Number 0-20317

BIOFARM, INC.
(Exact name of registrant as specified in its charter)

| Nevada | 88-0270266 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

1244 Main Street, Linfield, Pennsylvania 19468
(United States address of principal executive offices, including zip code)

(610) 495-8413
(Issuer's telephone number)

Check whether the Issuer: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

Yes X No ---

The number of shares outstanding of the Issuer's Common Stock, $.001 par value, as of September 10, 2004, was 5,545,895.

---

<PAGE>

TABLE OF CONTENTS

<TABLE>
<CAPTION>
PART I FINANCIAL INFORMATION

<S>

Item 1. Financial Statements (Unaudited)

Consolidated Balance Sheets
July 31, 2004 and October 31, 2003

Consolidated Statements of Operations - Nine months ended
July 31, 2004 and 2003 (Restated)

Consolidated Statements of Operations - Three months ended
July 31, 2004 and 2003 (Restated)

Consolidated Statements of Changes in Stockholders' Equity

Consolidated Statements of Cash Flows - Nine months ended
July 31, 2004 and 2003 (Restated)

Notes to Financial Statements

Item 2. Management's Discussion and Analysis or Plan of Operation

Item 3. Controls and Procedures

PART II OTHER INFORMATION

Item 1. Legal Proceedings

Item 5. Other Information

Item 6. Exhibits and Reports on Form 8-K

Signatures

Certification Pursuant to Sarbanes-Oxley Act of 2002
</TABLE>

<PAGE>

PART I
ITEM 1. FINANCIAL STATEMENTS
BIOFARM, INC.
CONSOLIDATED BALANCE SHEETS
(Unaudited)

<TABLE>
<CAPTION>

ASSETS

| <S> | JULY 31, 2004 <C> | OC <C> |
|---|---|---|
| CURRENT ASSETS | | |
| Cash and cash equivalents | $ 229 | $ |
| Total current assets | 229 | |
| Other Assets | 7,500 | |
| TOTAL ASSETS | $ 7,729 | $ |

LIABILITIES AND STOCKHOLDERS' EQUITY

| | | |
|---|---|---|
| CURRENT LIABILITIES | | |
| Accounts payable | $ -- | $ |
| Total current liabilities | -- | |
| COMMITMENTS AND CONTINGENCIES | | |
| STOCKHOLDERS' EQUITY | | |
| Preferred stock, $.001 par value; 5,000,000 Shares authorized, none issued | | |
| Common stock, $.001 par value; 25,000,000 shares authorized, 5,546,280 shares issued and 5,545,895 shares outstanding in 2004 and 5,240,280 shares issued and 5,239,895 shares outstanding in 2003 | 5,547 | |
| Additional paid-in capital | 17,187,242 | 1 |
| Accumulated deficit | (17,159,973) | (1 |
| Stock subscription receivable | (24,100) | |
| Accrued interest on stock subscription receivable | -- | |
| | 8,716 | |
| Less treasury stock, at cost, 385 shares | (987) | |
| Total Stockholders' Equity | 7,729 | |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $ 7,729 | $ |

</TABLE>

The accompanying notes are an integral part of these consolidated financial statements

<PAGE>

BIOFARM, INC.
CONSOLIDATED STATEMENTS OF OPERATIONS
(Unaudited)

<TABLE>
<CAPTION>

| <S> | NINE MONTHS ENDED JULY | |
|---|---|---|
| | 2004 | 2003 |
| | <C> | <C> |
| Expenses | | (RESTA |
| General and administrative expenses | 72,481 | 69 |
| Write-off of investments and advances to investees | -- | 19 |
| Extraordinary Loss: Transfer of assets and liabilities | 92,924 | |
| NET LOSS | $ (165,405) | $ (88 |
| Basic loss per common share | $ (0.03) | $ ( |
| Weighted-average number of common shares outstanding | 5,544,046 | 5,083 |

</TABLE>

The accompanying notes are an integral part of these consolidated financial statements.

<PAGE>

BIOFARM, INC.
CONSOLIDATED STATEMENTS OF OPERATIONS
(Unaudited)

<TABLE>
<CAPTION>

| <S> | THREE MONTHS ENDED JULY | |
|---|---|---|
| | 2004 | 2003 |
| | <C> | <C> |
| Expenses | | (RESTA |
| General and administrative expenses | 18,440 | 21 |
| Write-off of investments and advances to investees | -- | 19 |
| Extraordinary Loss: Transfer of assets and liabilities | 92,924 | |
| NET LOSS | $ (111,364) | $ (40 |
| Basic loss per common share | $ (0.02) | $ ( |

| | | |
|---|---|---|
| Weighted-average number of common shares outstanding | 5,546,280 | 5,178 |
| | =========== | ======= |

</TABLE>

The accompanying notes are an integral part of these consolidated financial statements.

<PAGE>

<TABLE>
<CAPTION>

| <S> | SHARES OF COMMON STOCK <C> | COMMON STOCK <C> | ADDI PAI CAP <C> |
|---|---|---|---|
| Balance, November 1, 2002 | 4,972,930 | $ 4,973 | $ 1 |
| Issuance of common stock | 267,350 | 268 | |
| Payments collected on subscription receivable from related party | - | - | |
| Interest accrued on subscriptions receivable | - | - | |
| Net loss | - | - | |
| | ------------ | ------------- | ------- |
| Balance, October 31, 2003 | 5,240,280 | 5,241 | 1 |
| Issuance of common stock | 306,000 | 306 | |
| Payments collected on subscription receivables | - | - | |
| Interest accrued on subscriptions receivable | - | - | |
| Transfer to OCWEN | - | - | |
| New subscription receivable | | | |
| Net loss | - | - | |
| | ------------ | ------------- | ------- |
| Balance, July 31, 2004 | 5,546,280 | $ 5,547 | $ 1 |
| | ============ | ============= | ======= |

</TABLE>

<TABLE>
<CAPTION>

| SUBSCRIPTION RECEIVABLE | ACCRUED INTEREST ON SUSCRIPTIONS RECEIVABLE | TR |
|---|---|---|

<S> <C> <C> <C>

| | | | |
|---|---|---|---|
| Balance, November 1, 2002 | $ (364,900) | $ (15,545) | |
| Issuance of common stock | - | - | |
| Payments collected on subscription receivable from related party | 141,200 | - | |
| Interest accrued on subscriptions receivable | - | (10,442) | |
| Net loss | - | - | |
| Balance, October 31, 2003 | (223,700) | (25,987) | |
| Issuance of common stock | | | |
| Payments collected on subscription receivables | 68,500 | | |
| Interest accrued on subscriptions receivable | - | (3,777) | |
| Transfer to OCWEN | 156,100 | 29,764 | |
| New subscription receivable | (25,000) | | |
| Net loss | - | - | |
| Balance, July 31, 2004 | $ (24,100) | $ - | |

</TABLE>

The accompanying notes are an integral part of these consolidated financial statements

<PAGE>

BIOFARM, INC.
CONSOLIDATED STATEMENTS OF CASH FLOWS
(Unaudited)

<TABLE>
<CAPTION>

| | NINE MONTHS ENDED JULY 31, | |
|---|---|---|
| | 2004 | 2003 (RESTATED) |
| OPERATING ACTIVITIES | | |
| <S> | <C> | <C> |
| Net loss | $(165,405) | $ (88,729) |
| Adjustments to reconcile net loss to cash | | |

| utilized by operating activities: | | |
|---|---|---|
| Extraordinary loss on transfer to OCWEN | 92,924 | -- |
| Write-off of investments and advances to investees | | 932 |
| Changes in: | | |
| Other Assets | (7,500) | -- |
| Accounts payable | 11,317 | (22,701) |
| Net cash utilized by operating activities | (68,664) | (110,498) |
| INVESTING ACTIVITIES | | |
| Advances for note receivable | -- | (1,000) |
| Net cash utilized by investing activities | -- | (1,000) |
| FINANCING ACTIVITIES | | |
| Payments received for subscriptions receivable | 68,500 | 111,200 |
| Net cash provided by financing activities | 68,500 | 111,200 |
| DECREASE IN CASH | (164) | (298) |
| Cash, beginning of period | 393 | 363 |
| Cash, end of period | $ 229 | $ 65 |

</TABLE>

Non-cash transactions:

An additional $25,000 in subscriptions receivable was received subsequent to the transfer to OCWEN. This amount has been reflected as an increase to Additional Paid-In Capital.

The accompanying notes are an integral part of these consolidated financial statements

<PAGE>

BIOFARM, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
JULY 31, 2004 AND 2003

NOTE A - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Basis of presentation

Biofarm, Inc. (formerly Global Spill Management, Inc.) and its subsidiaries ("Biofarm" or the "Company") has prepared these unaudited consolidated financial statements in accordance with the instructions to Form 10-QSB and Rule 10-01 of Regulation S-X. Accordingly, they do not include all of the information and footnotes required by U.S generally accepted accounting principles for complete

financial statements.

These financial statements include all adjustments that are necessary for a fair presentation of the Company's results of operations and financial condition for the interim periods shown including normal recurring accruals and other items. The results of operations for the interim periods presented are not necessarily indicative of results for the full year.

Prior period amounts have been reclassified where appropriate to conform to the current year classification for comparative purposes.

Organization

Biofarm was incorporated in June 1991 to acquire, operate and develop environmental contracting and consulting companies and related businesses. All operating companies were disposed of or sold in prior years. Presently, the Company is a non-operating shell corporation.

Principles of consolidation

The accompanying consolidated financial statements include the accounts of Biofarm, Inc. and its wholly owned subsidiaries after elimination of all intercompany balances and transactions.

Use of estimates

The preparation of financial statements in conforming with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

Income taxes

Income taxes are calculated using the liability method specified by Statement of Financial Accounting Standards ("SFAS") No. 109, "Accounting for Income Taxes."

<PAGE>

NOTE A - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

Loss per common share

The Company reports basic and diluted earnings per share in accordance with SFAS No. 128, "Earnings Per Share" ("EPS"). There is no difference in basic and diluted EPS for the nine and three months ended July 31, 2004 and 2003 since there are no potentially dilutive securities outstanding for either period presented.

NOTE B - OPERATIONS

The Company's consolidated financial statements have been prepared on a going

concern basis, which contemplates the continuation of operations, realization of assets and liquidation of liabilities in the ordinary course of business, and do not reflect any adjustments that might result if the Company is unable to continue as a going concern. At July 31, 2004, the Company has total assets of $229 and no liabilities. The Company's recent operations have consisted of administrative costs to maintain the Company, and identifying potential investment and acquisition opportunities. The Company's ability to operate in the immediate future is highly dependent upon its ability to collect subscriptions receivable related to purchases of its common stock. On June 11, 2004 $156,100 of subscriptions receivable was transferred to OCWEN Corp. as described in Note I. Subsequent to the OCWEN transfer a new subscription receivable in the amount of $25,000 was received.

These factors indicate that there is substantial doubt about the Company's ability to continue as a going concern. The accompanying financial statements do not include any adjustments that might be necessary should the Company be unable to continue as a going concern.

Although the Company's efforts to identify potential investment and acquisition opportunities have not resulted in any consummated transactions to date, the Company continues to seek opportunities. The Company's ability to operate beyond the immediate future is dependent on its ability to consummate investment or acquisition transactions to fund its ongoing operations, or successfully obtain other financing. No assurances can be given that the Company will be successful in identifying and consummating an investment or acquisition transaction, or in obtaining other financing.

NOTE C - SUBSCRIPTIONS RECEIVABLE

The Company has a stock subscription receivable of $24,100 and $223,700 at July 31, 2004 and October 31, 2003, respectively. The stock subscription receivable on July 31, 2004 is non-interest bearing and is due on December 31, 2004. The stock subscription receivable on October 31, 2003 (balance of $156,100 on June 11, 2004) and the related accrued interest of $29,764 was distributed to OCWEN Corp. as described in Note I.

<PAGE>

BIOFARM, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
APRIL 30, 2004 AND 2003

NOTE D - INCOME TAXES

The Company has deferred tax assets of approximately $4,300,000 as of July 31, 2004, related to net operating loss carryforwards ("NOL"), which have yet to be utilized. As a result of the sale of the Company's operating subsidiaries and the issuance of additional shares of common stock, the amount of the NOL of approximately $12,270,000 may be limited. Also, the utilization of these losses, if available, to reduce the future income taxes will depend upon the generation of sufficient taxable income prior to the expiration of the NOL. Therefore, at July 31, 2004 and October 31, 2003, the Company has established a 100% valuation allowance against the deferred tax assets as the likelihood of recognizing this benefit cannot be certain. The net operating losses will expire in various years through June 2022.

NOTE E - PROPERTY

Underwater Technics, Inc., a subsidiary of the Company owned a property ("site") located in Camden, New Jersey, which was carried at zero value. This property was transferred to OCWEN Corp. as described in Note I. As an owner of real estate formerly used in providing comprehensive environmental services, including the handling of hazardous materials, the subsidiary may be subject to environmental cleanup liability, regardless of fault, pursuant to the Comprehensive Environmental Response, Compensation and Liability Act. While operating its former business at the site, a site inspection report was prepared for the U.S. Environmental Protection Agency in May 1989, which concluded that no further remedial action was required. In August 1996, the subsidiary performed a preliminary site assessment, which recommended additional investigations at the site, but did not conclude that any environmental liability had been incurred. No additional testing has been performed by the subsidiary since that date, nor has the subsidiary received any reports from regulatory agencies concerning the site. In assessing its potential liability related to environmental remediation, the subsidiary has not accrued any amounts, as management has not determined that it is probable that a liability has been incurred. In performing its assessment, the subsidiary considered factors, including: the subsidiary has not been identified as a potentially responsible party; there are no other parties identified as potentially responsible parties at the site; the site is not on the National Priorities List; and there have not been any proceedings against the subsidiary related to potential liability for environmental remediation at the site.

<PAGE>

BIOFARM, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
APRIL 30, 2004 AND 2003

NOTE F - ABANDONED INVESTMENTS

On June 5, 2002 the Company entered into a contract to acquire 2,500,000 shares of a company engaged in the transportation logistics business. The transaction was to close simultaneously with the receipt of the audited financial statements of the company, the private placement of $8,000,000 of equity in the company and the declaration of the effectiveness of the company's registration statement by the SEC. The financial statements submitted to the Company were reviewed by the Company's independent auditors to determine compliance with generally accepted accounting principles. The deficiencies noted by the Company's independent auditors have not been resolved. Accordingly, the Company has abandoned the proposed transaction and has recorded advances of $3,432 as a charge to operations during the year ended October 31, 2003.

On October 31, 2002, the Company entered into an agreement to acquire all of the capital stock of Ideal 4X Corporation (Ideal) in exchange for 3,500,000 shares of the Company's common stock. The acquisition of Ideal was contingent upon Ideal raising a minimum of $1 million in a private placement offering, and providing management of the Company independent valuation of the tangible and intangible assets being acquired so that the Company could reflect those assets in the consolidated statements of the Company and Ideal. The Company has abandoned the proposed transaction and has elected to write-off in full its investment in the amount of $15,605 during the year ended October 31, 2003.

On January 21, 2003, the Company entered into an agreement to acquire all of the common stock of Currency Charting Corporation (CCC). The Company was to issue 2,300,000 shares of its common stock in exchange for all of the common stock of

CCC. The acquisition of CCC was contingent upon the ability of Ideal to be able to raise a minimum of $1 million in a private placement offering. The Company has abandoned the proposed transaction.

<PAGE>

BIOFARM, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
APRIL 30, 2004 AND 2003

NOTE G - COMMITMENTS

Effective as of July 31, 2003, the Company entered into an agreement to acquire 600,000 shares of common stock in an entity whose Registration Statement has been declared effective. Of the aggregate of 600,000 shares, a total of 180,000 of such shares were registered for sale by the Company. The balance of 420,000 shares is subject to the provisions of Rule 144 promulgated under the 1933 Act.

Trading in these shares commenced during the month of February, 2004 and the 600,000 shares owned by the Company were exchanged for an aggregate of 653,523 shares, all of which are being registered under the 1933 Act. These shares were transferred to OCWEN Corp. as described in Note I.

During the year ended October 31, 2003 the Company executed a written agreement to acquire, in exchange for consulting services, 800,000 shares of common stock of a private entity engaged in the hospitality and entertainment industry. No income related to this transaction has been recorded by the Company for any period. This agreement was cancelled on April 12, 2004.

NOTE H - ISSUANCE OF COMMON SHARES

On February 20, 2003 the Company issued 160,500 shares of its authorized, unissued common stock in exchange for the collection of $60,400 in subscriptions receivable and $19,875 in payment of the amount previously advanced by the Company in connection with a third party subscription agreement. On June 23, 2003 the Company issued an additional 106,850 shares of its authorized, unissued Common Stock in exchange for the collection of $53,400 in subscriptions receivable. On November 5, 2003, the Company issued an additional 306,000 shares to unaffiliated persons in exchange for the (i) payment by certain of such persons of the sum of $33,000 (received by the Company through October 31, 2003), and (ii) execution by the remainder of such persons of consulting agreements with the Company. There were no fees, discounts or commissions payable by the Company in these transactions. The par value of these shares was removed from additional paid-in capital and credited to common stock.

During the nine month period ended July 31, 2004, the Company collected $68,500 of stock subscriptions receivable. No common stock was issued in connection with any subscriptions collected during the period subsequent to October 31, 2003.

<PAGE>

BIOFARM, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
APRIL 30, 2004 AND 2003

NOTE I - TRANSFER TO OCWEN

On June 11, 2004, the Board of Directors of the Company adopted a resolution providing for the transfer of all of the assets and liabilities ("the Transfer") of the Company to OCWEN Corp. (OCWEN), a wholly-owned Nevada subsidiary of the Company. The Transfer resulted in an extraordinary loss of $98,324 in the third quarter of 2004. The filing by OCWEN of a Registration Statement under the 1933 Act will, when declared effective, permit the distribution of the OCWEN shares to the shareholders of the Company on a share-for-share basis as a stock dividend. Thereby, the shareholders of the Company will continue to own an equivalent number of OCWEN shares and such number of shares of the Company shall be determined by negotiation between the Company and any operating entity to be acquired by the Company. This transfer of the assets and liabilities of the Company to OCWEN (i) enables the Company to effect the acquisition of an operating entity on a basis that gives the shareholders of the operating entity a preponderant interest in the Common Stock of the Company, (ii) removes the Company as a party defendant in the sole litigation matter to which the Company was a party defendant, and (iii) provides the shareholders of the Company with shares in another (OCWEN) future public company. The Company agreed to deliver an aggregate of 200,000 shares of its Common Stock to the plaintiff to obtain the dismissal of the Company as a party defendant. Upon the realization by the plaintiff of a specified minimum amount from the sale of such shares, plaintiff is obligated to dismiss OCWEN as a party defendant. Pending the effectiveness of the OCWEN Registration Statement, one certificate representing all of the shares of OCWEN has been issued in the name of the three directors as trustees for the benefit of the shareholders of the Company.NOTE J - SUBSEQUENT EVENTS

On August 13, 2004 the Company entered into a Share Exchange Agreement with the shareholders of Friendlyway, Inc. (FW), a Delaware corporation, pursuant to which FW is to become a wholly-owned subsidiary of the Company. The issued and outstanding shares of Common Stock of the Company will be unaffected by such acquisition. The number of shares of Common Stock of the Company to be issued to the FW shareholders will represent 75% of the issued and outstanding share of the Company. Closing of the FW acquisition is expected to occur prior to October 15, 2004.

NOTE K - RESTATEMENT OF CONSOLIDATED FINANCIAL STATEMENTS

Subsequent to the filing of its' quarterly report on Form 10-QSB for the six months ended April 30, 2003, the Company determined that interest income related to subscriptions receivable, originally reported in the statement of operations, should have been reported in the statement of changes in stockholders' equity. The effects of the restatement on the three-months and nine-months ended July 31, 2003 is to increase net loss to $(40,628) and $(88,729), respectively, from the previously reported amounts of $(38,091) and $(80,524), respectively.

<PAGE>

ITEM 2. Management's Discussion and Analysis or Plan of Operation

The Company having disposed of all its operations, may today be fairly characterized as a non-operating "shell" corporation. Therefore, there is no need for discussion herein of prior results of operations and of year-to-date operating results and comparisons. The Company's liquidity is predicated upon the continuing collection of its subscriptions receivable, its principal source of capital. The Company believes that the

entirety of the remaining principal amount of subscriptions receivable of $24,100 at July 31, 2004, is collectible. The Company's ability to continue as a going concern is dependent upon its ability to collect its subscriptions receivable. This going concern contingency will remain unless and until the Company concludes the acquisition of a profitable business. (See Item 5 hereinafter.) As of the date hereof, the Company is able to meet its debts as they mature, which obligations consist exclusively of legal, accounting and miscellaneous expenses payable by any public company. Assuming collection of its subscriptions receivable, the Company will have available cash and no liabilities. Because current accounting rules require that subscriptions receivable for capital stock are deemed to be reductions in equity until such subscriptions are actually paid, at July 31, 2004, the $24,100 remaining outstanding subscriptions receivable do not appear as an asset on the Company's consolidated balance sheets.

The ongoing administrative costs of the Registrant are minimal. These include monthly transfer agent and secretary costs and quarterly costs associated with required SEC filings. These amount to less than $7,500 per quarter. The Registrant believes that the $24,100 principal amount of subscriptions receivable will be sufficient to fund ongoing administrative costs, and that its existing shareholders will fund such additional subscriptions receivable as are required to satisfy future administrative costs.

ITEM 3. Controls and Procedures

The Company maintains a system of disclosure controls and procedures that is designed to ensure that information required to be disclosed by the Company in this Form 10-QSB, and in other reports required to be filed under the Securities Exchange Act of 1934, is recorded, processed, summarized and reported within the time periods specified in the rules and forms for such filings.

Management of the Company, comprised of the Company's Chief Executive Officer and Chief Financial Officer, reviewed and performed an evaluation of the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by the Report.

Based on that review and evaluation, the Chief Executive Officer and Chief Financial Officer have determined that the disclosure controls and procedures were and are effectively designed to ensure that material information relating to the Company and its consolidated subsidiaries would be made known to them on a timely basis.

2

<PAGE>

PART II

OTHER INFORMATION

ITEM 1. Legal Proceedings

As previously reported in Item 3 of Form 10-KSB/A filed on April 16, 2004, and in Item 5 of Form 10-QSB filed on June 14, 2004, the Company, effective as of July 30, 2004, obtained an Order of the Court providing for the dismissal of the litigation instituted against the Company by Hermes Kreditversicherungs AG.

The applicable Court order approved the settlement agreement between the parties, provided for the dismissal of the litigation promptly upon the closing of an acquisition by the Company, encompassed a general release from plaintiff to the Company, and substituted OCWEN Corp ("OCWEN", a former subsidiary of the Company) as the party defendant. (The closing of the transaction referred to in Item 5 hereinafter will satisfy the provisions of the Court order.) The termination of this litigation will bring to a conclusion the problems associated with the rescission of the Litchfield transaction effective October 31, 1999.

ITEM 5. Other Information

On June 11, 2004, the Board of Directors of the Company adopted a resolution providing for the transfer of all of the assets and liabilities of the Company to OCWEN. The filing by OCWEN of a Registration Statement under the 1933 Act will, when declared effective, permit the distribution of the OCWEN shares to the shareholders of the Company on a share-for-share basis as a stock dividend. Thereby, the shareholders of the Company will own an equivalent number of OCWEN shares and will continue to own such number of shares of the Company as shall be determined by negotiation between the Company and any operating entity to be acquired by the Company. This transfer of the assets and liabilities of the Company to OCWEN (i) enables the Company to effect the acquisition of an operating entity on a basis that gives the shareholders of the operating entity a preponderant interest in the Common Stock of the Company, (ii) removes the Company as a party defendant in the sole litigation matter to which the Company was a party defendant, and (iii) provides the shareholders of the Company with shares in another (OCWEN) future public company. The Company agreed to deliver an aggregate of 200,000 shares of its Common Stock to the plaintiff to obtain the dismissal of the Company as a party defendant. Upon the realization by the plaintiff of a specified minimum amount from the sale of such shares, plaintiff is obligated to dismiss OCWEN as a party defendant. Pending the effectiveness of the OCWEN Registration Statement, one certificate representing all of the shares of OCWEN has been issued in the name of its three directors as Trustees for the benefit of the shareholders of the Company.

On August 13, 2004, the Company entered into a Share Exchange Agreement with the shareholders of Friendlyway, Inc. ("FW"), a Delaware corporation, pursuant to which FW is to become a wholly-owned subsidiary of the Company. The issued and outstanding shares of Common Stock of the Company will be unaffected by such acquisition. The number of shares of Common Stock of the Company to be issued to the FW shareholders will represent 75% of the issued and outstanding shares of the Company. Closing of the FW acquisition is expected to occur prior to October 15, 2004.

<PAGE>

ITEM 6. Exhibits and Reports on Form 8-K

Exhibits required to be filed by Item 601 of Regulation S-B

31.1 Certification of Chief Executive Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

31.2 Certification of Chief Financial Officer Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

32.1 Certification of Chief Executive Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002

32.2 Certification of Chief Financial Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002

No reports on Form 8-K were filed during the quarter for which this report is filed.

SIGNATURES

In accordance with the requirements of the Exchange Act, the registrant caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

BIOFARM, INC.

(Registrant)

/s/ David R. Stith
-------------------------
David R. Stith
President

Dated: September 14, 2004

/s/ Allan Esrine
-------------------------
Allan Esrine
Vice President

</TEXT>
</DOCUMENT>

# Exhibit 2 to the Declaration of Holly Baudler

<DOCUMENT>
<TYPE>10KSB
<SEQUENCE>1
<FILENAME>v012780.txt
<TEXT>

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 10-KSB

(Mark One)

|X| ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 For the Fiscal Year Ended October 31, 2004

OR

|_| TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

Commission File Number 0-20317

----------

BIOFARM, INC.
(Exact name of small business issuer as specified in its charter)

| Nevada | 88-0270266 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

1255 Battery Street, Suite 200, San Francisco, California 94111

Issuer's telephone number: (415) 288-3333

Securities registered pursuant to Section 12(b) of the Exchange Act:
None

Securities registered pursuant to Section 12(g) of the Exchange Act:

Common Stock ($.001 Par Value)

Check whether the issuer: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes |X| No |_|

Check if there is no disclosure of delinquent filers in response to Item 405 of Regulation S-B not contained herein, and no disclosure will be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-KSB or my amendment to this Form 10-KSB |X|.

State issuer's revenues for its most recent fiscal year:
$ -0-

As of February 12, 2005, 23,681,095 shares of Common Stock ($.001 par value) were issued and outstanding. The aggregate market value of the Common

Stock held by non-affiliates was approximately $2,662,297 determined by the closing sale price on that date based upon 5,324,595 shares owned by non-affiliates.

<PAGE>

TABLE OF CONTENTS

Part I

Item 1. Description of Business

Item 2. Description of Property

Item 3. Legal Proceedings

Item 4. Submission of Matters to a Vote of Security Holders

Part II

Item 5. Market for Common Equity and Related Stockholder Matters

Item 6. Management's Discussion and Analysis or Plan of Operation

Item 7. Financial Statements

Item 8. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure

Item 8A. Controls and Procedures

Part III

Item 9. Directors and Executive Officers of the Registrant

Item 10. Executive Compensation

Item 11. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters

Item 12. Certain Relationships and Related Transactions

Item 13. Exhibits and Reports on Form 8-K

Item 14. Principal Accountant Fees and Services

<PAGE>

PART I

Item 1. Description of Business

For the last three years, BioFarm, Inc. ("BIOF" or the "Company") has been a public shell company with no revenue from operations. During this period, the Company's management has sought to acquire an operating business. On August 24, 2004, BIOF entered into a Share Exchange Agreement with the stockholders of friendlyway, Inc. ("FWI"), pursuant to which the Company agreed to acquire all of the outstanding shares of FWI in exchange for the issuance of 18,000,000 shares of Common Stock of the Company and the assumption of outstanding options granted to FWI employees. That transaction closed on December 10, 2004 and FWI

became a wholly-owned subsidiary of BIOF. This transaction has been accounted for (effective as of December 10, 2004) as a recapitalization of FWI, which is the accounting acquirer.

Prior to the FWI transaction, the Company on June 11, 2004 transferred substantially all of its then existing liabilities and substantially all of its assets to a wholly-owned subsidiary, Ocwen, Corp. ("Ocwen"). It then transferred all of the outstanding shares to Ocwen to certain trustees to hold for the benefit of the stockholders of the Company on June 11, 2004. Under the terms of the agreement between the Company and these trustees, the trustees will hold the Ocwen shares until they can be registered and distributed to the stockholders of the Company as of October 31, 2004 or, if such distribution is determined not be practicable, the trustees will sell the shares and distribute the proceeds to those stockholders.

FWI was incorporated in Delaware in June 2000, as a self-service solutions provider of customer-facing public access self-service systems. FWI's products focus on the improvement of internet-based customer communication at the point of sale in retail stores, point of service/information in public locations or the Internet. Through July 31, 2002, FWI was a wholly-owned subsidiary of Friendlyway AG ("FWAG"). Effective August 1, 2002, FWI's President, Alexander von Welczeck, acquired a 70% interest in FWI from FWAG, pursuant to a Management Buyout Agreement ("MBO") with FWAG. Following the MBO, FWAG retained a 30% ownership interest in FWI.

In March 2004, Henry Lo assumed full time responsibilities as Chief Financial Officer. Mr. Lo, together with Mr. Welczeck, brought new investors to the FWI to strengthen FWI's working capital to support its sales growth, and took steps necessary to implement a new business strategy. This new business strategy will seek to combine software, services and design around the self-service solutions marketplace. In December 2004, FWI announced the launch of Friendlyway Media, which will be primarily focused on FWI's software platform and custom software design services. Together with Friendlyway Interactive Systems and Friendlyway Event Services, these three business units form the revenue model of FWI. Currently, FWI generates most of its revenue from the sale and rental of its systems. FWI has a direct sales force in addition to a strong network of Value Added Resellers for complex software integration projects. For our rental business, FWI utilizes its unique Certified Rental Partner Network for fulfilling short-term rental deployments for our customers. FWI outsources its non-strategic tasks, including assembly and manufacturing, providing FWI with tremendous leverage, resulting in increased turnover and scalability in a cost-effective manner. FWI's products and services are offered domestically, in Europe and in Asia.
<PAGE>

During 2004, a number of significant steps were taken to prepare FWI for the launch of this new plan, culminating with the reverse merger transaction with BIOF. Among these steps taken were:

- Construction of the details of the new business plan around the Company's three core business units: Friendlyway Interactive Systems, Friendlyway Event Services and Friendlyway Media.
- Reduction of costs via direct materials sourcing and change in contract manufacturing partner.
- Engagement of key professional services providers: including legal and investment banking.
- Negotiating with new investment sources.
- Identifying and negotiating with key acquisition targets.

This plan is now being implemented. The financial statements included in

this annual report are the historical financial statements of BIOF as a shell corporation, but are not indicative of how management intends to operate the Company.

The Company's goal is to become a leading provider of self-service solutions provider of customer-facing public access self-service systems. FWI's customers include some of the most prestigious Fortune 500 companies including: Bank of America, Boeing, Disney, Fidelity Investments, Marriott Hotels, Merck, Microsoft, Nike, and Pfizer.

Item 2. Description of Property

The principal office of the Company in the United States is currently located at 1255 Battery Street, Suite 200, San Francisco, California 94111.

Item 3. Legal Proceedings

Neither the Company nor its property is subject to any legal proceedings.

Item 4. Submission of Matters to a Vote of Security Holders

No matters were submitted to a vote of security holders during the Company's fiscal fourth quarter.

PART II

Item 5. Market for Common Equity and Related Stockholder Matters

Market for Common Equity

The Company's Common Stock is traded on the OTC Electronic Bulletin Board under the symbol BIOF. The following table sets forth the reported high and low bid and high and low asked quotations for the Company's Common Stock for the period November 1, 2002, to October 31, 2004 as reported by OTC Bulletin Board. Such quotations reflect inter-dealer prices, without retail mark-up, mark-down, or commissions, and may not represent actual transactions.

<PAGE>

| | High Bid | Low Bid | High Ask | Low Ask |
|---|---|---|---|---|
| 2002 | | | | |
| Oct 1 - Dec 31 | 1.26 | 0.55 | 1.30 | 0.57 |
| 2003 | | | | |
| Jan 1 - Mar 31 | 1.00 | 0.57 | 1.05 | 0.75 |
| Apr 1 - Jun 30 | 1.20 | 0.69 | 1.25 | 0.75 |
| Jul 1 - Sep 30 | 1.28 | 0.61 | 1.31 | 0.90 |
| Oct 1 - Dec 31 | 2.10 | 1.01 | 2.25 | 1.09 |
| 2004 | | | | |
| Jan 1 - Mar 31 | 1.42 | 0.75 | 1.64 | 0.93 |
| Apr 1 - Jun 30 | 0.93 | 0.75 | 1.10 | 0.83 |
| Jul 1 - Sep 30 | 1.02 | 0.55 | 1.10 | 0.57 |
| Oct 1 - Dec 31 | 1.10 | 0.53 | 1.12 | 0.59 |

Shares Outstanding

As of February 11, 2005 there were 23,681,095 shares of Common Stock validly issued and outstanding. This number excludes 1,085,000 shares of Common Stock issued pursuant to two improperly filed Form S-8 filings. These shares are not deemed to be validly issued, fully paid and non-assessable because such shares were not registered for public sale, were issued without consideration and were not authorized for issuance by the Board of Directors. Under the terms of the agreement pursuant to which it acquired the outstanding shares of FWI, the Company is required to issue to FWI stockholders an additional 3 shares of Common Stock for each share over 6,000,000 shares the Company had issued and outstanding (or was otherwise obligated to issue) as of the closing of the transaction. The Company intends to attempt to cancel the aforementioned 1,085,000 shares of Common Stock in the near future; however, it may not be able to do so. If it is unable to do so, it will be required to issue additional shares of Common Stock to FWI stockholders. There were a total of approximately 600 holders of record as of December 31, 2004. The Company believes, based upon available information, that there are in excess of 1,000 beneficial owners of the Company's Common Stock. No shares of the Company's authorized Preferred Stock have ever been issued.

Dividends

The Company has not paid any cash dividends on its Common Stock in the last two years and does not anticipate paying any cash dividends on its Common Stock in the foreseeable future.
<PAGE>

Item 6. Management's Discussion and Analysis or Plan of Operation

Prior to the Company's reverse merger transaction with FWI on December 10, 2004, the Company was fairly characterized as a non-operating "shell" corporation. Therefore, the Company has not had any revenues from operation in each of its last two fiscal years.

Plan of Operation

The Company has not had any business operations in the last two fiscal years. Since the end of its 2004 fiscal year the Company acquired FWI. FWI generates revenue from the sale and rental of its systems. For the twelve month periods ended December 31, 2003 and 2002, FWI's total revenues were $1,637,012 and $1,160,922, respectively. In 2004, FWI strengthened its Balance Sheet by raising approximately $600,000 to enhance its working capital as a result of increases in inventory and accounts receivable associated with its sales growth. The Company anticipates that it will need to raise additional funds during fiscal 2005.

Off-Balance Sheet Arrangements

The Company does not have any off-balance sheet arrangements.

Item 7. Financial Statements

The Company's audited financial statements appear beginning on page F-1 of this report.

Item 8. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure

None.

Item 8A. Controls and Procedures

Disclosure Controls and Procedures

As of the end of the period reported in this report, an evaluation was carried out, under the supervision of our management, including the Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures, pursuant to Rule 13a-15 of the Securities Exchange Act of 1934. Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective, in all material respects, with respect to the recording, processing, summarizing and reporting of information required to be disclosed by us in the reports that we file or submit under the Exchange Act.

Internal Control Over Financial Procedures

There have been no significant changes in our internal controls or in other factors that could significantly affect internal controls subsequent to the date of the evaluation described above.
<PAGE>

PART III

Item 9. Directors and Executive Officers of the Registrant

The executive officers, directors and key personnel of the Company and their ages as of February 11, 2005 are as follows: Except for Mr. Von Welczeck, Mr. Lo and Mr. Trox, who were appointed to their positions on December 10, 2004 in connection with the Company's reverse merger transaction with FWI, each of the other four persons named below occupied the office set forth opposite his/her name from November 15, 1996, until October 5, 1998, and resumed the occupancy of such office on October 31, 1999. Additionally, Mr. Stith served as the Company's President and Chief Executive Officer and Mr. Esrine served as the Company's Chief Financial Officer from October 31, 1999 until December 10, 2004.

<TABLE>
<CAPTION>

| <S> Name | <C> Age | <C> Positions held with the Compa |
|---|---|---|
| Alexander von Welczeck | 41 | Chief Executive Officer, Pres |
| Henry Lo | 41 | Chief Financial Officer and D |
| Klaus Trox | 48 | Director |
| David R. Stith | 75 | Director |
| Herbert S. McDonald | 68 | Director |
| Allan Esrine | 76 | Director |
| Desiree L. Pierson | 42 | Secretary |

</TABLE>

Biographies of the directors and executive officers of the Company are set forth below. All directors hold office until the next annual stockholders meeting and until their successors have been elected and qualified or until

their death, resignation, retirement, removal or disqualification. Vacancies in the existing Board are filled by majority vote of the remaining directors. Officers of the Company serve at the will of the Board of Directors.

Alexander von Welczeck has approximately 18 years of sales, marketing and business development experience with multi-national companies. Since 1998, Mr. Welczeck has been the Chief Executive Officer and President of FWI. During 2002, Mr. Welczeck orchestrated the management buyout of FWI from friendlyway AG. Prior to joining FWI in 1998, Mr. Welczeck spent two years as Marketing Manager at Thyssen GmbH in Stuttgart, Germany. Prior to his years at Thyssen, he spent over ten years at Dover Elevators in various managerial positions in sale, marketing and business development. During his tenure at Dover, Mr. Welczeck played a key role in the acquisition of 11 companies in a rollup strategy.

Henry Lo has approximately 18 years of finance and accounting experience with publicly-traded and privately-held companies. Mr. Lo oversees all finance, accounting and administrative activities and developments for the Company. In addition, his responsibilities include the architecture of the reverse merger transaction with the public shell and fundraising. Prior to joining FWI in 2004, Mr. Lo founded and served as Chief Financial Officer of Planet-Intra Software, a web-based portal software company, since its inception in 2000. During his tenure at Planet-Intra, Mr. Lo raised over $10M from first-tier venture capital firms and ultimately sold the Company in 2003. Prior to Planet-Intra, he was Chief Financial Officer at Versata Software leading its Initial Public Offering in March 2000. Prior to Versata Software, he spent six years in the disk drive industry with two publicly-traded companies. He served as Treasurer and Director of Investor Relations at StorMedia Incorporated which went through its Initial Public Offering in 1995. Mr. Lo was also Chief Financial Officer at SyQuest Technology and orchestrated its sale to Iomega Corporation. Prior experience included various managerial positions at GE Capital and was a Senior Manager at PriceWaterhouseCoopers. Additionally, he is a Certified Public Accountant, and is a member of the AICPA and the California Society of CPAs.
<PAGE>

Klaus Trox was one of the founders of Friendlyway. Currently, Mr. Trox serves as Chief Executive Officer of Friendlyway AG. Prior to joining friendlyway, Mr. Trox served in various senior management positions in multinational engineering companies, including Kontron, an embedded computer systems company, Micromedia Corporation and Boards Corporation.

David R. Stith became Vice Chairman and a Director of the Company on November 25, 1991. Mr. Stith founded Underwater Technics in 1967 and has served as its Chairman and President since such date. Mr. Stith led the crew that cleaned up the major oil spills from the tankers the "Elias," the "Mellon, and the "Athos." Mr. Stith was also involved in underwater testing for the National Aeronautics and Space Administration, and led the crew that dove for sunken treasure on the Spanish Gallon "San Jose" which sank off Columbia in 1708.

Herbert S. McDonald became a director of the Company on December 27, 1995. Mr. McDonald has, since January 1993, been the President of The Fulcrum Group, a management consulting firm specializing in the restructuring and merger/acquisition of corporate clients. Prior thereto, Mr. McDonald was (since August 1990) the President (CEO) and principal shareholder of European Automotive Products, Inc., a major importer of imported cars specializing in higher end German automotive parts. Prior thereto, Mr. McDonald was the President (CEO) and principal shareholder of Fulcrum Investments, a firm making investments in manufacturing, leasing, automobile dealerships and real estate.

Allan Esrine became a director of the Company on November 15, 1996, as well as Principal Financial Officer. Mr. Esrine has, for the past five years,

been involved in private financial activities in New York City, including the management of several family businesses.

Desiree L. Pierson became Secretary of the Company in January, 1996. Ms. Pierson was an employee of the Company from 1991 until June 28, 1996. In her capacity as Secretary, Ms. Pierson's duties include shareholder relations, matters involving the Transfer Agent and corporate record keeping, and do not include corporate decision making or substantive matters involving the Company.

No director, officer or affiliate of the Company is an adverse party to the Company or any of its subsidiaries in any material proceeding.

The Company's Board of Directors does not have an audit committee and no determination has been made as to whether any member of the Board of Directors qualifies as an audit committee financial expert as defined in Item 401 of Regulation S-B.
<PAGE>

Compliance with Section 16(a) of the Act

The Company and its directors and executive officers are in compliance with the requirements of Section 16(a) of the Exchange Act.

Code of Ethics

The Company does not currently have a code of ethics applicable to its principal executive and financial officers. Prior to the Friendlyway transaction, the Company did not believe such a code was necessary as the Company was not an operating company. The Board of Directors intends to consider adopting such a code.

Item 10. Executive Compensation

None of the directors and officers of the Company has received any remuneration of any kind (including reimbursement of expenses) during the period November 1, 2003, through October 31, 2004. Desiree L. Pierson, Secretary, has received the sum of $600 per month for services rendered to the Company on a part-time basis. Alexander von Welczeck, Chief Executive Officer and President of FWI received the sum of $5,000 per month for services rendered to FWI. Henry Lo, Chief Financial Officer of FWI received the sum of $3,000 per month beginning on July 1, 2004 for services rendered to FWI.

Item 11. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters

The following table sets forth certain information with regard to the beneficial ownership of outstanding shares of Common Stock by (i) each person known by the Company to own beneficially five (5%) percent or more of the outstanding shares of the Company's Common Stock; (ii) each director and executive officer individually; and (iii) all executive officers and directors of the Company as a group:

<TABLE>
<CAPTION>

| Name and Address Of Beneficial Owner | Number of Shares of Common Stock Beneficially Owned (1) | Perc Clas |
|---|---|---|
| <S> | <C> | |
| Alexander von Welczeck | 8,659,999 | |

| | |
|---|---|
| Klaus Trox | 6,000,001 |
| Henry Lo | 900,000 |
| David R. Stith | 86,500 |
| Herbert S. McDonald | 70,000 |
| Allan Esrine | 200,000 |
| Directors and Officers as a Group (6 persons) | 15,916,500 |

</TABLE>

<PAGE>

----------

(1) Beneficial ownership as reported in the table above has been determined in accordance with Instruction (4) to Item 403 of Regulation S-B of the Securities Exchange Act.

(2) Percentage of class based upon 23,681,095 shares of Common Stock outstanding on February 12, 2005. (3) Includes 6,000,001 shares held by friendlyway, AG of which Mr. Trox is Chief Executive Officer. Mr. Trox disclaims beneficial ownership of these shares.

Item 12. Certain Relationships and Related Transactions

None

Item 13. Exhibits and Reports on Form 8-K

(a) Exhibits

<TABLE>
<CAPTION>

| <S> | <C> |
|---|---|
| 2.1 | Separation Agreement dated June 11, 2004 between the Herbert McDonald, David R. Stith and Allan Esrine. |
| 2.2 | Trust Agreement dated June 11, 2004 between the Regis McDonald, David R. Stith and Allan Esrine. |
| 2.3 | Share Exchange Agreement dated August 13, 2004. (Incorporated by reference to Exhibit 2.1 to Registrants Report on Form 8-K filed on December 16, 2004. |
| 2.4 | Closing Agreement dated December 10, 2004. (Incorporate Registrants Report on Form 8-K filed on December 16, 200 |
| 3.1 | Amended and Restated Certificate of Incorporation of Reg |
| 3.2 | Amended and Restated Bylaws of Registrant. (Incorporate Registrants Report on Form 8-K filed on December 16, 200 |
| 31.1 | Certification of Chief Executive Officer Pursuant to Se Act of 2002. |
| 31.2 | Certification of Chief Financial Officer Pursuant to Se Act of 2002. |
| 32.1 | Certification of Chief Executive Officer Pursuant to Act of 2002. |

| | |
|---|---|
| 32.2 | Certification of Chief Financial Officer Pursuant to Act of 2002. |

</TABLE>

(b) Reports on Form 8-K

None.

Item 14. Principal Accountant Fees and Services

a) AUDIT FEES. The aggregate fees billed for each of the last two fiscal years for professional services rendered by the independent auditor for the audit of the Company's annual financial statements and review of
<PAGE>

financial statements included in the Company's Form 10-QSB, or services that are normally provided by the accountant in connection with the statutory and regulatory filings or engagements for such two fiscal years, amounted to $38,150 ($20,500 and $17,650 for the fiscal years ended October 31, 2004 and 2003, respectively)

b) AUDIT RELATED FEES. The aggregate fees billed in each of the last two fiscal years for assurance and related services by the independent auditor that are reasonably related to the performance of the audit or review of the Company's financial statements and are not reported under Item 9(e)(1) of Schedule 14A, amounted to $4,860 ($3,200 and $1,660 for the fiscal years ended October 31, 2004 and 2003, respectively) The nature of the services comprising the fees disclosed under this category included review of filings and reissuance of audit opinions related to the Company's restated financial statements for the years ended October 31, 2003 and 2002, and interim period ended January 31, 2004.

c) TAX FEES. There were no fees billed in either of the last two fiscal years for professional services rendered by the independent auditor for tax compliance, tax advice and tax planning.

d) ALL OTHER FEES. There were no fees billed in each of the last two fiscal years for products and services provided by the independent auditor other than the services reported in the three preceding paragraphs.
<PAGE>

SIGNATURES

In accordance with Section 13 or 15(d) of the Exchange Act, the registrant caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

BIOFARM, INC.

By: /s/ Alexander von Welczeck
---------------------------------------
Alexander von Welczeck
President and Chief Executive Officer,
February 14, 2005

In accordance with the Exchange Act, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on

the dates indicated.

<TABLE>
<CAPTION>

| Signatures | Title | Date |
|---|---|---|
| <S> | <C> | <C> |
| /s/ David R. Stith<br>David R. Stith | Director | Febr |
| /s/ Allan Esrine<br>Allan Esrine | Director | Febr |
| /s/ Herbert S. McDonald<br>Herbert S. McDonald | Director | Febr |
| /s/ Alexander von Welczeck<br>Alexander von Welczeck | Chief Executive Officer, President and Director (Principal Executive Officer) | Febr |
| /s/ Henry Lo<br>Henry Lo | Chief Financial Officer and Director (Principal Financial Officer) | Febr |
| /s/ Klaus Trox<br>Klaus Trox | Director | Febr |

</TABLE>

<PAGE>

Biofarm, Inc.

OCTOBER 31, 2004 AND 2003

TABLE OF CONTENTS

Page

Report of Independent Registered Public Accounting Firm...........F-2

Consolidated Financial Statements

Balance Sheets...........................................F-3

Statements of Operations.................................F-4

Statements of Changes in Stockholders' Equity............F-5

Statements of Cash Flows.................................F-6

Notes to Consolidated Financial Statements...............F-7 - F-11

<PAGE>

REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The Stockholders and Board of Directors
Biofarm, Inc.

We have audited the accompanying consolidated balance sheets of Biofarm, Inc. (the "Company") as of October 31, 2004 and 2003, and the related consolidated statements of operations, stockholders' deficit and cash flows for the years then ended. These financial statements are the responsibility of management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Biofarm, Inc. as of October 31, 2004 and 2003, and the consolidated results of its operations and its cash flows for the years then ended, in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note A to the consolidated financial statements, the Company entered into a reverse merger transaction with friendlyway, Inc. on December 10, 2004. The reverse merger transaction will be accounted for as a recapitalization of friendlyway, Inc., which is the accounting acquirer, effective on December 10, 2004.

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note A to the consolidated financial statements, the Company has limited working capital and no recent operating activities. Additionally, friendlyway, Inc., a company with which the Company entered into a reverse merger transaction on December 10, 2004, is an early stage entity with a limited operating history. These conditions raise substantial doubt about the Company's ability to continue as a going concern. Management's plans regarding these matters also are described in Note A. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

/s/ ASHER & COMPANY, LTD.

Philadelphia, PA
February 12, 2005

<PAGE>

BIOFARM, INC.
CONSOLIDATED BALANCE SHEETS
OCTOBER 31, 2004 AND 2003

ASSETS

<TABLE>

<CAPTION>

-
<S> <
CURRENT ASSETS
Cash $
-
Total current assets
-

Total Assets $
=

LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)

CURRENT LIABILITIES
Accounts payable $
-
Total current liabilities

COMMITMENTS AND CONTINGENCIES

STOCKHOLDERS' EQUITY (DEFICIT)

Preferred stock, $.001 par value; 5,000,000 Shares authorized, none issued
Common stock, $.001 par value; 25,000,000 shares authorized, 5,681,480 shares issued and 5,681,095 shares outstanding at October 31, 2004 and 5,240,280 shares issued and 5,239,895 shares
outstanding at October 31, 2003
Additional paid-in capital
Accumulated deficit
Stock subscriptions receivable
Accrued interest on stock subscriptions receivable
-

Less treasury stock, at cost, 385 shares
-
Total Stockholders' Equity (Deficit)
-

Total Liabilities and Stockholders' Equity (Deficit) $
=
</TABLE>

The accompanying notes are an integral part of these consolidated financial statements

F-3

<PAGE>

BIOFARM, INC.
CONSOLIDATED STATEMENTS OF OPERATIONS
YEARS ENDED OCTOBER 31, 2004 AND 2003

<TABLE>
<CAPTION>

| | 2004 | 2003 |
|---|---|---|
| <S> | <C> | <C> |

| | | |
|---|---|---|
| Expenses | | |
| General and administrative expenses | $ 82,817 | $ 113,885 |
| Costs related to abandoned investments | 17,500 | 19,037 |
| | 100,317 | 132,922 |
| Extraordinary Loss: Transfer of assets and liabilities | 193,892 | -- |
| NET LOSS | $ (294,209) | $ (132,922) |
| Basic and diluted loss per common share | | |
| Loss before extraordinary item | $ (0.02) | $ (0.03) |
| Extraordinary item | (0.03) | -- |
| Net loss | $ (0.05) | $ (0.03) |
| Weighted-average number of common shares outstanding | 5,554,609 | 5,122,969 |

</TABLE>

The accompanying notes are an integral part of these consolidated financial statements.

<PAGE>

BIOFARM, INC.
CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY (DEFICIT)
YEARS ENDED OCTOBER 31, 2004 AND 2003

<TABLE>
<CAPTION>

| <S> | Shares of Common Stock <C> | Common Stock <C> | Additional Paid-In Capital <C> | <C |
|---|---|---|---|---|
| Balance, November 1, 2002 | 4,972,930 | $ 4,973 | $ 17,148,597 | $ |
| Issuance of common stock | 267,350 | 268 | (268) | |
| Payments collected on subscription receivable from related party | -- | -- | -- | |
| Interest accrued on subscriptions receivable | -- | -- | 10,442 | |
| Net loss | -- | -- | -- | |
| Balance, October 31, 2003 | 5,240,280 | 5,241 | 17,158,771 | |
| Issuance of common stock | 441,200 | 441 | (441) | |
| Payments collected on subscription receivable from related party | -- | -- | -- | |

| | | | | |
|---|---|---|---|---|
| Interest accrued on subscriptions receivable | -- | -- | 3,777 | |
| New subscription receivable | -- | -- | 25,000 | |
| Transfer to OCWEN | -- | -- | -- | |
| Net loss | -- | -- | -- | |
| Balance, October 31, 2004 | 5,681,480 | $ 5,682 | $ 17,187,107 | $ |

<CAPTION>

| <S> | Accrued Interest on Subscriptions Receivable <C> | Treasury Stock <C> | Total Stockholders' Equity (Deficit) <C> |
|---|---|---|---|
| Balance, November 1, 2002 | $ (15,545) | $ (987) | $ (89,508) |
| Issuance of common stock | -- | -- | -- |
| Payments collected on subscription receivable from related party | -- | -- | 141,200 |
| Interest accrued on subscriptions receivable | (10,442) | -- | -- |
| Net loss | -- | -- | (132,922) |
| Balance, October 31, 2003 | (25,987) | (987) | (81,230) |
| Issuance of common stock | -- | -- | -- |
| Payments collected on subscription receivable from related party | -- | -- | 88,000 |
| Interest accrued on subscriptions receivable | (3,777) | -- | -- |
| New subscription receivable | -- | -- | -- |
| Transfer to OCWEN | 29,764 | -- | 185,864 |
| Net loss | -- | -- | (294,209) |
| Balance, October 31, 2004 | $ -- | $ (987) | $ (101,575) |

</TABLE>

Theaccompanying notes are an integral part of these consolidated financial statements.

<PAGE>

BIOFARM, INC.
CONSOLIDATED STATEMENTS OF CASH FLOWS
YEARS ENDED OCTOBER 31, 2004 AND 2003

| | 2004 | 2003 |
|---|---|---|
| OPERATING ACTIVITIES | | |
| Net loss | $ (294,209) | $ (132,922) |
| Adjustments to reconcile net loss to cash utilized by operating activities: | | |
| Extraordinary loss on transfer to OCWEN | 193,892 | |
| Write-off of investments | -- | 932 |
| Changes in: | | |
| Accounts payable | 12,167 | (13,180) |
| Net cash utilized by operating activities | (88,150) | (145,170) |
| INVESTING ACTIVITIES | | |
| Advances for note receivable | -- | (1,000) |
| Repayments for note receivable | -- | 5,000 |
| Net cash provided by investing activities | -- | 4,000 |
| FINANCING ACTIVITIES | | |
| Payments received for subscriptions receivable | 88,000 | 141,200 |
| Net cash provided by financing activities | 88,000 | 141,200 |
| (DECREASE) INCREASE IN CASH | (150) | 30 |
| Cash, beginning of period | 393 | 363 |
| Cash, end of period | $ 243 | $ 393 |

The accompanying notes are an integral part of these consolidated financial statements

<PAGE>

BIOFARM, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
OCTOBER 31, 2004 AND 2003

NOTE A - ORGANIZATION AND OPERATIONS

Organization

Biofarm, Inc. (the "Company") was incorporated in June 1991 to acquire,

operate and develop environmental contracting and consulting companies and related businesses. All operating companies were disposed of or sold in prior years. At October 31, 2004, the Company was a non-operating shell corporation.

On December 10, 2004, the Company entered in a reverse merger transaction with friendlyway, Inc ("FWI"), a full-service solution provider of interactive customer communication systems and applications. As a result of this transaction, the stockholders of FWI became the controlling stockholders of the Company. This reverse merger transaction will be accounted for as a recapitalization of FWI, as FWI is the accounting acquirer, effective December 10, 2004.

Operations

The Company's consolidated financial statements have been prepared on a going concern basis, which contemplates the continuation of operations, realization of assets and liquidation of liabilities in the ordinary course of business, and do not reflect any adjustments that might result if the Company is unable to continue as a going concern. At October 31, 2004, the Company has total assets of $243 and liabilities of $101,818. Although all of the Company's liabilities have been assumed by Ocwen effective June 11, 2004 (see Note H), the Company remains as the primarily responsible party for these liabilities. The Company has recorded a receivable from Ocwen related to its assumption of the Company's liabilities; however, a valuation reserve equal to the full amount of the receivable has also been recorded. The Company's recent operations have consisted of administrative costs to maintain the Company, and identifying potential investment and acquisition opportunities. As a result of the Company's reverse merger transaction with FWI on December 10, 2004, the Company became an operating company. FWI is an early stage company with a limited operating history (See Note C for pro forma financial information related to this reverse merger transaction). Management considers FWI to be a potential high growth company with the ability to raise capital to fund its expansion and working capital needs

These factors indicate that there is substantial doubt about the Company's ability to continue as a going concern. The accompanying financial statements do not include any adjustments that might be necessary should the Company be unable to continue as a going concern.

<PAGE>

NOTE B - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

Principles of consolidation

The accompanying consolidated financial statements include the accounts of Biofarm, Inc. and its wholly owned subsidiaries after elimination of all intercompany balances and transactions.

Use of estimates

The preparation of financial statements in conforming with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of revenue and expenses during the reporting period. Actual results could differ from those estimates.

Income taxes

Income taxes are calculated using the liability method specified by Statement of Financial Accounting Standards ("SFAS") No. 109, "Accounting for Income Taxes."

Loss per common share

The Company reports basic and diluted earnings per share in accordance with SFAS No. 128, "Earnings Per Share" ("EPS"). There is no difference in basic and diluted EPS for the years ended October 31, 2004 and 2003 since there are no potentially dilutive securities outstanding for either period presented.

<PAGE>

BIOFARM, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
OCTOBER 31, 2004 AND 2003

NOTE C - PROFORMA FINANCIAL INFORMATION

As discussed in Note A, on December 10, 2004, the Company entered into a reverse merger transaction with FWI pursuant to the terms of a Share Exchange Agreement between the two companies. This reverse merger transaction will be accounted for as a recapitalization of FWI.

The following table summarizes the results of the Company on a pro forma basis, as if the reverse merger transaction with FWI had occurred at the beginning of each period. These results do not purport to represent what the results of operations for the Company actually would have been or to be indicative of the future results of operations of the Company.

| | (Unaudited) For the year ended October 31, | |
|---|---|---|
| | 2004 | 2003 |
| Revenues | $ 2,251,344 | $ 1,494,468 |
| Net loss | $ (613,263) | $ (731,568) |
| Net loss per share - basic and diluted | $ (.03) | $ (.03) |

NOTE D - SUBSCRIPTIONS RECEIVABLE

The Company has a stock subscription receivable of $4,600 and $223,700 at October 31, 2004 and October 31, 2003, respectively. The stock subscription receivable on October 31, 2003, along with related accrued

interest receivable of $29,764, was distributed to Ocwen Corp. as described in Note H.

NOTE E - INCOME TAXES

The Company has deferred tax assets of approximately $4.4 million as of October 31, 2004, related to net operating loss carryforwards ("NOL"), which have not been utilized. As a result of the spin-off of certain of the Company's operating subsidiaries, the reverse merger transaction with FWI on December 10, 2004, and the issuance of additional shares of common stock, the amount of the NOL of approximately $12.6 million is limited. Additionally, the utilization of this NOL, if available, to reduce the future income taxes will depend upon the generation of sufficient taxable income prior to the expiration of the useable portion of the NOL. Therefore, at October 31, 2004 and October 31, 2003, the Company has established a 100% valuation allowance against the deferred tax assets as the likelihood of recognizing this benefit cannot be certain. The net operating losses are due to expire in various years through October 2020.

<PAGE>

BIOFARM, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
OCTOBER 31, 2004 AND 2003

NOTE F - ABANDONED INVESTMENTS

The Company has previously entered into several contracts related to the proposed acquisitions of businesses. In connection with such contracts, the Company may have made cash advances to such businesses. Each of these investments (excluding friendlyway, Inc. Note K) has been abandoned and the contracts are terminated at October 31, 2004. Abandoned investments in 2004 and 2003 resulted in charges to operations of $17,500 and $19,037, respectively.

NOTE G - ISSUANCE OF COMMON SHARES

The Company has issued the following shares of its authorized, unissued common stock in exchange for the collection of subscriptions receivable and $19,875 in payment of the amount previously advanced by the Company in connection with a third party subscription agreement. The par value of these shares was removed from additional paid-in capital and credited to common stock.

| | Issued Shares | Subscription Amount Received |
|---|---|---|
| June 23, 2003 | 106,850 | $53,400 |
| November 5, 2003 | 306,000 | 33,000 |
| October 5, 2004 | 135,200 | 67,600 |

During the year ended October 31, 2004, the Company collected an additional $20,400 of stock subscriptions receivable for which no common stock has been issued, but for which the Company is obligated to issue 40,800 shares of its common stock.

Additionally, at October 31, 2004, the Company is contingently obligated to issue an additional 9,200 shares of its common stock pending collection of the remaining subscriptions receivable of $4,600.

<PAGE>

BIOFARM, INC.
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
OCTOBER 31, 2004 AND 2003

NOTE H - LITIGATION SETTLEMENT AND TRANSFER TO OCWEN

Transfer to Ocwen

On June 11, 2004, the Board of Directors of the Company adopted a resolution providing for the transfer of all of the Company's assets to Ocwen Corp. ("Ocwen" - a former wholly-owned subsidiary of Biofarm) and assumption of all of the Company's liabilities by Ocwen. Also on June 11, 2004, the Company transferred its ownership of 100% of the outstanding stock of Ocwen to a trust for the benefit of the stockholders of Biofarm. This transfer from Biofarm of its assets to and assumption of its liabilities by Ocwen (i) enables Biofarm to effect the acquisition of an operating entity on a basis that gives the shareholders of the operating entity a preponderant interest in the Common Stock of Biofarm, (ii) removes Biofarm as a party defendant in the sole litigation matter to which it was a party defendant, and (iii) provides the shareholders of Biofarm with shares in another (Ocwen) company.

As a result of the transfer of ownership in Ocwen to a trust, Ocwen is a private shell company. It is primarily through collection of its subscriptions receivable that Ocwen intends to fund the payment of liabilities assumed from Biofarm. As a result, the receivable recorded by the Company in connection with Ocwen's obligation to fund payment for the Company's liabilities is fully reserved at October 31, 2004.

Litigation Settlement

On July 22, 2004, the Company entered into an agreement of settlement with a party which had been seeking seeking recovery of approximately $3,000,000 that was paid by a foreign insurance company for an insurance settlement. As part of the settlement, which results in no costs to the Company, the Company agreed to transfer all of its assets and liabilities to Ocwen, as described above. Additionally, the agreement of settlement permitted the substitution of the Company by Ocwen as the named defendant.

</TEXT>
</DOCUMENT>

# Exhibit 3 to the Declaration of Holly Baudler

<DOCUMENT>
<TYPE>8-K
<SEQUENCE>1
<FILENAME>v016957.txt
<TEXT>

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, DC 20549

FORM 8-K

CURRENT REPORT

PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

DATE OF REPORT (DATE OF EARLIEST EVENT REPORTED): April 21, 2005

friendlyway Corporation
(NAME OF REGISTRANT AS SPECIFIED IN ITS CHARTER)

Nevada
(STATE OR OTHER JURISDICTION OF INCORPORATION OR ORGANIZATION)

| 0-20317 | 88-0270266 |
|---|---|
| COMMISSION FILE NUMBER | (I.R.S. EMPLOYER IDENTIFICATION NUMBER) |

| 1255 Battery Street, Suite 200, San Francisco, California | 94111 |
|---|---|
| (ADDRESS OF PRINCIPAL EXECUTIVE OFFICES) | (ZIP CODE) |

ISSUER'S TELEPHONE NUMBER: (415) 288-3333

Biofarm, Inc.
(FORMER NAME OR FORMER ADDRESS, IF CHANGED SINCE LAST REPORT)

<PAGE>

Item 8.01 Other Events

On April 21, 2005, Registrant issued a press release announcing the filing of an amendment to its Articles of Incorporation on April 19, 2005 to: (a) change the name of Registrant from Biofarm, Inc. to friendlyway Corporation and (b) increase the total number of authorized shares of common stock, par value $0.001 per share, to 100,000,000 shares. In addition, the press release announced the trading of Registrant's shares under a new stock symbol (FDWY.OB) as of April 22, 2005.

Item 9.01. Financial Statement and Exhibits.

(c) Exhibits.

99.1 Press Release Announcing Name and Stock Symbol Change.

SIGNATURE

Pursuant to the requirements of the Securities Exchange Act of 1934, Registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized.

Date: April 22, 2005

friendlyway Corporation

----------------------------------

Alexander von Welczeck
President/Chief Executive Officer

</TEXT>
</DOCUMENT>

# Exhibit 4 to the Declaration of Holly Baudler

---

**SECURITIES AND EXCHANGE COMMISSION**

**Washington, D.C. 20549**

---

**FORM 8-K**

**CURRENT REPORT**

**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

---

**Date of report: October 2, 2006**
(Date of earliest event reported)

**PSI CORPORATION**
(Exact name of Registrant as specified in its charter)

**Nevada**
(State or other jurisdiction of incorporation)

| **000-20317** | **88-0270266** |
|---|---|
| (Commission File No.) | (I.R.S. Employer Identification No.) |

**7222 Commerce Center Drive, Suite 240**
**Colorado Springs, CO 80919**
(Address of principal executive offices; zip code)

**(719) 359-5533**
(Registrant's telephone number, including area code)

**N/A**
(Former Name or Former Address, if changed Since Last Report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (*see* General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13-4(e) under the Exchange Act (17 CFR 240.13e-4(c))

---

**Section 1 - Registrant's Business and Operations**

**Item 1.01. Entry into a Material Definitive Agreement.**

Effective September 25, 2006, we entered into an employment agreement (the "Abbo Agreement") with Joseph A. Abbo, our Chief Operating Officer. The description of the Abbo Agreement in Item 5.02 below is incorporated herein by reference. A copy of the Abbo Agreement is attached hereto as Exhibit 10.1.

Effective September 25, 2006, we entered into an employment agreement (the "Self Agreement") with Adam C. Self, our Chief Information Officer. The description of the Self Agreement in Item 5.02 below is incorporated herein by reference. A copy of the Self Agreement is attached hereto as Exhibit 10.2

**Section 5 - Corporate Governance and Management**

**Item 5.02. Departure of Directors or Principal Officers; Election of Directors; Appointment of Principal Officers.**

Effective September 25, 2006, we appointed Joseph A. Abbo as our Chief Operating Officer and Adam C. Self as our Chief Information Officer. The biographical information of Messrs. Abbo and Self required by this Item is set forth below.

| Name | Age | Biographical Information |
|---|---|---|
| Joseph A. Abbo | 38 | Mr. Abbo has served as our Chief Operating Officer since September 2006. From 2003 until he joined our company, he served as Vice President of Services and General Manager of Global ATM Aftermarket for NCR Corporation, a leading manufacturer of ATM machines based in Dayton, Ohio. From 2000 until 2003, Mr. Abbo served as Director of Operations and Product Management in the banking operations division of 7-Eleven, Inc., a Dallas, Texas-based operator of convenience stores containing over 4,500 ATM machines. Mr. Abbo has over 15 years of bank operations experience with a specific concentration in the ATM, kiosk and payments sector. |
| Adam C. Self | 42 | Mr. Self has served as our Chief Information Officer since September 2006. In 2003, he co-founded Web Automation & Integration Group, LLC, a company that designs, hosts and integrates web pages for the purpose of increasing sales productivity for businesses, where he served as its Chief Information Officer and Network Administrator until he joined our company. From 1999 until 2002, Mr. Self was employed by Electronic Data Systems ("EDS"). From 2002 to until 2006, he served as a Systems Architect/Web Developer at EDS and from 1999 until 2002, he served as a Lead Technician/Xerox Remote Desktop Support. |

Effective as of September 25, 2006, we entered into an employment agreement (the "Abbo Agreement") with Joseph A. Abbo, our Chief Operating Officer. The Abbo Agreement provides for the payment to Mr. Abbo of an annual base salary of $160,000, any portion of which we may elect to pay in shares of our common stock. The Abbo Agreement has a term of 24 months. The Abbo Agreement provides that Mr. Abbo may be terminated for "just cause," as defined in the Abbo Agreement, upon 30 days notice unless the relevant termination event is cured within such period. In the event Mr. Abbo is terminated for any reason other than "just cause," Mr. Abbo shall have the right to participate in all benefit programs of our company for the greater of one year or the remaining term of the agreement. In connection with the Abbo Agreement, Mr. Abbo has entered into confidentiality and non-compete agreements with our company.

Effective as of September 25, 2006, we entered into an employment agreement (the "Self Agreement") with Adam C. Self, our Chief Information Officer. The Self Agreement provides for the payment to Mr. Self of an annual base salary of $100,000, any portion of which we may elect to pay in shares of our common stock. The Self Agreement has a term of 24 months. The Self Agreement provides that Mr. Self may be terminated for "just cause," as defined in the Self Agreement, upon 30 days notice unless the relevant termination event is cured

within such period. In the event Mr. Self is terminated for any reason other than "just cause," Mr. Self shall have the right to participate in all benefit programs of our company for the greater of one year or the remaining term of the agreement. In connection with the Self Agreement, Mr. Self has entered into confidentiality and non-compete agreements with our company.

**Section 7 - Regulation FD**

**Item 7.01. Regulation FD Disclosure.**

On October 2, 2006, we issued a press release announcing the change of our corporate name to PSI Corporation and the change of our ticker symbol on the Over-the-Counter-Bulletin-Board to PSCP, effective immediately. A copy of the press release is attached hereto as Exhibit 99.1 and incorporated herein by reference.

The information contained in the accompanying press release is being furnished pursuant to "Item 7.01. Regulation FD." The information contained in the accompanying press release shall not be incorporated by reference into any filing of our company, whether made before or after the date hereof, regardless of any general incorporation language in such filing, unless expressly incorporated by reference to such filing. The information in the press release attached hereto shall not be deemed to be "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or otherwise subject to the liabilities of that section or Sections 11 and 12(a)(2) of the Act.

**Section 9 - Financial Statements and Exhibits**

**Item 9.01. Financial Statements and Exhibits.**

(d) Exhibits.

| Number | Description |
|---|---|
| 10.1 | Employment Agreement, dated as of September 17, 2006, by and between PSI Corporation and Joseph Abbo. |
| 10.2 | Employment Agreement, dated as of August 2, 2006, by and between PSI Corporation and Adam Self. |
| 99.1 | Press Release dated October 2, 2006. |

**Signatures**

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, the Registrant has duly caused this Report to be signed on its behalf by the undersigned hereunto duly authorized.

PSI Corporation

Date: October 10, 2006

By: /s/ Ken Upcraft

Name: Ken Upcraft
Title : Chief Executive Officer