FILED

JUN - 8 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PSI CORPORATION (f/k/a/ FRIENDLYWAY CORPORATION, f/k/a BIOFARM, INC.),<br><br>Plaintiff,<br><br>vs.<br><br>ALEXANDER VON WELCZECK, HENRY LO, MICHAEL DRAPER, and FRIENDLYWAY AG,<br><br>Defendants. | No. C 07-02869 SBA<br><br>**ORDER**<br><br>[Docket No. 6] |

Currently before the Court is PSI Corporation's ("PSI's") ex parte motion for a temporary restraining order against defendants friendlyway AG ("FWAG"), Alexander von Welczeck, Henry Lo, and Michael Draper [Docket No. 6]. For the reasons that follow, the Court DENIES the ex parte motion for a temporary restraining order.

## BACKGROUND

### I. Background Facts

In 2000, defendant FWAG, a German business entity, established a United States subsidiary, incorporated in Delaware, called friendlyway, Inc. ("FWI"). In 2002, FWAG divested a majority of the ownership of FWI. *See* Trox Decl. ¶ 4. Defendant Alexander von Welczeck, who was president of FWI and a former employee of FWAG, purchased 70% of FWI's outstanding common stock, and FWAG retained a minority 30% stake in the outstanding shares of FWI. *Id.*

In 2004, FWI sought to merge with a publicly-traded shell company in order to have access to funding through the public markets. *Id.* at ¶ 8. FWI identified Biofarm, Inc (eventually to be known as PSI Corporation, the plaintiff in this action) as a possible merger candidate. *Id.* at ¶ 9. According its report on Form 10-QSB filed with the Securities and Exchange Commission ("SEC") on September 14, 2004, Biofarm was a "non-operating shell corporation" that, as of July 31, 2004, had "total assets of $229 and no liabilities." *See* Baudler Decl. Ex. 1. Biofarm stated in a subsequent report on Form 10-KSB filed with the SEC on February 14, 2005, that it had been a "public shell company with no revenue from operations" for the past three years, and the audited financial statements included in the report indicate Biofarm had total assets of $243 and liabilities of $101,818 as of October 31, 2004. *See* Baudler Decl., Ex. 2.

After negotiations, the stockholders of FWI, including FWAG, eventually agreed to exchange all of their shares of FWI common stock for 75% of the shares of Biofarm common stock pursuant to a Share Exchange Agreement dated August 13, 2004 (the "2004 Share Exchange Agreement") and a Closing Agreement, effective December 10, 2004, among Biofarm, FWI, and each of FWI's stockholders. *See* Pl.'s Exs. C, E. The share exchange ratio was set so that the pre-merger Biofarm (now PSI) stockholders would retain 25% of the surviving entity as compensation for contributing Biofarm's public shell to FWI. *See id.* The 18,000,000 shares received by the FWI stockholders in the merger transaction represented 75% of the shares of common stock anticipated to be outstanding at the close of the merger transaction. *See id.*

In May 2006, FW Corp. acquired Pantel Systems, Inc., a Nevada corporation, pursuant to a Share Exchange Agreement (the "2006 Share Exchange Agreement"), dated April 27, 2006, among FW Corp. (now PSI), Pantel Systems, Inc. and Kenneth J. Upcraft, its sole stockholder. *See* Baudler Decl., Ex. 10. Pursuant to the 2006 Share Exchange Agreement, Upcraft acquired 20,000,000 shares of FW Corp. (now PSI) common stock in exchange for all his shares of capital stock of Pantel Systems, Inc. *See id.* As a result, Upcraft became the largest single shareholder of FW Corp. (now PSI). Upon the closing of the transaction described in the 2006 Share Exchange Agreement, Upcraft

2

1  also became President and Chief Executive Officer of FW Corp. (now PSI), and had the power to
2  exercise his control over FW Corp. (now PSI). *See id.*
3        Soon after Upcraft acquired control of the company through the Pantel Systems
4  transaction, FW Corp. (now PSI) announced that it had "cancelled" the issuance of 15,560,000
5  shares of its common stock, which included the 6,000,001 shares issued to FWAG pursuant to the
6  2004 Share Exchange Agreement and 1,529,824 shares transferred to FWAG by Welczeck pursuant
7  to a settlement agreement. *See* Baudler Decl., Ex. 11.
8        Under Upcraft's direction, the company engaged in a series of transactions involving large
9  stock issuances, resulting in dilution of FW Corp.'s (now PSI's) stock. On August 7, 2006, the
10 company acquired the assets of Big Fish Marketing Group, Inc. for 4,952,380 shares plus cash and
11 additional stock promised upon achievement of certain revenue targets. *See* Baudler Decl., Ex. 12.
12 On August 22, 2006, the company acquired the assets of Ignition Media Group, LLC for 6,818,182
13 shares plus $1 million in cash. *See* Baudler Decl., Ex. 13. On October 17, 2006, the company issued
14 5,000,000 shares of its common stock plus warrants to purchase up to 5,000,000 additional shares of
15 common stock to Lazarus Investment Partners, LLP for $500,000, or $0.10 per share, a substantial
16 discount to the stock's closing price of October 17, 2006 of $0.35 per share. *See* Baudler Decl., Ex.
17 14.
18       While Upcraft controlled the company, the FW Corp.'s (now PSI) stock price fell
19 from $0.49 on April 27, 2006 to $0.35 on December 20, 2006, when Upcraft resigned
20 as chief executive officer. *See* Baudler Decl., Ex. 15. David Foni was appointed to the board of
21 directors on January 16, 2007, and the board of directors appointed him chief executive officer on
22 January 19, 2007. *See* Baudler Decl., Ex. 16. The company's stock price has further fallen from
23 $0.40 on January 16, 2007 to $0.06 on June 6, 2007. *See* Baudler Decl., Exs. 17, 18.
24       On April 23, 2007, in connection with PSI's cancellation of FWAG's shares of common
25 stock, FWAG filed a complaint against PSI, Superior Court of California, County of Santa Clara,
26 Case No. CGC-07-462622 for breach of contract and other causes of action. *See* Pl.'s Ex. G.

## II.  The Temporary Restraining Order Motion

Apparently in response to FWAG's state court complaint, PSI, rather than respond to the complaint, filed the instant action in this Court on June 1, 2007. PSI alleges that it was fraudulently induced to enter into the 2004 Stock Exchange Agreement with FWI, and seeks damages and rescission of the Stock Exchange Agreement. Specifically, PSI alleges that various defendants made oral representations to PSI regarding FWI's financial health, which representations PSI relied on in consummating the merger, and which were ultimately revealed to be false by SEC forms filed by FWI in 2005.

PSI seeks a temporary restraining order ("TRO") enjoining defendants from selling any PSI stock. Specifically, it seeks to enjoin defendants from:

1. selling, assigning, encumbering, or transferring, in any manner, shares of PSI's stock;
2. taking any action to encumber or otherwise consign any interest in PSI stock that they presenting own, possess or control; and
3. agreeing to or working in concert with any individual or entity to do or undertake any of the foregoing acts.

PSI argues that sales of PSI stock by defendants, which are supposedly imminent, will eliminate PSI's ability to seek rescission and will result in its loss of control over itself through the sale of its stock to third parties.

PSI filed the instant motion for a TRO on June 5, 2007. The Court ordered further briefing on the motion. Docket No. 11. On June 7, 2007, defendant FWAG filed an opposition to the motion; on the same day, defendants Welczeck and Lo filed a separate opposition. PSI filed its reply on June 8, 2007.

### LEGAL STANDARD

Federal Rule of Civil Procedure 65 authorizes a court to enter a temporary restraining order or preliminary injunction. *See* Fed. R. Civ. P. 65. The purpose of such injunctive relief is to

4

preserve the relative positions of the parties until a trial on the merits can be conducted. *See E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 990 (9th Cir. 2006); *LGS Architects, Inc. v. Concordia Homes*, 434 F.3d 1150, 1158 (9th Cir. 2006). A party seeking a preliminary injunction must show either: (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in its favor. *Faith Ctr. Church Evangelistic Ministries v. Glover*, 462 F.3d 1194, 1201-02 (9th Cir. 2006). These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases. *LGS Architects*, 434 F.3d at 1155; *see also Harper v. Poway Unified Sch. Dist.*, 445 F.3d 1166, 1174 (9th Cir. 2006) (the greater the relative hardship to the moving party, the less probability of success must be shown to support the grant of a preliminary injunction).

The party seeking preliminary injunctive relief must do more than merely allege imminent harm sufficient to establish standing; he or she must demonstrate immediate threatened injury as a prerequisite to such relief. *Associated Gen. Contractors v. Coalition for Economic Equity*, 950 F.2d 1401, 1410 (9th Cir. 1991), *cert. denied*, 503 U.S. 985 (1992). A temporary restraining order is an extraordinary remedy that will be granted only in cases where the need for *immediate* relief is clear. Fed. R. Civ. Pro. § 65(b) ("A temporary restraining order may be granted without written or oral notice to the adverse party or that party's attorney only if . . . it clearly appears from specific facts shown by affidavit . . . that *immediate* and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition" (emphasis added)); *see also* Schwarzer, Tashima, & Wagstaffe, California Practice Guide: Federal Civil Procedure Before Trial (The Rutter Group 2007) § 13:7.

## ANALYSIS

### I. Likelihood of Success on the Merits

PSI has failed to show a likelihood of success on the merits. Its securities and breach of contract claims appear to be time-barred, and its allegations related to fraud are unsupported.

5

### A. Statute of Limitations

FWAG argues that PSI's claims under federal and state securities statutes are time-barred. PSI's claims under Section 10(b) of the federal Securities Exchange Act and California Corporations Code § 25401 are predicated upon supposed representations about FWI's financial health, including its revenues and profitability, and other terms of the 2004 transaction between Biofarm and FWI. Pl.'s Br. at 15-16. PSI asserts that the falsity of the complained-of representations was revealed by the Forms 8-K and 10-Q filed with the SEC on March 3, 2005 and March 17, 2005. See Pl.'s Br. at 9-11. PSI did not bring its statutory fraud claims until June 1, 2007 – more than two years after the supposed falsity of these statements was revealed.

A Section 10(b) claim must be commenced within "the earlier of (1) 2 years after the discovery of facts constituting the violation; or (2) 5 years after such violation." 28 U.S.C. § 1658(b). Claims brought under Section 25401 of the California Corporations Code must "be brought before the expiration of one year after the discovery by the plaintiff of the facts constituting the violation." *Deveny v. Entropin, Inc.*, 42 Cal. Rptr. 3d 807, 815 (2006) (internal quotation marks omitted); Cal. Corp. Code § 25506. Inquiry notice, plus reasonable diligence, is sufficient to trigger the limitations period. *Deveny*, 42 Cal. Rptr. 3d at 423; *Betz v. Trainer Wortham & Co.*, 2007 WL 1377613, at *4 (9th Cir. May 11, 2007) (holding "that either actual or inquiry notice can start the running of the statute of limitations on a federal securities fraud claim").

"Inquiry notice" exists when circumstances "raise sufficient suspicion of fraud to cause a reasonable investor to investigate the matter further." *Berry v. Valence Technology, Inc.*, 175 F.3d 699, 704 (9th Cir.1999). To determine if plaintiffs are on inquiry notice, a court may examine

> any financial, legal, or other data, such as public disclosures in the media about the financial condition of the corporation and other lawsuits alleging fraud committed by the defendants, that provide the plaintiff with sufficient storm warnings to alert a reasonable person to the probability that there were either misleading statements or significant omissions involved in the sale of securities

*In re Infonet Services Corp. Securities Litigation*, 310 F.Supp .2d 1106, 1113-14 (C.D. Cal. 2003). The limitations period begins to run when such information is made public. "A reasonable investor is

6

presumed to have information available in the public domain, and therefore ... is imputed with constructive knowledge of this information." *Berry*, 175 F.3d at 703, n. 4.

PSI is a sophisticated business entity, the primary business of which is to act as a shell corporation for other businesses. Under any standard of "reasonable diligence," PSI should have been aware of the content of the Forms 8-K and 10-Q filed with the SEC on March 3, 2005 and March 17, 2005, which purportedly revealed the falsity of the representations forming the basis of this lawsuit. In its reply brief, PSI cursorily asserts that the Court should disregard FWAG's statute of limitations argument because such a "fact intensive inquiry" is inappropriate in the context of a motion for a TRO, relying on the standards related to summary judgment articulated in *Betz*. However, on a motion for a temporary restraining order, the burden is on the moving party to demonstrate a probability of success on the merits; it is not the opposing party's burden to show that a TRO should not be issued simply because the moving party requests one. *See Faith Ctr. Church*, 462 F.3d at 1201-02. Rather, to the extent the defendants have any burden, it is only to point to the improbability of PSI's success on the merits. The Court will therefore not disregard the statute of limitations inquiry.

PSI further contends that defendants controlled PSI's board between June 2005 and May 1, 2006, and therefore the statute of limitations should be tolled because PSI could not have brought an action against defendants until May 2006. *See, e.g., Healthtrac, Inc. v. Sinclair*, 302 F. Supp. 2d 1125, 1127 (N.D. Cal. 2004). However, PSI brought its suit on June 1, 2007 – a year and a month after defendants' purported control of the company ended. Therefore, even if the 1-year statute of limitations in the state statute was tolled trough May 1, 2006, PSI's June 1, 2007 complaint does not survive the limitations. Moreover, as FWAG points out, through June 2005 – months after the facts upon which PSI now relies were disclosed – fully half of Biofarm's board of directors were pre-transaction Biofarm representatives, and these directors could have caused Biofarm to bring the lawsuit that PSI now attempts to bring today. Therefore, PSI's tolling argument, at least on the evidence currently before this Court, is not persuasive.

7

Finally, PSI's claims under Sections 20(a) and 29(b) of the federal securities laws depend on the viability of its Section 10(b) claim, and therefore fail along with that claim. *See Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 978 (9th Cir. 1999) ("To be liable under section 20(a), the defendants must be liable under another section of the Exchange Act."); *In re U.S. Grant Hotel Assocs., Ltd. Sec. Litig.*, 740 F. Supp. 1460, 1466 (S.D. Cal. 1990) (finding that plaintiff's § 29(b) claim was "dependent upon a prior finding by the court that [defendant] violated § 10(b) of the 1934 Act[.]").

It appears, therefore, on the evidence before the Court, that PSI's statutory claims may be barred, and therefore PSI cannot demonstrate a "probability" of success on the merits of its statutory securities claims.

### B.  Fraud and Breach of Contract Claims

#### 1.  Intention to Perform Future Acts

Among the purportedly false representations that PSI attributes to FWAG are statements that FWAG intended to take or refrain from taking some specified action at some future time. For example, PSI contends that on August 20, 2004, FWAG represented that it intended to merge into PSI once it acquired FWI. Pl.'s Br. at 5. PSI also points to FWAG's representation in the Agreement that it was acquiring PSI's stock for its own account and had no *present* intention of selling or otherwise distributing it. Pl.'s Br. at 6; Pl.'s Exh. C ¶ 4.5.4

FWAG's alleged statements were statements about its then-current intentions. *See especially* Pl.'s Exh. C ¶ 4.5.4 (stating that FWAG had no *present* intention of selling or otherwise distributing PSI stock). PSI has adduced no evidence to show that FWAG did not possess its stated intention at the time of the representations. The paragraphs of FWAG's state-court complaint PSI cites in support of the alleged falsity (Pl.'s Exh. G), show only that, in April 2006 – nearly two years after the Agreement was executed – FWAG instructed PSI to transfer some of its PSI stock to other parties. Pl.'s Exh. G ¶ 24. This fact does not call into question FWAG's representation that at the time of the Agreement it had no then-present intention of distributing PSI stock.

### 2. Falsity of Oral Representations

The bulk of the representations PSI relies on are oral statements supposedly made by Henry Lo in 2004 about such things as FWI's financial health, profitability, and revenue projections, the falsity of which were supposedly revealed by the Forms 8-K and 10-Q filed with the SEC in March 2005. *See* Pl.'s Br. at 4-5. However, while PSI produced hundreds of pages of documents in support of its motion, it has not produced any documentation of the purported misrepresentations made by Lo, and instead cites only to the unsupported allegations in its complaint as evidence. Such "evidence" is not sufficient to raise "serious questions" going to the merits of PSI's claims, particularly in light of the apparent lack of irreparable harm that will result if a TRO is not granted, as explained below.

Moreover, many of these representations consisted of projections regarding how FWI would perform over a time period that was not yet concluded. For example, PSI contends that Lo told it on March 31, 2004 that he and Welczeck "currently believed" that FWI was performing such that it would generate $3.5 million in revenue in 2004. Pl.'s Br. at 4. However, PSI points to no evidence that shows that these representations purportedly made by Lo were false *at the time they were made*, or that Lo did not actually believe them to be true when he made them. PSI merely points to FWI's financial statements filed with the SEC in March of 2005 reporting financial results for the periods ending Oct. 31, 2004 and January 31, 2005—six and nine months after the representations were supposedly made—to prove the falsity of these claims. Pl.'s Br. at 9-10. However, financial results for these later periods do not show that Lo believed his projections rendered at an earlier time were false.

### 3. Breach of Contract

The Stock Exchange Agreement contains a "survival clause" limiting the period in which the parties could make claims based on the representations in the Agreement. The clause provides that "[t]he representations, warranties, covenants and agreements made in this Agreement shall survive any investigation made by any party hereto and the closing of the transactions contemplated hereby

9

1  for two years from the date of the Closing Date." Ex. C ¶ 11.5. The closing date was December 10,
2  2004. Pl.'s Br. at 8-9. Thus, any breach of contract claim based on representations and warranties in
3  the Agreement would be time-barred as of December 10, 2006. As PSI did not assert its claim until
4  June 1, 2007, it appears that its contract claim based on representations in the Agreement is
5  time-barred. *See Lincoln Nat'l Corp. v. Takecare, Inc.*, No. C 97-02193, 1998 WL 281290, at *1, 3-6
6  (N.D. Cal. May 11, 1998) (Wilken, J.) (survival clause in stock purchase agreement bars claims
7  based on one party's representations and warranties brought after the contractual limitations period
8  set forth in the agreement, unless an exception in survival clause is satisfied).

## II. Irreparable Harm

PSI fails to make the required showing that it will face the possibility of irreparable harm or that the balance of hardships tips sharply in its favor. *Wherry v. All Cal. Funding*, No. C 06-4384 SBA, 2006 WL 2038495, at *1 (N.D. Cal. Jul. 20, 2006) (Armstrong, J.).

As an initial matter, the Court notes that the timing of the present motion is exceedingly suspicious. PSI has been in control of the company since the Pantel transaction in May 2006. *See* Pl.'s Br. at 11. Moreover, PSI has known since at least April 2006 that FWAG is seeking to transfer some of its stock. *See* Ex. G ¶ 24. Yet, PSI waited until June 1, 2007 – only days after FWAG filed a lawsuit against it – to seek any sort of injunctive relief. PSI claims that it has only recently filed suit due to two facts: 1) the limits on transferring the stock imposed by SEC Rule 144 "recently" expired, and therefore it is now "possible" that defendants will sell their supposedly ill-gotten stock to third-parties; and 2) defendants are in the course of "dumping" PSI's stock to third-parties. PSI contends May 29, 2007, PSI learned that defendant Draper recently contacted PSI's transfer agent and secured the release of 720,000 shares of PSI's stock. *See* Ex. D ¶ 5. Two days later, PSI states, the market price of PSI's stock declined by half, which PSI implies is somehow the result of defendants' activities. *See id.* ¶ 6. PSI further states that defendant Lo "recently" sold shares of Plaintiff's stock. *See id.* ¶ 7. PSI implies that the above actions demonstrate that defendants imminently intend to engage in a mass sell-off of their stock in PSI, which, PSI

10

further implies, will devastate its stock prices and block it from seeking further financing.

PSI's claims of imminent, irreparable harm are not credible. Indeed, it appears PSI has made two deliberate misrepresentations related to the supposed immediacy of the harm. First, in its motion, PSI states that the limits on transferring the stock imposed by SEC Rule 144 "recently" expired. Curiously, given the context of this statement, PSI does not provide any date for the expiration. However, as defendants Welczeck and Lo indicate in their opposition, the Rule 144 limits actually expired in December 2006 -- *six months ago*. It appears, therefore, that PSI intentionally failed to indicate the date of the Rule 144 limits expiration in its motion in order to give the appearance of a newly-created, "imminent" threat.

Additionally, PSI claims that on May 31, 2007, PSI's stock "declined by half," which was, in some unexplained way, the result of defendant Draper's attempt to secure the release of 720,000 shares of PSI's stock. However, PSI conspicuously failed to provide any documentation of this price drop. In fact, as documentated by the day-to-stock quotes regarding PSI's stock prices provided by FWAG, PSI's stock price has fluctuated between 6 and 8 cents per share for the entire month of May and into June. *See* Baudler Decl., Exs. 17, 18. While it is literally true that on May 31, the stock price "fell" from 6 cents to 3 cents, apparently in response to a large volume of trading that day, the price returned to 6 cents *the next day*, and was 7 cents as of the time of the filing of FWAG's opposition. *Id.* Thus, PSI's implied claim that its stock price was ravaged by defendants' actions is false.

PSI's stock price has fallen steadily – and precipitously – from $0.40 on January 16, 2007 to $0.07 on June 6, 2007, which has happened independently of any of the supposedly recent actions taken by defendants, and, as FWAG argues, is in fact the result of an "acquisition spree" by PSI through which PSI has been issuing new stock in exchange for ownership of other companies, thereby drastically diluting the value of its stock. PSI provides no basis to conclude that any stock sales by anyone other than PSI is damaging PSI.

In fact, it appears that the present motion is simply a tactical maneuver by PSI to attempt to gain leverage over FWAG in the state court proceedings. If it had succeeded in enjoining FWAG

11

from selling PSI stock, it would have obtained a value bargaining chip against FWAG's demands that it release the stock that it claims PSI is contractually obligated to release. As such, it appears that FWAG will be harmed if a TRO is issued. Additionally, defendant Welzcek states that a large portion of his net worth consists of PSI stock and that he sells off approximately $5,000 a month of the stock in order to support his family. Welzcek Decl. ¶ 6. Therefore it appears that irreparable – and potentially serious – harm may result to Welzcek if a TRO enjoining the sale of the stock is issued.

## CONCLUSION

PSI has not demonstrated a likelihood of success on the merits or, the possibility of irreparable harm, or any need for the immediate relief provided by a TRO, as required by Rule 65(b). Accordingly, the plaintiffs' Ex Parte Motion for a Temporary Restraining Order [Docket No. 6] is DENIED.

PSI's motion did not specifically request that, in the event the Court denies the TRO, the Court construe this motion as one for a preliminary injunction. If PSI wishes the Court to so construe it, it may notify the Court and the preliminary injunction may be noticed for hearing.

IT IS SO ORDERED.

Dated: June 8, 2007

For Saundra Brown Armstrong
United States District Judge

12